MICHAEL J. GARCIA
United States Attorney
Southern District of New York
Attorney for United States Department of Education
By: LAWRENCE H. FOGELMAN (LF-9700)
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2719

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | CHAPTER 7 |
| RENEE MARIE FRENCH, | Bankruptcy Case No. 04-40365 |
| Debtor | |

RENEE FRENCH,

                              Adversary Proceeding

         Plaintiff,              No. 04-03060

      v.

NCO FINANCIAL SYSTEMS, INC.

         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT UNITED STATES DEPARTMENT OF EDUCATION'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Proposed Findings of Facts

### A. Plaintiff's Educational Background

1. Plaintiff, Renee Marie French, is thirty-eight years old, single, and does not have

any medical condition that impairs her ability to work. See Declaration of Lawrence H.

Fogelman, dated November 22, 2005 ("Fogelman Decl."), Ex. 1 (Excerpts from Deposition of

1

Renee Marie French ("Dep."), at 7, lines 4-10; Dep. at p. 8, lines 19-25; Dep. at p. 9, lines 1-13; Dep at 12, lines 7-10; Dep. at 13, lines 1-3; Dep. at p. 14, lines 1-25.

2.      Plaintiff has one dependent, a daughter named Jaya French, who was born on September 22, 2001. Dep. at p. 15, lines 11-23. Plaintiff's daughter does not have any medical conditions. Dep. at p. 16, lines 2-6.

3.      Plaintiff graduated from high school in 1983. Dep. at p. 94, lines 19-20.

4.      From the spring of 1985 until the spring of 1986, plaintiff attended the Junior College of Albany, currently known as The Sage College. Dep. at p. 96, lines 20-25; Dep. at p. 97, lines 1, 9-11. Plaintiff did not obtain a degree from this college. Dep. at p. 97, lines 12-13.

5.      From the fall of 1986 until the spring of 1988, plaintiff attended the State University of New York at Albany ("SUNY Albany"). Dep. at p. 100, lines 6-7. Plaintiff withdrew from SUNY Albany in May of 1988 without having obtained a degree. Dep. at p. 101, lines 3-5; Dep. at p. 102, lines 10-12.

6.      Following her withdrawal from SUNY Albany until the winter of 1989-1990, plaintiff worked at a restaurant called the Steuben Athletic Club. Dep. p. 102, lines 7-15, 23-25.

7.      In the spring of 1990, plaintiff attended The New School. Dep. at p. 103, lines 20-21. Plaintiff stopped attending the New School without completing a semester or obtaining a degree. Dep. at p. 104, lines 1-3; Dep. at p. 110, lines 16-25.

**B.      Plaintiff's Work History**

8.      Since leaving The New School in 1990, plaintiff has held jobs in several fields, with salaries as high as $52,000 per year.

2

9. Plaintiff has held jobs in acting and freelance film. In 1992, plaintiff acted in the film "Coffee and Cigarettes," for which she was paid $500 for one day of filming. Dep. at p. 117, lines 4-16.

10. "Coffee and Cigarettes" was released in 2004. In 2004, plaintiff was paid royalties in the amount of $6,924, equal to one percent of the film's profits. Dep. at p. 118, lines 1-11.

11. In 2005, plaintiff received additional royalties in the amount of $2,949. Dep. at p. 118, lines 12-18.

12. Plaintiff continues to earn royalties on "Coffee and Cigarettes" at equal to one percent of the film's profits. Dep. at p. 117, lines 22-25; Dep. at p. 118, lines 1-3.

13. Plaintiff has held at least three jobs as a waitress or bartender, earning as much as $500 per week. Dep. at p. 120, lines 9-25; Dep. at p. 121, lines 1-2; Dep. at p. 122, lines 8-25; Dep. at p. 123, lines 1-2; Dep. at p. 131, lines 11-24.

14. Plaintiff has held several jobs in interior wall finishing as a freelance contractor. Dep. at p. 128, lines 9-24; Dep. at p. 129, lines 8-21; Dep. at p. 141, lines 1-10. Plaintiff earned as much as $1000 per week for her interior finishing work. Dep. at p. 128, line 25; Dep. at p. 129, lines 1-5, 15-16.

15. Plaintiff's most extensive work experience is in restaurant management. From 1993 until 1994, plaintiff worked as a restaurant manager at Bar 6, and at B-Bar & Grill, both in Manhattan. Dep. at p. 132, lines 13-23; Dep. at p. 133, lines 19-24; Dep. at p. 134, lines 13-16. Plaintiff earned approximately $1000 per week for this work. Dep. at p. 133, lines 9-12; Dep. at p. 134, lines 8-10.

16. In 1998, plaintiff returned to work at B-Bar & Grill as a restaurant manager. Dep. at p. 147, lines 1-3. Plaintiff earned approximately $600 per week. Dep. at p. 147, lines 4-7.

17. From 1998 until December 2000, plaintiff worked as the night manager for a restaurant, bar, and music venue called Joe's Public, which was owned by the owners of B-Bar & Grill. Dep. at p. 148, lines 1-3, 7-11, 16-25; Dep. at p. 149, line 1, 23-24. Plaintiff worked five days each week and earned a salary of $52,000 per year. Dep. at p. 149, lines 2-3; Dep. at p. 150, lines 9-12.

18. From August 2003 until April 2004, plaintiff worked full time at Largato Productions, a production company for an artist named John Lurie, as a personal assistant to Mr. Lurie. Dep. at p. 24, lines 6-9, 12-17, 20-25; Dep. at p. 25, lines 1-14; Dep. at p. 158, lines 21-25; Dep. at p. 159, lines 1-8; Dep. at p. 160, lines 17-18. Plaintiff earned a salary of $3,500 per month. Dep. at p. 25, lines 17-18; Dep. at p. 159, lines 9-10.

19. Plaintiff was fired from her job in April 2004, but received one month of severance pay. Dep. at p. 26, lines 13-19. Dep. at p. 160, lines 19-24.

C. **Current Employment Status**

20. From April 2004 until the present, plaintiff has not held a job. Dep. at p. 29, lines 7-9.

21. From July 2004 until January 2005, plaintiff received unemployment benefits in the amount of $269 per week. Dep. at p. 67, lines 6-22.

22. After losing her job in April 2004, plaintiff did not look for another job in New York City. Dep. at p. 26, lines 20-22; Dep. at p. 160, line 25; Dep. at p. 161, lines 1-2.

23. In May 2004, plaintiff moved from New York City to Cahoes, New York. Dep. at p. 20, lines 19-22.

4

24. From May 2004 until November 2004, plaintiff applied to twenty (20) jobs at restaurants by mailing resumes. Dep. at p. 29, lines 10-16; Dep. at p. 32, lines 17-21. Plaintiff did not interview for any jobs during that time. Dep. at p. 29, 17-18. plaintiff testified that she applied for approximately 20 additional jobs that were not restaurants during this time frame, but that she could not recall the nature of these jobs. Dep. at p. 34, lines 13-21. Plaintiff's mother passed away in December 2004. Dep. at p. 23, 35.

25. Plaintiff has not applied for a job since November 2004. Dep. at p. 32, lines 14-16.

**D. Nursing School**

26. In the fall of 2005, plaintiff enrolled in a two-year associate program for nursing at Memorial Hospital. Dep. at p. 35, lines 15-22; Dep. at p. 36, lines 5-8.

27. Tuition for the nursing program is approximately $2,000 per semester. Dep. p. 36, lines 12-13.

28. Plaintiff expects to live with her stepfather while attending nursing school, and anticipates that her stepfather will pay the entire tuition. Dep. at p. 36, lines 14-21; Dep. at p. 59, lines 9-12.

29. Plaintiff expects that her current financial arrangement will remain in place while she completes her schooling. Dep. at p. 59, lines 17-20.

30. Following nursing school, Plaintiff expects to look for a job as a nurse. Dep. at p. 36, line 25; Dep. at p. 37, lines 1-2. She expects to earn a starting salary of approximately $35,000 per year. Dep. at p. 37, lines 10-13.

31. According to the Bureau of Labor Statistics, the median annual wage of registered nurses in the United States in 2004 was $53,640, and the mean annual wage of a registered nurse

was $55,680.  See Bureau of Labor Statistics Occupational Outlook Handbook ("BLS
Handbook") (available at http://www.bls.gov/oes/current/oes291111.htm).

32.     The BLS lists New York as the fifth-highest paying state in the country for
registered nurses.  Id.  In 2004, the annual mean wage for registered nurses in New York was
$62,140.  Id.

33.     In the Albany area, where plaintiff currently lives, approximately 8,730 registered
nurses are employed at a mean annual wage of $50,560.  See November 2004 Metropolitan Area
Occupational Employment and Wage Estimates: Albany-Schenectady-Troy, NY MSA (available
at http://www.bls.gov/oes/current/oes_0160.htm).  The mean annual wage for all occupations in
the Albany area is approximately $38,430.  Id.

34.     In New York City, where plaintiff has often lived in the past, approximately
82,540 registered nurses are employed at a mean annual wage of $70,280.  See November 2004
Metropolitan Area Occupational Employment and Wage Estimates: New York, NY MSA
(available at http://www.bls.gov/oes/current/oes_5600.htm).  The mean annual wage for all
occupations in New York City is approximately $49,670.  Id.

35.     According to an article in the Occupational Outlook Quarterly, a publication of
the BLS, health care is "one of the largest—and most lucrative—career fields for those with an
associate degree."  Olivia Crosby, Associate Degree, 46(4) Occupational Outlook Quarterly 2, 6,
(available at http://www.bls.gov/opub/ooq/2002/winter/art01.pdf).

36.     Individuals with an associate degree compose more than half of all registered
nurses.  Id.

## E.    Plaintiff's Expenses

37.    In her second amended complaint, plaintiff claims to have the following monthly expenses: $80.00 for telephone, $510.00 for part-time daycare, $300.00 for food, $50.00 for "medical," $100.00 for transportation, and $120.00 for car insurance. Plaintiff's Second Amended Complaint ("Compl.") at ¶ 17. According to the complaint, plaintiff incurs a total of $1,160.00 in monthly expenses. Compl. at ¶ 17.

38.    In fact, all of the expenses listed in the complaint are paid for by plaintiff's stepfather, not by the plaintiff herself.

39.    Plaintiff currently lives with her stepfather. Dep. at 23, lines 9-21.

40.    Plaintiff's stepfather earns between $70,000 and $100,000 per year. Dep. at p. 43, lines 1-4. He is 62 years old. Dep. at p. 69, lines 7-8.

41.    Plaintiff's stepfather provides plaintiff with $270 each week for weekly expenses. Dep at p. 42, lines 15-25; Dep. at p. 45, lines 7-10.

42.    Plaintiff has expenses of $300 per month on a Volkswagen Jetta, which are paid in their entirety by her stepfather. Dep. at p. 41, lines 19-25; Dep. at p. 42, line 1.

43.    Plaintiff incurs expenses of $715 per month for her daughter's daycare, which are paid for in full by plaintiff's stepfather. Dep. at p. 39, lines 12-14; Dep. at p. 54, lines 4-11.

44.    In the past year, Plaintiff incurred approximately $1,200 in expenses for dental care. Dep. at p. 48, lines 1-11. Plaintiff's stepfather paid these expenses in their entirety. Dep. at p. 48, lines 12-17.

45.    Plaintiff's stepfather pays for all of Plaintiff's expenses, including Jaya's daycare, Con Ed bills, maintenance of the house, electricity, telephone bills, and cellular phone bills. Dep. at p. 43, lines 14-25; Dep. at p. 44, lines 1-4; Dep. at p. 45, lines 18-23.

7

46. Plaintiff's stepfather has also given plaintiff a credit card for her personal use. Dep. at p. 48, lines 15-22.

47. Plaintiff expects that her stepfather will cover all of her expenses until she has graduated from nursing school and becomes employed. Dep. at p. 68, lines 12-17.

48. Plaintiff expects that it will also be possible for her to continue living with her stepfather if she wishes after she has finished her nursing program. Dep. at p. 68, line 25; Dep. at p. 69, lines 1-6. Her stepfather has offered plaintiff the opportunity to continue living with him for as long as she would like. Dep. at p. 43, lines 5-7.

49. Plaintiff has not sought to amend her complaint to reflect the fact that she does not have any out-of-pocket expenses.

50. Following this bankruptcy proceeding, plaintiff does not expect to have any debts if her student loans are discharged. Dep. at p. 68, lines 9-11.

## F.    Support from Jaya's Father

51. The father of plaintiff's daughter Jaya, Rafael Garcia, lives in Washington Heights in New York City, on West 185th Street. Dep. at p. 63, lines 3-7.

52. Plaintiff stopped communicating regularly with Mr. Garcia in February of 2001 while she was pregnant with Jaya. Dep. at p. 64, lines 1-15. She last spoke to Mr. Garcia in December of 2001. Dep. at p. 64, lines 19-24; Dep. at p. 65, lines 18-20.

53. Plaintiff does not receive any money from Mr. Garcia in child support. Dep. at p. 65, lines 9-11. She has never asked Mr. Garcia for money to support Jaya, nor has she otherwise sought child support from him. Dep. at p. 65, lines 12-14; Dep. at p. 66, lines 9-11.

## G. The Student Loans

54. Prior to taking out the consolidated loan at issue in this case in 1999, plaintiff had taken out loans dating back to 1985. Declaration of Lola Hom, dated November 16, 2005 ("Hom Decl."), ¶ 20, Ex. A.

55. The loan at issue in this proceeding is a William D. Ford Federal Direct Consolidation Loan. Hom Dec. ¶ 20. Plaintiff signed a promissory note for this loan on or around March 27, 1999. Hom Decl. ¶ 21; Hom Decl. Ex. B.

56. On or about April 19, 1999, pursuant to the terms of this promissory note, $19,621.79 was disbursed on the subsidized Direct Consolidation Loan, and $4,806.18 was disbursed on the unsubsidized Direct Consolidation Loan. Hom Decl. ¶¶ 21-22; Hom Decl. Ex. M.

57. As of November 9, 2005, plaintiff owed the Department a total of $32,844.85, composed of $26,047.02 in principal and $6,797.83 in unpaid accrued interest. Hom Decl. at ¶ 30.

## H. Plaintiff's Payments on the Loans

58. Plaintiff did not make any payments on her student loans prior to the time that she consolidated her loans. Dep. at p. 184, lines 12-17.

59. After she consolidated her loans in 1999, plaintiff made monthly payments on her loan until she was laid off from Joe's Public in December 2000. Dep. at p. 193, lines 1-8.

60. Records do reflect any payment made by plaintiff after January 2, 2001. Hom Decl. Ex. M.

61. Plaintiff defaulted on her loan obligation on or about June 25, 2003. Hom Decl. at ¶¶ 26-28.

9

62. Prior to defaulting on her loan, plaintiff made payments totaling $3,365.36. Hom Decl. at ¶ 27; Ex. M. Of that amount $3,346.89 was applied to interest and $18.47 was applied to principal. Hom Decl. at ¶ 27; Attachment M. Plaintiff has not made any payments on the loan since it defaulted. Hom Decl. at ¶ 28.

**I.    Relevant Deferments, Forbearances and Payment Plans**

63. The Department of Education in appropriate circumstances grants borrowers deferments or forbearances, which are two types of temporary postponements of payment. Hom Decl. at ¶ 24.

64. Pursuant to plaintiff's requests, Hom Decl. Ex. L, the Department of Education granted plaintiff unemployment deferments on her student loans from February 8, 2001 until September 19, 2001, and from February 27, 2002 until September 11, 2002. Hom Decl. at ¶ 23; Hom Decl. Ex. C.

65. Plaintiff also received an administrative forbearance due to her location after the attacks of September 11, 2001 for the period of October 28, 2001 to January 28, 2002. Hom Decl. at ¶ 23; Ex. C.

66. From towards the end of 2002 until plaintiff filed for bankruptcy in February 2004, plaintiff did not make any efforts to obtain a deferment on her loans. Dep. at p. 198, lines 11-14; Hom Decl. ¶ 24..

67. In addition, during that time period plaintiff did not make any attempts to obtain a forbearance on her loans. Dep. at p. 198, lines 15-17; Dep. at 204, lines 12-23; Hom Decl. ¶ 24; Ex. C.

68. From towards the end of 2002 until February 2004, plaintiff did not investigate whether she could change her payment option on the student loans. Dep. at p. 198, lines 18-21.

69. Plaintiff did not recall speaking with the Department of Education to explore any of the Department's repayment plans, including a standard repayment plan, extended repayment plan, graduated repayment plan, or income contingent repayment plan. Dep. at p. 203, lines 17-25; Dep. at p. 204, lines 1-23.

70. Plaintiff was throwing away the statements that she received from the Department of Education during this time period. Dep. at 200, lines 13-18.

71. Plaintiff does not recall contacting the Department of Education to determine whether she qualified for a deferment or forbearance, and stated that she "just avoided it." Dep. at p. 199, lines 4-19.

72. In fact, prior to her default on June 25, 2003, plaintiff had numerous deferment and forbearance options available to her. Hom Decl. at ¶ 24. Her potential options included an unemployment deferment (up to several months), an economic hardship deferment (up to three years), a general forbearance (up to three years), and others. Id.

73. Prior to declaring bankruptcy, plaintiff did not seek any type of administrative discharge of her student loan. Hom Decl. at ¶ 29.

## PROPOSED CONCLUSIONS OF LAW

## I.    PLAINTIFF IS NOT ENTITLED TO A DISCHARGE OF HER STUDENT LOANS

## A.    The Brunner Test for Undue Hardship

1. In general, a debtor who seeks to discharge her debts under the Bankruptcy Code cannot discharge her student loan debt. See Williams v. New York State Higher Educ. Serv. Corp. (In re Williams), 296 B.R. 298, 302 (S.D.N.Y. 2003).

2. Pursuant to 11 U.S.C. § 523(a)(8), however, a student loan can be discharged if the borrower proves that "excepting such debt from discharge under this paragraph will impose

11

an undue hardship on the debtor and the debtor's dependents." See 11 U.S.C. § 523(a)(8);
Thoms v. Educ. Credit Mgmt. Corp. (In re Thoms), 257 B.R. 144, 148 (Bankr. S.D.N.Y. 2001)
("the only situation that would allow a debtor to avoid the nondischargeability of a student loan
would be a showing that requiring payment of such loan would impose an 'undue hardship on
the debtor and the debtor's dependents.'").

3.      The statute does not define "undue hardship." As this Court explained, however,
"[b]ecause any debtor in bankruptcy usually has significant financial problems, a finding of
undue hardship will not be based simply on the debtor's difficulty in making payments." In re
Wiliams, 296 B.R. at 302. "Instead, the undue hardship must be truly severe." Id.; see also
Craig v. Pennsylvania Higher Educ. Assistance Agency, 64 B.R. 854, 857 (Bankr. W.D. Pa.
1986) ("To prove 'undue hardship,' one must be suffering from truly severe, and even uniquely
difficult circumstances."). Discharge for undue hardship "is reserved for extreme circumstances
where a debtor is living in poverty or near poverty with little possibility of supplemental
income." In re Williams, 296 B.R. at 303.

4.      In Brunner v. New York State Higher Educ. Services Corp., 831 F.2d 395 (2d
Cir.1987), the Second Circuit established a three-part test for evaluating claims of undue
hardship. To demonstrate undue hardship, the debtor must prove each of three elements:

> (1) that the debtor cannot maintain, based on current income and expenses, a
> "minimal" standard of living for herself and her dependents if forced to repay the
> loans;
> (2) that additional circumstances exist indicating that this state of affairs is likely
> to persist for a significant portion of the repayment period of the student loans;
> and
> (3) that the debtor has made good faith efforts to repay the loans.

Id. at 396.

12

5.    In order to qualify for discharge, all three prongs must be satisfied. "'If one of the requirements of the Brunner test is not met, the bankruptcy court's inquiry must end there, with a finding of no dischargeability.'" In re Williams, 296 B.R. at 302 (quoting Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d. Cir. 1995); see also Bolen v. Sallie Mae Servicing Corp., 2003 WL 22327201, at *2 (D. Vt. Oct. 8, 2003) ("If borrower cannot satisfy each and every prong of the Brunner test, he is not entitled to a hardship discharge.") In re Thoms, 257 B.R. at 148 (all three prongs of Brunner test must be satisfied to entitle claimant to hardship discharge); In re Lehman, 226 B.R. 805, 808 (Bankr. D. Vt. 1998) (same).

6.    Moreover, the burden of proof to establish undue hardship rests on the debtor. See Pincus v. Graduate Loan Center (In re Pincus), 280 B.R. 303 (Bankr. S.D.N.Y. 2002); In re Thoms, 257 B.R. at 148; In re Fowler, 250 B.R. 828, 830 (Bankr. D. Conn. 2000); Elmore v. Massachusetts Higher Education Assistance Corp., 230 B.R. 22, 26 (Bankr. D. Conn. 1999).

**B.    Plaintiff Did Not Meet Her Burden of Proving Undue Hardship**

   **1.  Plaintiff Fails to Demonstrate that She Would Be Unable to Maintain a Minimal Standard of Living if Required to Repay Her Loan**

7.    In order to satisfy the first prong of the Brunner test, plaintiff must demonstrate that she cannot maintain a minimal standard of living if required to repay her student loans. Meeting this standard "'requires more than a showing of tight finances' … and is not met 'merely because repayment of the borrowed funds would require some major personal and financial sacrifices.'" Elmore, 230 B.R. at 26 (Bankr. D. Conn. 1999) (quoting Pennsylvania Higher Education Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3rd Cir. 1995)). "Implicit in the Court's analysis is a determination whether the Debtors have demonstrated that they have minimized their living expenses while maximizing their personal and professional

13

resources." In re Muto, 216 B.R. 325, 329-330. As a result, "a debtor who is unemployed cannot establish undue hardship where the debtor has the potential to find employment." In re Williams, 296 B.R. at 303; see also Brunner, 831 F.2d at 396-97.

8. In determining whether the borrower would be able to maintain a minimal standard of living if required to repay her student loans, a court will often (1) subtract the borrower's necessary monthly expenses from her monthly income, and then (2) determine whether enough money remains to cover the borrower's monthly loan payments. See, e.g., In re Thoms, 257 B.R. at 149 (denying dischargeability where, after accounting for debtor's necessary living expenses, debtor retained a surplus of $550 per month, which was enough to cover monthly loan payments under some payment plans); Long v. Educational Credit Management Corp. (In re Long), 292 B.R. 635, 638-39 (BAP 8th Cir. 2003) (finding no "undue hardship" where debtor's monthly income of $1,166.66 exceeded her reasonably necessary monthly expenses of $830 to $1,105. The surplus of at least $61.66 was sufficient to cover plaintiff's $54 monthly payment on her student loans.).

9. According to her second amended complaint, plaintiff claims to incur monthly expenses of $80 for telephone, $510 for part-time daycare, $300 for food, $50 for "medical," $100 for transportation, and $120 for car insurance, for a total of $1,160 monthly. Compl. at ¶ 17.

10. Because plaintiff and her daughter are currently being supported by plaintiff's stepfather, however, plaintiff herself has no necessary monthly expenses.

11. Since plaintiff's educational loan is currently in default, plaintiff is ineligible for the repayment options available to borrowers, such as the income contingent repayment plan. See Hom Decl. at ¶ 17.

14

12.     Nevertheless, plaintiff has the option to have the loan rehabilitated and recalled from default by making "twelve reasonable and affordable payments." Id. The amount of a reasonable and affordable payment is "determined on a case by case basis upon review of each individual borrower's financial circumstances," and may, depending on the circumstances, be even as low as $5 per month. Id.

13.     Once plaintiff's loans were rehabilitated, she would be eligible for the income contingent repayment plan. Hom Decl. at ¶ 17.

14.     Under the income contingent repayment plan, with an adjusted gross income of zero, plaintiff's initial monthly payments on her loan would also be zero. Hom Decl. at ¶ 33; Ex. Q (Repayment Plan Detail).

15.     If plaintiff were to rehabilitate her loan, she would also then be eligible for an in-school deferment of her loan, during which time no payments would be required. Hom Decl. at ¶ 34.

16.     Plaintiff claims that, when she graduates from nursing school, she expects to earn a starting salary of approximately $35,000 per year. Dep. at p. 37, lines 10-13. Subtracting taxes of 25%, plaintiff's monthly income would be $2,187.50. Assuming plaintiff's monthly expenses of $1,160 as stated in her amended complaint are accurate, plaintiff would have a surplus each month of $1027.50. Under the income contingent payment plan, an individual with an adjusted gross income of $35,000 would have monthly payments of $319.55. See Hom Decl. at ¶ 33. Accordingly, after paying for her student loans, plaintiff would still net $700 over expenses per month.

17.    Accordingly, plaintiff fails to meet her burden under Brunner of establishing that she would be unable to maintain a minimal standard of living if required to repay her loan. Thus, plaintiff has failed to establish the first prong of the Brunner test.

## 2. Plaintiff Fails to Demonstrate Additional Circumstances Indicating that Her Financial Difficulties are Likely to Persist

18.    In order to satisfy the second prong of the Brunner test, plaintiff must show that additional circumstances exist indicating that the inability to maintain a minimal standard of living is likely to persist for a significant portion of the repayment period. See Brunner, 831 F.2d at 395; see also In re Brisco, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981) ("dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment"); In re Lehman, 226 B.R. at 808 (same). This prong focuses on the Congressional intent behind Section 523(a)(8) "to make the discharge of student loans much more difficult than that of other nonexcepted debt." Brunner, 831 F.2d at 396. "Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'" Id.

19.    In Brunner, the court set out some examples of what would constitute "additional circumstances." Id. at 396-97. Among them were whether the debtor is disabled, elderly, or has any dependents. Id. at 396. The court also considered whether "evidence was presented indicating a total foreclosure of job prospects in [the debtor's] area of training." Id. at 396-97; see also In re Thoms, 257 B.R. at 149 ("An example of an additional circumstance … would be if the debtor experienced an illness, developed a disability, or became responsible for a large number of dependents after receiving the loan.").

20.     Plaintiff is thirty-eight years old, in good health, and does not have a medical condition that impairs her ability to work. Dep. at 7, lines 4-10; Dep. at p 8, lines 19-25; Dep. at p. 9, lines 1-13; Dep. at p. 12, lines 7-10; Dep. at 13, lines 1-3; Dep. at p. 14, lines 1-25.

21.     Plaintiff's good health weighs heavily against a finding of "undue hardship," because it means that she is physically able to find and maintain an income through work. See In re Porrazzo, 307 B.R. 345, 347 (Bankr. D. Conn. 2004) ("Following Brunner, courts in this circuit have routinely noted the absence of a disability as a factor for denying a debtor's attempt to discharge loans."); contrast In re Doherty, 219 B.R. 665, 667 (Bankr. W.D.N.Y. 1998) (finding "hopelessness" where a debtor's incurable injury was the cause of his inability to repay loans).

22.     Plaintiff has one dependent, a daughter who was born on September 22, 2001. Dep. at p. 15, lines 11-23. Plaintiff's daughter does not have any medical conditions. Dep. at p. 16, lines 2-6. Indeed, plaintiff does not struggle to provide for her daughter. In spite of the fact that plaintiff is unemployed, she can nevertheless afford to send her daughter to daycare for several days each week. Compl. at ¶ 17; Dep. at p. 39, lines 7-14. This is not a case where the debtor is forced to spend most of the funds available to her to support her dependent. See In re Doe, 325 B.R. 69, 79-80 (Bankr. S.D.N.Y. 2005) (Gropper, J.) (debtor succeeded in establishing "undue hardship" where the "majority of the Debtor's 'discretionary' spending [was] for her sick, aged mother," whom she validly claimed as her dependent).

23.     In addition, plaintiff has not submitted any evidence "indicating a total foreclosure of job prospects in [her] area of training." Brunner, 831 F.2d at 396-97. The no more than 20 resumes that plaintiff claims to have merely mailed to restaurants, and approximately 20 other applications for jobs she cannot even remember, do not constitute the

17

kind of diligent job search required by the Brunner test. See In re Archibald, 280 B.R. 222, 227 (Bankr. S.D.Ind. 2002) (by submitting only four to ten resumes and making some informal job inquiries, debtor showed that she was not determined to maximize her income); In re Dolph, 215 B.R. 832 (BAP 6th Cir. 1998) (although debtor sent out over 200 resumes, he failed to demonstrate that his state of affairs was likely to persist because he had not conducted an efficient job search); In re Connor, 83 B.R. 440 (Bankr. E.D. Mich. 1988) (Debtor who applied for approximately 200 to 300 jobs is nevertheless ineligible for discharge because, being educated and in good health, she is obligated "to keep trying to find employment of whatever kind"); but see In re Doe, 325 B.R. at 72 ("undue hardship" found where debtor consulted more than 100 recruiters and sent more than 3000 resumes in her effort to find a permanent job.).

24.     Plaintiff has not provided any other evidence indicating that her job prospects in the areas of restaurant management have been foreclosed. See In re Muto, 216 B.R. 325, 330-31 (Bankr. N.D.N.Y. 1996) (debtor's failure to provide the court with any concrete evidence of his efforts to obtain employment demonstrated that his past financial problems were unlikely to persist over time).

25.     Plaintiff has also failed to seek jobs in her other areas of training or experience, such as interior wall finishing and film. See In re Kraft, 161 B.R. 82 (Bankr. W.D.N.Y. 1993) (debtor failed to search diligently for a job because she looked for positions only in one field).

26.     Finally, plaintiff's attendance at nursing school indicates that her current conditions are likely to improve. Even assuming plaintiff's modest estimate to be accurate, plaintiff can expect to earn a starting salary as a nurse of approximately $35,000 per year once she completes her two-year associate degree program. Dep. at p. 37, lines 10-13. Plaintiff has

18

also stated that additional opportunities for advancement exist with further education. Dep. at p. 37, lines 14-19.

27. An income of $35,000 is sufficient to support a family of two to an extent to preclude a finding of "undue hardship." See Harris v. Pennsylvania Higher Education Assistance Agency (In re Harris), 103 B.R. 79 (Bankr. W.D.N.Y. 1989) ("annual income of over $31,000 per year [was] an adequate income for a family of one adult and four children in the Hornell, New York area," such as to preclude a finding of undue hardship).

28. For all of these reasons, plaintiff fails to demonstrate additional circumstances indicating that her financial difficulties are likely to persist.

29. Accordingly, plaintiff has failed to satisfy the second prong of the Brunner test.

### 3. Plaintiff Has Failed to Make a Good Faith Effort to Repay Her Loans

30. A plaintiff's good faith attempt at full repayment of her student loan is "'measured by his or her efforts to obtain employment, maximize income and minimize expenses' … and to undertake all other reasonable efforts to ensure repayment." Stein v. Bank of New England (In re Stein), 218 B.R. 281, 288 (Bankr. D. Conn. 1988) (quoting In re Roberson, 999 F.2d 1132, 1136 (7th Cir. 1993). In addition, to establish good faith, the debtor must show that her inability to pay does not "stem from the debtor's willful conduct or the debtor's neglect. Rather, it must result from factors beyond the debtor's reasonable control." In re Thoms, 257 B.R. at 149; see also In re Elmore, 230 B.R. at 27. In this case, plaintiff's failure to maximize her income by seeking employment, her failure to explore and take advantage of payment options available to her, and her failure to seek child support from her daughter's father, are each independently sufficient reasons to find that she has not made a good faith effort to repay her loans.

19

31. Courts consistently deny attempts to discharge student loans where the debtor has failed to engage in a diligent job search as an attempt to maximize his or her income. See, e.g., In re Muto, 216 B.R. at 330-31; In re Brightful, 267 F.3d at 329 n.4; In re Archibald, 280 B.R. at 227.

32. In this case, plaintiff has failed to engage in a diligent job search. She claims to have applied to no more than twenty jobs at restaurants, all by mail, and has interviewed for none of them. She cannot even recall the nature of the additional 20 jobs for which she claims to have applied. She has also failed to seek employment in other fields where she has experience, such as interior wall finishing and film.

33. In addition to looking at a debtor's attempts to seek employment in determining whether a debtor has made a good faith effort to repay her student loans, courts also look to whether the debtor has sought "alternative remedies to discharge, such as deferment of payment" or forbearances. Pincus v. Graduate Loan Center (In re Pincus), 280 B.R. 303, 316 (Bankr. S.D.N.Y. 2002). Courts will also decline to find good faith where the debtor has failed to contact the Department of Education to arrange a payment plan, or has failed or refused to explore other payment options. See In re Doe, 325 B.R. at 80 ("Courts generally treat refusal to enter an income contingent repayment plan as some evidence of bad faith."); In re Thoms, 257 B.R. at 149 (finding that third prong of Brunner test was not satisfied where debtor "failed to avail herself of the other payment options" offered by the Department of Education, such as the "graduated[,] extended or income contingent repayment plans"); In re Harris, 103 B.R. at 82 (third prong of Brunner test not satisfied where debtor "never attempted to negotiate a more favorable repayment schedule"); Markley v. Educ. Credit Mgmt. Corp (In re Markley), 236 B.R.

242, 248 (Bankr. N.D.Ohio 1999) (in applying the third prong of the Brunner test, "[factors to be considered include … the debtor's attempt to negotiate with the lender").

34. From towards the end of 2002, when her most recent unemployment deferment ended, until when plaintiff filed for bankruptcy in February 2004, plaintiff did not make any efforts to obtain a deferment or a forbearance on her loans. Dep. at p. 198, lines 11-17; Hom Decl. Ex. C. In addition plaintiff did not contact the Department of Education to explore any payment options. Dep. at p. 198, lines 18-21. Plaintiff was throwing away the statements that she received from the Department of Education during this time period. Dep. at 200, lines 13-18. Further, prior to this adversary proceeding, plaintiff claims never to have heard of any of the payment plans available to borrowers of student loans. Dep. at p. 203, lines 17-25; Dep. at p. 204, lines 1-11. Plaintiff's failure to seek any of these alternatives to repayment precludes a finding that she made a good faith attempt to repay her loans.

35. This court has held that, where the debtor has failed to seek child support from her child's father, that fact alone precludes a finding that the debtor has sought to maximize her income as required by the "good faith" prong of the Brunner test. See In re Thoms, 257 B.R. at 150 ("the Debtor has not entirely maximized her income because she has not adequately explained her failure to seek child support for her five-year old from the child's father."); see also Betz v. New York State Higher Educ. Serv. Corp. (In re Betz), 31 B.R. 565, 566-67 (Bankr. W.D.N.Y. 1983) (unemployed single mother failed to establish "undue hardship" where she "failed to demonstrate a good faith effort to obtain employment and child support in an attempt to repay her educational loan.")

36. Plaintiff claims that she has not sought child support because her daughter's father, Rafael Garcia, does not make any money. She also admits, however, that the last time she

21

spoke to the father was in December 2001. Dep. at p. 64, lines 19-24; Dep. at p. 65, lines 18-20. She has never asked Mr. Garcia for money to support Jaya, nor has she otherwise sought child support from him. Dep. at p. 65, lines 12-14; Dep. at p. 66, lines 9-11.

37. Accordingly, plaintiff has failed to satisfy the third prong of the Brunner test.

## C. Plaintiff Cannot Establish "Undue Hardship" by the Sole Fact that She Is A Single Mother

38. While many of the debtors that are able to discharge their student loans are single mothers, that fact, standing alone, is not sufficient to establish "undue hardship" as required by Brunner.

39. In Harris v. Pennsylvania Higher Education Assistance Agency (In re Harris), 103 B.R. 79 (Bankr. W.D.N.Y. 1989), the debtor was a single mother of four children. The court found that her "annual income of over $31,000 per year [was] an adequate income for a family of one adult and four children in the Hornell, New York area, and that the debtor [had] failed to show that her income would be insufficient to maintain a minimum standard of living for herself and her dependents if she were required to pay off her student loans." Id. at 81; see also Ulm v. Educ. Credit Mgmt. Corp., 304 B.R. 915, 923 (S.D. Georgia 2004) (35-year-old single mother did not qualify for "undue hardship" discharge where, having recently obtained stable employment, debtor failed to show that her poor financial situation was likely to persist); In re Long, 292 B.R. at 638-39 (39-year-old single mother did not qualify for "undue hardship" discharge where annual income of $14,000 was sufficient to cover both necessary expenses and monthly loan payments); Wessels v. Educ. Credit Mgmt. Corp., 271 B.R. 313, 315-16 (W.D. Wisconsin 2002) (single mother of two children with training as a licensed practical nurse failed to qualify for "undue hardship" discharge given lack of evidence that there were not full-time jobs available in the field for which she was qualified).

22

40. By contrast, in the cases where a single mother was able to establish "undue hardship," her financial situation was exceptionally severe, her prospects for the future were bleak, and she had nevertheless made a good faith attempt to pay back her loans. See, e.g., In re Stewart-Johnson, 319 B.R. 192 (Bankr. D. Ariz. 2005) (single mother of two was entitled to "undue hardship" discharge where, despite living very frugally, debtor had less than $85 per month in disposable income and her situation was not likely to improve); In re Carter, 295 B.R. 555, 560-62 (Bankr. W.D. Penn. 2003) (single mother of two qualified for "undue hardship" discharge where debtor lived far below the poverty line and nevertheless had "made heroic good faith efforts at repayment"); In re Brown, 234 B.R. 104 (Bankr. W.D. Missouri 1999) (single mother of three was entitled to "undue hardship" discharge where debtor earned wage just above the poverty level and was able to support her child only because she lived in government subsidized housing, received public assistance, and kept her living expenses "abnormally low"); In re Coulson, 253 B.R. 174 (W.D. N. Carolina) (single mother entitled to "undue hardship" discharge where despite having "done almost everything possible to maximize her income and minimize her expenses," and having made monthly payments even when "supporting at least two (and initially 4) dependent children by herself" on an annual salary of under $24,000, debtor's financial situation remained hopeless); Windland v. U.S. Dept. of Educ., 201 B.R. 178, 182-83 (Bankr. N.D. Ohio 1996) (single mother of two children entitled to "undue hardship" discharge where debtor's necessary expenses exceeded her monthly income of $1,318.61, requiring repayment of loans would cause debtor's children to suffer, and debtor's situation was unlikely to improve).

41. Plaintiff is fortunate enough not to be in such dire straights. She has marketable skills and has held jobs with salaries ranging as high as $52,000 per year; she has a promising future in health care once she completes her nursing degree; and she is in good health. For the foregoing reasons, plaintiff is not entitled to a discharge of her student loans.

Dated: New York, New York
       November 22, 2005

Respectfully Submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant United States
Department of Education

By:    /s/ **Lawrence H. Fogelman**
       LAWRENCE H. FOGELMAN (LF-9700)
       Assistant United States Attorney
       86 Chambers Street, 3rd Floor
       New York, New York 10007
       Tel: (212) 637-2719
       Fax: (212) 637-2730