<pre>
1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
2

3   --------------------------------------X
                                          :  04-40365 (ALG)
4   In re:                                :
                                          :  One Bowling Green
5       RENEE MARIE FRENCH,               :  New York, New York
                                          :
6                    Debtor.              :  November 28, 2005
    --------------------------------------X
7   FRENCH,                               :
                                          :
8                        Plaintiff,       :
                     v.                   :  Adv. No. 04-03060
9                                         :
    NCO FINANCIAL SYSTEMS, INC.,          :
10                                        :
                     Defendant.    :
11  --------------------------------------X

12                   TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ALLAN L. GROPPER
13           CHIEF UNITED STATES BANKRUPTCY JUDGE

14  APPEARANCES:

15  For the Plaintiff:       CARA D. EDWARDS, ESQ.
                             VINCENT J. ROLDAN, ESQ.
16                           DLA Piper, Rudnick, Gray, Cary
                             1251 Avenue of the Americas
17                           New York, NY 10020

18
    For the US Attorney:     LAWRENCE H. FOGELMAN, ESQ.
19                           DAVID S. JONES, ESQ.
                             US Department of Justice
20                           US Attorney's Office
                             86 Chambers Street
21                           New York, NY 10007

22
    Court Transcriber:       MARY GRECO
23                           TypeWrite Word Processing Service
                             356 Eltingville Boulevard
24                           Staten Island, New York 10312

25


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service
</pre>

I N D E X

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

WITNESSES

| Renee French | 17 | 116 | 154 | | |

| EXHIBITS | Marked | Received |
|---|---|---|

PLAINTIFF:

| 1 | Complaint | | 8 |
|---|---|---|---|
| 2 | Chapter 7 Petition | | 8 |
| 3 | Junior College of Albany Transcript | | 8 |
| 4 | SUNY Albany Transcript | | 8 |
| 5 | New School Transcript | | 8 |
| 6 | 1996-2004 Tax Returns | | 8 |
| 7 | Notice of Consolidated Loan | | 8 |
| 8 | Direct Consolidation Loan Verification Certificate. | | 8 |
| 9 | Cancelled Checks | | 8 |
| 10 | Payment History Sheet | | 8 |
| 11 | DOL Termination Letter | | 8 |
| 12 | Unemployment Deferment Request | | 8 |
| 13 | Borrower History and Activity Report | | 8 |
| 14 | Unemployment Deferment Request | | 8 |

## I N D E X
(Continued)

| EXHIBITS | | Marked | Received |
|---|---|---|---|
| **PLAINTIFF:** | | | |
| 15 | Unemployment Determination | | 8 |
| 16 | Paycheck Stubs and Letters for Movie | | 8 |
| 17 | Day Care Receipts | | 8 |
| 18 | Cell Phone Bill | | 8 |
| 19 | Résumé | | 8 |
| 20 | Acceptance Letter From Nursing School | | 8 |
| 21 | School Bill | | 8 |
| 22 | | | 8 |
| 23 | | | 8 |
| 24 | | | 8 |
| 25 | | | 8 |
| 26 | Day Care Statement | | 8 |
| 27 | 6/04 Letter From Day Care | | 8 |
| 28 | Day Care Invoice | | 8 |
| | | | |
| **GOVERNMENT:** | | | |
| 1 | | | 9 |
| 2 | | | 9 |
| 3 | | | 9 |

```
 1                                                               4

 2

 3                        I N D E X
                          (Continued)
 4
     EXHIBITS                                Marked   Received
 5
     GOVERNMENT:
 6     4                                                9

 7     5                                                9

 8     6    1996-2004 Tax Returns                        9

 9     7    Application and Promissory Note              9

10     8                                                9

11     9                                                9

12    10    Loan Payment Statement                       9

13    11                                                9

14    12    Citibank Checking Account Statements        152

15    13    Trustco Bank Statements                     152

16    14                                                9

17    15                                                9

18    16                                                9

19    17    Deposition Corrections                       9

20    18    Interrogatories and Document Requests        9

21    19                                                9

22    20                                                9

23    21    Résumé                                       9

24

25
```

| EXHIBITS | | Marked | Received |
| --- | --- | --- | --- |
| GOVERNMENT: | | | |
| 4 | | | 9 |
| 5 | | | 9 |
| 6 | 1996-2004 Tax Returns | | 9 |
| 7 | Application and Promissory Note | | 9 |
| 8 | | | 9 |
| 9 | | | 9 |
| 10 | Loan Payment Statement | | 9 |
| 11 | | | 9 |
| 12 | Citibank Checking Account Statements | | 152 |
| 13 | Trustco Bank Statements | | 152 |
| 14 | | | 9 |
| 15 | | | 9 |
| 16 | | | 9 |
| 17 | Deposition Corrections | | 9 |
| 18 | Interrogatories and Document Requests | | 9 |
| 19 | | | 9 |
| 20 | | | 9 |
| 21 | Résumé | | 9 |

1          THE COURT:  Please be seated.  May I have

2    appearances, please?  Good morning.

3          MS. EDWARDS:  Cara Edwards for plaintiff, Renee

4    French.

5          MR. ROLDAN:  Good morning, Your Honor.  Vincent

6    Roldan, DLA Piper, counsel to the plaintiff, Renee French.

7          THE COURT:  Good morning.

8          MR. FOGELMAN:  Good morning, Your Honor.  Lawrence

9    Fogelman from the US Attorney's office along with David Jones

10   from the US Attorney's office.  With the permission of the

11   Court, David Herman is an intern with our office from NYU.  May

12   he sit at counsel's table?

13         THE COURT:  Certainly.

14         MR. FOGELMAN:  Thank you.

15         THE COURT:  Certainly.

16         All right.  This is the trial in French v. NCO

17   Financial Systems, Inc.  Are you ready, Mr. Roldan?

18         MR. ROLDAN:  Yes, we are, Your Honor.  Counsel for

19   the defendant and I have gone over exhibits, Your Honor.  As a

20   preliminary matter we'd like to -- we have agreed on

21   substantial amounts of exhibits, of the admissibility of a

22   substantial amount of exhibits.

23         THE COURT:  All right.

24         MR. ROLDAN:  I think we'll consent to the offering of

25   these exhibits, certainly the exhibits --

1          THE COURT:  All right.  Okay.  Do you have them bound

2    or --

3          MR. ROLDAN:  Yes, Your Honor, they are bound and pre-

4    marked.

5          THE COURT:  All right.

6          MR. ROLDAN:  Your Honor, certain of the -- would Your

7    Honor like us to do pretrial motions on certain of the

8    exhibits?  The plaintiff has objections to some of the

9    defendant's exhibits.

10          THE COURT:  Why don't we -- now, we can do it two

11    ways.  We can do it as we go through.  I assume you're going to

12    put the plaintiff on the stand, or call your witnesses and we

13    can do it as we go through and decide on the admissibility of

14    an exhibit.  We can put in everything right now that's agreed

15    and then hold out simply the exhibits that are not agreed, and

16    then put them in as we hear the testimony or the other

17    evidence.

18          MR. FOGELMAN:  Your Honor, if I may, I think it might

19    be relatively straightforward to at least address certain of

20    these issues right up front.

21          THE COURT:  Sure.

22          MR. FOGELMAN:  Certain of the exhibits the plaintiff

23    has objected to are simply printouts from the Department of

24    Labor's web site which contains information about statistical

25    information about how much a registered nurse makes as a mean

1  in general, and then in Albany, and then in the New York area.

2  We think that the Court should be able to take judicial notice

3  of these documents as the plaintiff we believe will testify

4  that the income that she anticipates receiving after graduating

5  nursing school is less than the means in those areas.  So we'd

6  like the Court to take judicial notice of those statistical

7  exhibits.  Those are three of the exhibits that the plaintiff

8  has objected to.

9        THE COURT:  All right.  Well, why don't we deal with

10  those when we get to the Government's case.

11        MR. FOGELMAN:  Okay.

12        THE COURT:  Are those the only category of documents

13  that you objected to?

14        MS. EDWARDS:  No, they're not, Your Honor.  There are

15  two other exhibits.

16        THE COURT:  All right.

17        MS. EDWARDS:  Exhibits 12 and 13 that are bank

18  statements of the plaintiff's.  It is the plaintiff's position

19  that those exhibits not be admitted because they're irrelevant

20  because they deal with financial matters of the plaintiff that

21  occurred before she filed for bankruptcy and certainly before

22  this proceeding.  Specifically one deals with --

23        THE COURT:  Well, why don't we deal with those if the

24  Government tries to introduce them --

25        MS. EDWARDS:  Okay.

1          THE COURT:  -- I assume on cross examination.  Then
2  we'll take them up at that time.
3          What exhibits are agreed?  Why don't we just read
4  into the record the exhibits that are agreed, and if they're in
5  a book and you want to give them to me, fine, or you can give
6  them to me as we go through the testimony.
7          MR. ROLDAN:  Yes, Your Honor.  May I approach?
8          THE COURT:  Yes.
9          MR. ROLDAN:  Your Honor, I have both an original set
10  and original copies for Your Honor and the Government.
11          THE COURT:  All right.  Okay.  Why don't I just take
12  the -- all right, that's fine.  So these are the Government's
13  exhibits?
14          MR. FOGELMAN:  Yes, Your Honor, and there's an index
15  in the front with the caption --
16          THE COURT:  All right.
17          MR. FOGELMAN:  -- and the list of exhibits.
18          THE COURT:  I have Plaintiff's Exhibits 1 through --
19          MR. ROLDAN:  1 through 28, Your Honor.
20          THE COURT:  Through 28.  Are any of those objected
21  to?
22          MR. FOGELMAN:  No, Your Honor, the Government does
23  not object to those documents.
24          THE COURT:  All right.  We'll admit those.
25          (Petitioner's Exhibit Numbers 1-28 Received.)

1          THE COURT:  I assume that you'll put them in then

2   through the testimony.

3          MR. ROLDAN:  That's correct, Your Honor.

4          THE COURT:  All right.

5          MR. ROLDAN:  Would Your Honor like me to read a list

6   on the record?

7          THE COURT:  No, I have them.  I have a list of them.

8   We can read them.  I assume you'll use them as you go through

9   and put them in.  But if either party wishes to read them in,

10  we can certainly do that.

11         MR. FOGELMAN:  I see no need to read them but we

12  would like the plaintiff to state for the record which of the

13  Government's exhibits they object to so that the rest of them

14  would be admitted pending those --

15         THE COURT:  All right.  Okay.  Let's do that.  Yes.

16         MS. EDWARDS:  The exhibits that the plaintiff objects

17  to are numbers 12, 13, and 22 through 25.

18         THE COURT:  12, 13, 22 through 25 objected to.  The

19  others then can be admitted?

20         MS. EDWARDS:  That's correct, Your Honor.

21         THE COURT:  All right.  They'll be admitted then.

22     (Government's Exhibit Numbers 1-11 and 14-21, Received.)

23         MS. EDWARDS:  Thank you.

24         MR. FOGELMAN:  Your Honor, specifically just for the

25  record, the ones that they have objected to are statements from

1    Citibank as Exhibit 12; statements from Trustco Bank as Exhibit

2    13; Exhibit 22 is the US Department of Labor Bureau of

3    Statistics occupational employment and wages November 2004;

4    Exhibit 23 is US Department of Labor Bureau of Labor Statistics

5    November 2004 metropolitan area occupational employment and

6    wage estimates for Albany, Schenectady, Troy, New York; Exhibit

7    24 is the US Department of Labor Bureau of Labor Statistics

8    November 2004 metropolitan area occupational employment and

9    wage estimates for New York, New York.  Finally, 25, occupation

10   outlook quarterly, winter 2002 to 3, Associate Degree two years

11   to a career or a jump start to a Bachelor's Degree.

12             THE COURT:  All right.  Thank you.

13             MR. FOGELMAN:  Your Honor, if I may just clarify for

14   the record, then Exhibits 1 through 11 and 14 through 21 are

15   admitted as evidence?

16             THE COURT:  Correct.

17             Now, we'll also at some point deal with the

18   transcript of Ms. French's deposition which the Government

19   attached to its papers, but that's not admitted as a whole at

20   least at this time.

21             MR. FOGELMAN:  Your Honor, if I may?

22             THE COURT:  Yes.

23             MR. FOGELMAN:  One of our exhibits are the excerpts

24   from the transcript that we attached to the full declaration

25   which we submitted with our pretrial papers.  To the extent

1   that we need to rely on other pages from the deposition

2   transcript perhaps for impeachment, we do have full copies of

3   the deposition transcript with us this morning.

4           THE COURT:  All right.  Well, as to the excerpts, if

5   the plaintiff has no objection to those excerpts going in, the

6   Government has the right to use them for any purpose.  The only

7   caveat I had is that the defendant would have a right to object

8   to the admissibility of any particular part on whatever ground.

9   But if there's no objection, then I'll take that in and it's in

10  and the Government of course can use the transcript for

11  impeachment purposes if it wishes in connection with its cross

12  examination, but that's another issue.

13          MR. FOGELMAN:  Your Honor, if I may?

14          THE COURT:  Yes.

15          MR. FOGELMAN:  One last matter.  We also submitted a

16  declaration of Lola Hahn.

17          THE COURT:  Yes.

18          MR. FOGELMAN:  It was agreed to by the parties that

19  that would substitute for Ms. Hahn's appearing today --

20          THE COURT:  Yes.

21          MR. FOGELMAN:  -- to present testimony.  Just for the

22  record, we'd like formally move that declaration which has been

23  filed formally into evidence, and I have an additional copy if

24  it would be helpful for Your Honor.

25          THE COURT:  Well, I have a copy.  Mr. Roldan?

1    MR. ROLDAN:  I have a copy, Your Honor.

2    THE COURT:  All right.  Then there's no objection.

3    MR. ROLDAN:  No objection.

4    THE COURT:  Then we'll admit that for part of the

5  Government's case.

6    MR. FOGELMAN:  Thank you, Your Honor.

7    THE COURT:  And the exhibits attached to it.

8    MR. FOGELMAN:  Yes.  Thank you, Your Honor.

9    THE COURT:  All right.  Mr. Roldan, I have the

10 Government's proposed findings and conclusions.  I stated on

11 the telephone last week that I would give the plaintiff an

12 opportunity to put in proposed findings and conclusions if she

13 wanted to after this hearing, and obviously the Government can

14 revise its findings and conclusions to the extent it deems that

15 appropriate.

16    So, you're welcome to start.  You can make an opening

17 statement if you wish, but you need not.  I'll certainly wait

18 to decide this until I get a copy of the plaintiff's proposed

19 findings and conclusions.

20    MR. ROLDAN:  Yes, Your Honor.  Might I begin?

21    Your Honor, this is a case about a woman who has done

22 her best to fulfill her financial obligations.  Renee French is

23 a 39 year old single mother of a four year old girl.  Renee is

24 a hardworking mother who currently finds herself in some hard

25 times.  Unfortunately, for Renee, she has a limited education

and few marketable skills.  Thus, Renee cannot pay her student
loans while simultaneously caring for her daughter.  Renee has
made some mistakes in the past but she has worked through her
problems and she wants a chance at a fresh start for her and
her daughter.

Your Honor, Renee grew up in the capital region of
upstate New York.  Her biological father left her when she was
five years old.  Renee spent a short amount of time studying in
junior college in Albany and at SUNY Albany, and ultimately
transferred to the new school in New York City in the spring of
1990.  Like many students, Your Honor, Renee financed her
education through a mixture of financial aid and student loans.

Renee got a job as a waitress when she came to New
York City.  There she dropped out of college and fell into a
downward spiral of partying and drug abuse.  Renee never
finished her college degree.  After one unsuccessful period of
rehabilitation in 1995, Renee started using drugs again which
caused her to be fired and evicted at least once.  However, in
1997 Renee returned to Albany, checked into a detox center and
has been drug free ever since.

Through the years Renee has had a number of
waitressing jobs and film production assistant jobs.  She spent
some time on a handful of plaster wall finishing jobs just to
make ends meet, and even had a small part in a movie called
Coffee and Cigarettes.  It's an independent film filmed in

1992.  Throughout this time Renee did not have the means to pay her student loans.

After rehab she received a well paying job as a restaurant manager and she consolidated her loans at this time and actually began making payments.  Unfortunately, Renee got fired from this restaurant manager position as a result of layoffs.  To make matters worse for her financially, she got pregnant around that time.  Renee deferred her student loans twice and also received an administrative forbearance.

In September 2002, right around the time of her daughter's first birthday, her mother was diagnosed with cancer.  That same month Renee's second deferment period on her student loans expired and her roommate moved out.

Renee's latest employment was for a long-time friend as an assistant.  However, she was fired from that job in May of 2004.  Unable to pay for rent in New York, Renee decided to move back north to care for her sick mother and to save on expenses and to seek new employment.

Now, once she got back to Albany Renee applied to at least 20 restaurants for work with little success.  Her mother passed away in December of 2004.  Renee grieved for several months and eventually took over the daily duties of her mother that her mother had performed in the house and helped settle her mother's affairs for her stepfather.  Fortunately for Renee, Renee's stepfather is a kind and generous man.  He, from

his own 401K plan, has paid for bills, tuition for her current education, and he gives Renee a weekly stipend to cover other expenses in an amount that only matches Renee's previous unemployment benefits.  Renee pays for her food, for her daughter's food and clothing and day care expenses with what little funds she receives from her stepfather.  She has received some royalties from that film she did in 1992. Currently Renee has no disposable income, however.

         Now, the purpose of the Bankruptcy Code is to provide the honest debtor a fresh start in exchange for the distribution for creditors.  Of course discharge is essential to that fresh start.  Renee here filed for personal bankruptcy and is on her way to a fresh start.  She owes approximately $33,000.00 in student loans.  The evidence will show you that Renee will suffer an undue hardship if these loans are not discharged.

         Now, opposing counsel will argue that Renee has no expenses because they happen to be paid by her stepfather. He'll also suggest that Renee can seek child support from the father of her daughter.  The Government may say that her income will increase because Renee is currently studying to be a nurse in Albany.  The evidence, however, will reflect that neither Renee's stepfather nor the father of Renee's child could be counted on.  The bottom line is that Renee and her daughter have close to no income right now.  If it weren't for the

generosity of her stepfather, Renee would be on the streets.
We also note the stepfather has no obligation to care for Renee
and her daughter.

Additionally, the fact remains that even with an
income from new employment in a new field, upon graduation
Renee will barely make enough money to be self-sufficient and
to care for her daughter much less pay for her loans.

The evidence today will show that although the
standard is high and the exception to the Bankruptcy Code is
narrow, Renee fits that exception.  Renee is the kind of person
that Congress left room for when they drafted Section 523(a)(8)
of the Bankruptcy Code.  This evidence will show you that to
require payments of her loans would cause Renee and her little
daughter undue hardship and so her loans should be discharged
so they may truly begin their fresh start.

THE COURT:  I have the Government's papers and I've
read them so I think I'll hear anything further the Government
wishes to state, but I think you probably stated your case in
your proposed findings and conclusions.

MR. FOGELMAN:  We did, Your Honor.

THE COURT:  All right.  Why don't you call your first
witness, Mr. Roldan.

MR. ROLDAN:  Thank you, Your Honor.  Plaintiff calls
Renee French.

THE COURT:  Stay standing.

1    (Renee French, Plaintiff's Witness, Sworn.)

2         THE COURT:  Please have a seat.

3         THE WITNESS:  Thank you.

4                    DIRECT EXAMINATION

5    BY MR. ROLDAN:

6    Q    Good morning, Renee.

7    A    Good morning, Mr. Roldan.

8    Q    Renee, please state and spell your full name for the

9    record.

10   A    It's Renee Marie French, R-E-N-E-E, M-A-R-I-E, F-R-E-N-C-

11   H.

12   Q    Renee, do you understand why we're here today?

13   A    I do.

14   Q    What is your understanding?

15   A    It's the adversary proceeding of my student loans which is

16   part of my Chapter 7 bankruptcy case and it's to try to get the

17   loans dismissed.

18   Q    Renee, I'm going to ask you a few questions about

19   yourself, some background really.  Where do you live?

20   A    I live in Cohoes, New York, 50 Conliss Avenue, C-O-N-L-I-

21   S-S Avenue.

22   Q    How old are you?

23   A    I'm 39?

24   Q    Are you married?

25   A    No.

1   Q     Do you have a boyfriend right now?

2   A     No.

3   Q     Do you have any children?

4   A     I have a four year old daughter, one child.

5   Q     What is her name?

6   A     Jaya [Ph.] French.

7   Q     Who do you currently live with?

8   A     I live with her and my stepfather whose name is Bryce

9   Baker, B-R-Y-C-E, B-A-K-E-R.

10            MR. ROLDAN:  May I approach the witness with an

11  exhibit book, Your Honor?

12            THE COURT:  Yes.

13  Q     Renee, I handed you an exhibit but these exhibits have

14  been previously offered into evidence on the consent of the

15  Government in this case.  Will you please flip to what has been

16  pre-marked as Exhibit Number 1?

17  A     Yes.

18  Q     Can you identify that document?

19  A     This is the complaint to determine dischargeability of

20  student loans.

21  Q     Thank you.  Can you please turn to what has been pre-

22  marked as Exhibit Number 2?

23  A     Yes.

24  Q     Can you identify that document?

25  A     This is the petition, the beginning of the Chapter 7

1  Bankruptcy.

2  Q    Whose name is at the top of the petition?

3  A    That's my name.

4  Q    Thank you.  Renee, when did you file for bankruptcy?

5  A    In February of 2004.

6  Q    Why did you decide to file for bankruptcy?

7  A    I was no longer able to pay my debts.  I didn't have

8  enough finances to do that and I didn't see the situation

9  changing.  I had a lien put on my checking account from one of

10 the credit cards and I had to file then and there to get the

11 lien released.  So that was my final deciding factor.

12 Q    At the time you filed the petition, Renee, did you have

13 any assets?

14 A    No, I did not.

15 Q    Did you have any bank accounts in your name?

16 A    I did.

17 Q    How much cash did you have in these accounts?

18 A    I don't remember the exact amount.  Probably a couple of

19 hundred dollars.

20 Q    How much cash did you have on hand at the time you filed

21 the petition?

22 A    I don't recall.

23 Q    Did you have any security deposits with landlords or

24 utilities?

25 A    I had a security deposit for my apartment which was equal

1  to one month's rent.

2  Q    How much was that?

3  A    I think it was $1,350.00.

4  Q    Did you get that security deposit back?

5  A    That was used towards the last month of my rent when I

6  moved, so I didn't get that.

7  Q    Did you have any assets of any value?

8  A    No.

9  Q    How about right now?   Do you have any assets worth any

10 value right now?

11 A    No.  The only thing I could think of that's worth anything

12 is I have one video camera I bought for $400.00.

13 Q    When did you buy that video camera?

14 A    I bought it to have a record of my daughter.

15 Q    When did you buy it?

16 A    Oh, when did I buy it?  I bought that in I believe it was

17 August or September of 2004.

18 Q    Do you have any other household goods?

19 A    Nothing really of value, no.

20 Q    Do you own a car?

21 A    No, I do not.

22 Q    How do you get to work?  I apologize.

23 A    I use a car that is in my step -- it's my stepfather's

24 car.  He has it leased.

25 Q    What kind of car is it?

1  A    It's a 2005 Volkswagen Jetta.

2  Q    Do you have any works of art, books, CDs of any value?

3  A    No.

4  Q    Do you have any equipment of any value?

5  A    I do have a computer that my stepfather purchased for my

6  school.

7  Q    When did your stepfather purchase this computer?

8  A    He purchased that in May 2004.

9  Q    Do you know how much the computer was?

10  A    I believe it was $2,000.00.

11  Q    Do you have any interest in insurance policies?

12  A    No.

13  Q    Do you have any annuities?

14  A    No.

15  Q    Do you have any IRAs or stock accounts?

16  A    No.

17  Q    Do you have any interest in partnerships or corporations?

18  A    No.

19  Q    Do you have any assets you'd like to tell us about?

20  A    Nothing that -- nothing else, no.

21  Q    What were your liabilities at the time you filed?

22  A    At the time I had my rent, it was $1,350 a month.  I was

23  paying child care at the time of $220.00 a week, and utilities

24  were probably about $200.00 a month.  I had food expenses,

25  subway transportation expenses.

1  Q    Renee, if I may refer you to what's been pre-marked as
2  Exhibit 1 --
3  A    Yes.
4  Q    -- which you identified as your complaint, could you
5  please flip to Paragraph 17?  Paragraph 17 spans two pages.  It
6  begins at the bottom of the one page and ends on the other one.
7  A    Yes.
8  Q    Renee, do you see where it says you spend $80.00 a month
9  in telephone charges?
10 A    That was my cell phone.  That's a cell phone bill, yeah.
11 These expenses that are listed here were post when I filed for
12 bankruptcy.  That's when I'd actually moved upstate.
13 Q    Is this before or after you moved upstate?
14 A    After I moved upstate.
15 Q    Okay.
16 A    So that's a big reduction from what I was paying when I
17 filed, significant reduction.
18 Q    We'll go through these one by one right now because this
19 complaint I understand was filed some time ago.
20 A    Yes.
21 Q    This cell phone, $80.00 a month in cell phone, do you
22 spend more or less right now in cell phone coverage?
23 A    The same.
24 Q    Is it possible to get a less expensive plan?
25 A    I signed a contract when I moved to Cohoes, New York.

1  It's a two-year contract.  It's not expired yet, so it would

2  cost money to get out of the contract.  It's $59.99 a month

3  plan.  I don't think they offer a plan less than that.

4  Q    Do you know how many minutes you have under that plan?

5  A    800 minutes and unlimited nights and weekends.

6  Q    Can you please flip to what's been pre-marked as

7  Plaintiff's Exhibit Number 18?

8  A    Yes.

9  Q    Do you recognize that document?

10  A    Yes, it's a Cingular Wireless bill.

11  Q    What does it state are your monthly charges?

12  A    Monthly service $61.74 and with taxes the total is roughly

13  $75.00.

14  Q    Okay.  Renee, we'll get back now to Exhibit 1, Paragraph

15  17.  These are expenses that you listed, I believe you stated.

16  You list part time day care.

17  A    Now my daughter is attending full time day care.  It's a

18  different day care facility.  It's $195 a week.

19  Q    So you spend more now?

20  A    I spend more now on day care, yes.

21  Q    Is it possible to reduce this expense?

22  A    It is not, no.

23  Q    Renee, can you please flip to what's been pre-marked as

24  Plaintiff's Exhibit Number 17?

25  A    Yes.

1  Q    Can you please identify that document?

2  A    That's a receipt for a payment for her day care facility

3  those last weeks.  It shows $195 a week.

4  Q    When did she start this day care?

5  A    Approximately three weeks ago.

6  Q    What is the name of the day care center?

7  A    The Spotted Zebra Learning Center.

8  Q    Did you say whether it was possible to reduce that

9  expense?

10  A    Well, I'm attending school full time days and she needs to

11  go five days a week.  I don't have any other ways of having

12  anybody watch her except if she goes to day care.

13  Q    Can you please flip to what's been pre-marked as

14  Plaintiff's Exhibit Number 26?

15  A    Yes.

16  Q    Can you please identify that document?

17  A    That was a statement saying my expense for day care at the

18  previous facility.  That was Pine Hills Montessori.  It's not

19  actually stamped on there.  That's when she was attending part

20  time.  It was a monthly charge of $510.00.

21  Q    What is the date on that?

22  A    That's September of 2004.

23  Q    When did she stop attending only part time day care?

24  A    I believe it was January of 2005 she started attending

25  full time.

1   Q     Why did she start attending full time?

2   A     I was not functioning to take care of her after my

3   mother's death and I felt it better for her to actually be in

4   the day care facility, and I was busy taking care of the

5   aftermath.

6   Q     Please flip to what's been pre-marked as Plaintiff's

7   Exhibit Number 27.

8   A     Okay.

9   Q     Can you identify that document?

10  A     That's a letter from Pine Hills Montessori speaking about

11  Jaya's enrollment there and her start date and it lists the

12  tuition.

13  Q     What is the date of the letter?

14  A     June of 2004.

15  Q     How much is her day care tuition?

16  A     It's $715.00 for full-time enrollment and I decided to

17  have her go part time which is $510.00.

18  Q     Can you please flip to what's been pre-marked as

19  Plaintiff's Exhibit Number 28?

20  A     Yes.

21  Q     Can you identify that document?

22  A     That is the invoice from Pine Hills Montessori.  That's

23  when she started to attend.

24  Q     Where is Pine Hills Montessori?

25  A     It's in Albany, New York.

1  Q    How much does Pine Hills Montessori cost?

2  A    $715.00 monthly for full time and $510.00 monthly for part

3  time.

4  Q    Why did you switch Jaya from Pine Hills to Spotted Zebra

5  Learning Center?

6  A    At the time I started looking for someplace that was

7  closer to my own school.  Spotted Zebra was actually closer to

8  our home.  I was having some issues with Pine Hills with some

9  staff members.  She was not really functioning too well there.

10 Q    How much closer is Spotted Zebra?

11 A    It's about ten miles closer, maybe seven miles, but it's

12 about 20 minutes driving.

13 Q    One way?

14 A    One way, 20 minutes driving, yes, closer.

15 Q    Okay.  Turning back to your complaint now, Renee, Exhibit

16 Number 1 --

17 A    Yes.

18 Q    Right after telephone and right after day care it says

19 that you spend $300.00 a month in food.  Can you explain that

20 further?

21 A    I spend more now.  When it was $300.00 I was encompassing,

22 I was thinking about food just for myself and Jaya while living

23 at my mother's home.  Now I put it to include myself, my

24 stepfather, and Jaya.

25 Q    Would you say you spend more or less now?

1  A    More, significantly more.  I probably spend 150 to $200.00

2  a week on food for the family.

3  Q    Is it possible to reduce this expense?

4  A    No.

5  Q    If it was just you and Jaya, how much do you think you

6  would spend in food?

7  A    I would say about $100.00.  I can probably function with

8  $100.00 a week.

9  Q    The next line on that list, Renee, what does that say?

10 A    Medical $50 monthly.

11 Q    Can you explain that further?

12 A    I have to purchase Clariton for her.  That's not covered

13 through her Medicaid program.  That's about $20.00 a month, and

14 additional expenses throughout the year whether it be dentist

15 or -- it was kind of an average of additional medical expenses

16 outside of what's covered.

17 Q    Do you think you spend more or less now?

18 A    Probably about the same.

19 Q    What does the next line say, Renee?

20 A    Transportation, $100.00.  That was gas price, gas cost.

21 Now I spend a little bit more.  I spend about 30 to $40.00

22 weekly.  It's probably going to be about $30.00 but it's going

23 to be reduced a little bit since the day care is closer.

24 Q    Is it possible to reduce that expense?

25 A    It is not.

1  Q     How many miles a day do you drive?

2  A     Maybe about 30.

3  Q     One way?

4  A     No.  Maybe 30 to 40.  It depends on -- I have to go to

5  another school to take some classes.  It depends on what my

6  schedule is.  Sometimes I have to drive back home and sometimes

7  I only drive to one school and that varies a little bit.  But I

8  know I always spend about 30 to $40.00 a week I guess.

9  Q     The next line, Renee, what does that say?

10 A     Car insurance that I no longer pay.  At the time I had an

11 old car that I had in my name, registered in my name when I

12 moved to Cohoes and it was insured.  I no longer have that

13 vehicle.

14 Q     The car you drive right now, do you know how much

15 insurance is for that car?

16 A     I believe it's about $1,000.00 yearly.

17 Q     Is there anything else on that list, Renee?

18 A     No.

19 Q     Can you think of any other expenses that are not listed on

20 this list?  Any of your current expenses that are not on this

21 list?

22 A     I have my tuition expenses.  That's not a monthly expense.

23 Q     How much is that, Renee?

24 A     This semester and now is about $2,000.00 and the upcoming

25 semester is close to $3,000.00.

1   Q      How many semesters at Albany Memorial Hospital?

2   A      There's five semesters.  One is a short summer session.

3   Q      Could you please turn to what's been pre-marked as

4   Plaintiff's Exhibit Number 21?  Do you recognize that document?

5   A      Yes.  It's the current bill from my school for next

6   semester.

7   Q      What is the date?

8   A      The date is November 20, 2005.

9   Q      What is the balance due?

10  A      $2,927.00.

11  Q      Thank you.  So besides -- we discussed your telephone, day

12  care, transportation, insurance, medical, food, tuition.  Can

13  you think of any other expenses right now?

14  A      No.

15  Q      Who pays for the expenses right now where you live?

16  A      Bryce Baker.

17  Q      Are there any expenses for the household that he pays that

18  you would have to pay, that you could pay?

19  A      No.

20  Q      Is there a mortgage on the house?

21  A      He has two payments monthly.

22  Q      How much of a mortgage on the house?

23  A      $1,057.00 and the other payment is $170.00.

24  Q      How long has he lived in that house?

25  A      Since May of 2004.  My mother and Bryce Baker bought the

1  house the month that I moved there.

2  Q    What are the utilities?

3  A    They vary depending on the season.  I'd say an average of

4  about $350.00 for heat and electric.

5  Q    Do you ever buy clothes for you or Jaya?

6  A    Yes.

7  Q    How much do you think you spend a month in clothes?

8  A    Probably $500.00 a year.

9  Q    What do you and Jaya like to do for entertainment?

10  A    Nothing outside of ourselves so much.  We don't -- you

11  know, we play or spend time together.  Mostly that's what we

12  do.

13  Q    Do you ever take Jaya out?

14  A    Not often.  Sometimes I'll bring her to get a sandwich out

15  or pizza or something like that.

16  Q    How often do you think per month do you take Jaya out?

17  A    I would say maybe twice a month.

18  Q    How much would you say you spent per month?

19  A    30 to $40.00.

20  Q    Do you take drugs right now?

21  A    No.

22  Q    Do you smoke?

23  A    No.

24  Q    Do you spend any on alcohol?

25  A    Sometimes we have wine with dinner and my stepfather has

1   always been a big wine drinker.

2   Q    How much would you say you spend on alcohol per month?

3   A    I would say maybe two bottles of wine, $30.00.

4   Q    That's with your stepfather?

5   A    Yes.

6   Q    If it was just you and Jaya, how much do you think you

7   would spend in wine per month?

8   A    Nothing.

9   Q    How much do you think you'd spend in alcohol per month if

10  it was just you and Jaya?

11  A    Nothing.

12  Q    Renee, what was your income at the time you filed for

13  bankruptcy?

14  A    At the time I was making $3,500.00 a month.

15  Q    Do you have any income right now from any source?

16  A    My stepfather writes a weekly check to me of $270.00 and I

17  use that money for just food for the house and gas.

18  Q    How often does he write this check?

19  A    Weekly.

20  Q    Do you have any other income?

21  A    Bi-annually I have a statement from the movie Coffee and

22  Cigarettes, a royalty statement.  The last one I received was

23  October I believe and it was 400 and something, $490.00 I

24  believe.  Then also MGM Film Studios for home video sales, that

25  was about I think $300.00 a year.  No other income besides

1  that.

2  Q    We'll get to Coffee and Cigarettes a little more later.

3  Now Renee, at the time you filed for bankruptcy were you making

4  payments on your credit card bills?

5  A    I had stopped a few months previous to filing.

6  Q    Do you have any idea how much in debt you were to credit

7  card companies?

8  A    I think about $35,000.00.

9  Q    I think you mentioned earlier that somebody put a lien on

10  your account.  Can you please describe that?

11  A    I believe it was the Discover Card and they put a lien on

12  the account due to me not paying.

13  Q    How much did you owe Discover at the time?

14  A    I believe it was $10,000.00.

15  Q    Have you ever filed for bankruptcy prior to this one

16  instance where you filed for bankruptcy?

17  A    No, I have not.

18  Q    Were you aware of your student loans at the time you filed

19  for bankruptcy?

20  A    Was I -- I'm sorry?

21  Q    Were you aware of your student loans at the time --

22  A    Aware of them, yes.

23  Q    Did you ever contact the Government or anybody about your

24  student loans after you filed bankruptcy?

25  A    I believe -- I'm a little unclear whether I did it right

1  before I filed or I believe it was after filing I did call the

2  Department of Education.  They referred me to NCO Financial and

3  I did call them to see if there was some possible way to

4  rectify the situation.  They simply asked if I planned on

5  paying in full which I said I couldn't and that was the end of

6  that conversation.

7  Q    Did you try calling again?

8  A    No, I did not try calling again.

9  Q    Okay.  I'll ask you some questions now, Renee, about just

10 your background, your work background, work and education

11 background.  Where do you work right now?

12 A    I'm not working right now.  I'm attending school.

13 Q    Where do you go to school?

14 A    Albany Memorial School of Nursing.

15 Q    Where were you born?

16 A    In Albany, New York.

17 Q    Were you raised there?

18 A    For part of the time, yes.  Later we moved to smaller

19 towns in western New York.

20 Q    Who did you live with in Albany?

21 A    My mother and my biological father, my brother.

22 Q    So, where did you move?

23 A    We moved to Oneonta, New York.

24 Q    The whole family?

25 A    Yes.

1    Q    Then where?

2    A    After that I moved to Seneca Falls.

3    Q    The whole family?

4    A    That was a different family.  My biological father had

5    left.  My mother had remarried.  So when I moved it was my

6    mother, my stepfather, and myself and my brother.

7    Q    Your biological father, when did he leave?

8    A    When I was five years old.

9    Q    After he left your family did you have any contact with

10   him while you were growing up?

11   A    No.  He vanished.  My mother spent a good deal of time

12   trying to locate him but never did.

13   Q    Did your mother remarry now?

14   A    She remarried when I was ten.

15   Q    What was his name?

16   A    Jack Nielson.

17   Q    What was your mother's job at the time?

18   A    She was a car salesperson at the time.

19   Q    What happened to her relationship with Mr. Nielson?

20   A    That marriage dissolved.  They were divorced when I was

21   16.

22   Q    Where were you living at the time?

23   A    We had moved back to the capital region.  We lived in

24   Rensselaer, New York.

25   Q    Do you have any other family besides the individuals you

1   mentioned?

2   A    Immediate family, no.

3   Q    Where does your brother live?

4   A    He lives in Glens Falls, New York.

5   Q    About how far away is that from you?

6   A    It's about an hour north.

7   Q    What does he do?

8   A    He has a small landscaping business.

9   Q    How often do you speak to him?

10  A    Once every two weeks.

11  Q    Renee, where did you go to high school?

12  A    I finished high school in Rensselaer, New York.

13  Q    What year?

14  A    1983.

15  Q    How were your grades?

16  A    They were pretty good.  Probably a B average, some As.

17  Q    What did you do after you graduated high school?

18  A    After I graduated high school I worked before going to

19  college.  I worked at Macy's Department Store for a period and

20  then I started waitressing at a restaurant in the same shopping

21  mall.

22  Q    Which Macy's did you work?

23  A    It was Colony Center in Albany, New York.

24  Q    After that where did you go?

25  A    It was a restaurant in the same shopping mall, Colony

1  Center.

2  Q    Okay.

3  A    I'm not sure, I don't remember the name of it.  I'm

4  thinking Olive Garden but I know that's current.  It wasn't

5  Olive Garden.

6  Q    What was your job at Macy's?

7  A    I was a cashier.

8  Q    And your job at the restaurant?

9  A    I was a waitress.

10 Q    What happened after that?

11 A    After that I enrolled at the junior college of Albany.

12 Q    When did you begin college?

13 A    The spring of 1985.

14 Q    Why did you decide to go to college?

15 A    For an education.

16 Q    Can I please refer you to what's been pre-marked as

17 Plaintiff's Exhibit Number 3?

18 A    Yes.

19 Q    Can you identify that document?

20 A    It's a transcript from the Junior College of Albany.  That

21 was part of the Sage College.

22 Q    Okay.  How did you pay for the Junior College of Albany?

23 A    I believe most of that was with financial aid.  At the

24 time my mother was single so I received financial aid due to

25 her income.

1  Q    So your mother, she didn't help you pay for junior

2  college?

3  A    No, she did not.

4  Q    Was this the first time you took out financial aid?

5  A    Yes, it was.

6  Q    Were you studying a particular major at junior college?

7  A    I was not, no.  I wasn't really clear what I wanted to do

8  and what direction I was going in.  I think I was just studying

9  the bards.

10 Q    Could you please take a look at what's been pre-marked as

11 Exhibit 3.  Do you remember what classes you took when you were

12 at junior college?

13 A    I started taking art classes and philosophy classes.

14 That's from my memory what I remember the most.  I can see I

15 took other English, composition, anthropology and film history

16 course.

17 Q    Did you ever get a degree from Junior College of Albany?

18 A    No, I did not.

19 Q    What happened then?

20 A    I transferred to the State University of Albany, SUNY

21 Albany.

22 Q    Would you please flip to what's been pre-marked as

23 Plaintiff's Exhibit Number 4?  Can you identify that?

24 A    That is the transcript from SUNY Albany.

25 Q    Why did you transfer to Albany?

1 A    I wanted to get a four year degree.  I still wasn't sure

2 in what I wanted a degree in, but that's why I went to SUNY

3 Albany.

4 Q    What years did you attend SUNY Albany?

5 A    I started in the fall of '86 and I continued until spring

6 of 1988.

7 Q    How did you pay for SUNY Albany?

8 A    Financial aid and student loans.

9 Q    Did your mother help at all to pay for SUNY Albany?

10 A    No, she did not.

11 Q    What was your major while you were at SUNY Albany?

12 A    I had declared a philosophy major.

13 Q    Do you remember what kind of classes you took while you

14 were at SUNY Albany?

15 A    Philosophy, logic classes, some art classes, and some

16 political science classes.

17 Q    Did you ever get a degree while you were there?

18 A    No, I didn't.

19 Q    Why not?

20 A    I still was not clear what I wanted to do or what I wanted

21 a degree in.  I stopped going to SUNY Albany and started to

22 work for awhile.

23 Q    Where did you work?

24 A    I started waitressing.  I worked at a place called The

25 Steuben Athletic Club.

1   Q    I'm sorry, can you repeat that?

2   A    Steuben Athletic Club.

3   Q    Where was that?

4   A    That was in downtown Albany.  That was a restaurant for

5   kind of politicians and state workers.

6   Q    Do you remember how much you were paid?

7   A    Minimum wage for restaurant servers and tips.

8   Q    Were you working while you were studying?

9   A    No, I wasn't.

10  Q    How long were you at Steuben?

11  A    I think I worked there for about a year.  I worked there

12  until I moved to New York City.

13  Q    So what did you do after Steuben?

14  A    I moved to New York in the spring of 1990 and I began

15  attending a new school.

16  Q    Please flip to what's been pre-marked as Plaintiff's

17  Exhibit Number 5.  Can you please identify that document?

18  A    That's a transcript from the New School.

19  Q    Why did you enroll in the New School?

20  A    I wanted to move to New York and it seemed like it was

21  interesting school.  That was why.

22  Q    What did you study there?

23  A    Liberal arts and I didn't study much.  Soon after I

24  started going I stopped going.

25  Q    How much did the New School cost?

1   A    I don't recall the tuition.

2   Q    Do you remember how you paid for it?

3   A    Student loans and I believe I got financial aid as well.

4   Q    Did your mother help you pay at all for the New School?

5   A    No, she didn't.

6   Q    Was your mother still single at the time?

7   A    She had remarried at that time.  That was the third

8   marriage, that was to Bryce Baker.

9   Q    When did she marry Bryce Baker?

10  A    I believe it was 1988 or '89.

11  Q    Where were you when they married?

12  A    I was living in Albany, New York then.

13  Q    Getting back to the New School, how long did you study

14  there?

15  A    I was only matriculated there for that one semester,

16  spring of 1990.

17  Q    Now, why did you only spend one semester at the New

18  School?

19  A    I dropped out.

20  Q    Why did you drop out?

21  A    I started to work, I started going out, I lost interest in

22  school, I had no direction.  I started going to clubs, I

23  started making bad decisions, I started doing drugs.

24  Q    When did you start doing drugs?

25  A    As soon as I moved to New York.

1    Q    What kind of drugs?

2    A    Initially I was doing cocaine and some other types of

3    drugs like Ecstacy or marijuana.

4    Q    How did you start doing drugs?

5    A    Introduction from people at nightclubs.

6    Q    Did your friends do drugs?

7    A    Some of them did, yes.  A lot of acquaintances I knew did

8    drugs.

9    Q    You mentioned earlier that you were working as well.  Were

10   you working while you were at the New School?

11   A    Yes, I was.

12   Q    Where did you work?

13   A    I worked at the Temple Bar, a small bar on Lafayette

14   Street.

15   Q    How did you find that job?

16   A    Through the Village Voice.

17   Q    Why did you get a job while you were studying?

18   A    I really was well aware that I was no longer studying and

19   I was going to have to get an apartment.  I was staying at the

20   dorms so I needed to get a job to support myself.

21   Q    What kind of work did you do at the Temple Bar?

22   A    I was a cocktail waitress.

23   Q    What was your pay there?

24   A    Minimum wage plus tips.

25   Q    What were your hours there?

1  A    Probably 6 to 3.  They were long shifts.  5 to 4.  They

2  were staggering.

3  Q    How long were you at the Temple Bar?

4  A    I believe I worked there for about six months.

5  Q    Why did you leave the Temple Bar?

6  A    My boyfriend asked me to go away with him for a month and

7  I quit my job to do that.

8  Q    When you did that, were you still in school?

9  A    No, I was not.

10  Q    Where did you go on vacation?

11  A    We went to South Carolina.

12  Q    Who paid for this vacation?

13  A    He did.

14  Q    How long were you gone?

15  A    For about one month.

16  Q    After that vacation where did you go?

17  A    Back to New York.

18  Q    What did you do?

19  A    I looked for work.  I started to look for another

20  restaurant job.  I believe my first job was at Manray [Ph.]

21  Restaurant, a restaurant in Chelsea.  I worked as a waitress.

22  Q    How did you find that job?

23  A    Village Voice.

24  Q    Do you remember how much you made at the Manray?

25  A    Minimum wage plus tips.

1  Q    Any benefits?

2  A    No.

3  Q    What were your hours at Manray?

4  A    There were some lunch shifts.  They were probably from 10

5  a.m. to 3 p.m.  Most of them were dinner shifts 4 p.m. to maybe

6  11 p.m.

7  Q    How long were you at Manray?

8  A    I think I worked there for about six months.

9  Q    At this point did you have any intent to go back to the

10 New School?

11 A    No.

12 Q    After your six months at Manray, what did you do?

13 A    I had decided I wanted to try to work in the film industry

14 and I started to look for production work.

15 Q    How did you become interested in film?

16 A    I always liked film just as an art medium and New York is

17 a big film industry, so that's what I tried to do rather

18 unsuccessfully.

19 Q    Can you describe some of this work?

20 A    I got a job as a production assistant on a few music

21 videos.  They were day jobs.  My boyfriend at the time, the

22 same boyfriend that I went away with, he was actually doing a

23 television show through a Japanese production company and he

24 hired me to do some production work.  I believe I worked with

25 the line producer.  That was maybe for about a month or two

1   months.

2   Q    Okay.  We'll take these one by one.  Do you recall how

3   many music videos you did?

4   A    I don't recall exactly.  I think three.

5   Q    Do you recall the name of the TV show?

6   A    Fishing With John.

7   Q    What were your duties in these production jobs?

8   A    Production jobs were just moving equipment, you know,

9   setting up lights, whatever somebody needed help with.  It was

10  not specific.

11  Q    How long did these jobs normally last?

12  A    One or two days.

13  Q    Do you have any formal training in film?

14  A    No, I do not.  I did have another internship on a film,

15  Malcolm X, that was a four month unpaid internship.  That was

16  kind of informal training.  I worked in the location

17  department.

18  Q    What did you do for them?

19  A    I scouted locations and did production work for the

20  locations of the film.

21  Q    Do you have any training in production work?

22  A    No.

23  Q    Now, how did you get these jobs?

24  A    By doing research with the -- there's a film -- I forgot

25  the name of it, but there's a film department in Manhattan that

1  has like listings of jobs that are active production jobs.  I

2  would just call, randomly call offices and try to get work.

3  Q    How easy was it to find these jobs?

4  A    It was not easy.  It was not easy.

5  Q    What were you paid?

6  A    Production assistants average $150.00 a day.  When I

7  worked at [inaudible] I don't recall exactly how much I was

8  paid for that.

9  Q    Did you do any other projects?

10 A    There was one other film I got hired in the location

11 department.  That was Saints of Fort Washington.  But they then

12 changed my position to an unpaid position, so that was the last

13 attempt.

14 Q    Did you get paid any money from work at Saints of Fort

15 Washington?

16 A    No, I did not.

17 Q    What kind of work did you do with that film?

18 A    That was location scouting.

19 Q    Did you have any other projects?

20 A    The only other film project was Coffee and Cigarettes.  It

21 was a small acting job in 1992.

22 Q    Can you describe your work in Coffee and Cigarettes?

23 A    That was a short film about two, three minutes long and I

24 played a character that smoked cigarettes and drank coffee.  I

25 just got that job, I was friends with the director.  It wasn't

1   an intention of looking for an acting job.

2   Q    Have you ever taken acting lessons?

3   A    No, I have not.

4   Q    Were you paid for this role?

5   A    I was paid the day of the shooting $500.00, yes.

6   Q    Were you paid anything else?

7   A    Years later when it did come out in 2004 I was told I'd

8   receive 1% of the net profit of the film, and I did since that

9   time receive close to $10,000.00.

10  Q    When was the film released?

11  A    May of 2004 in the United States.  I think maybe March in

12  Europe.

13  Q    Could you please flip to what's been pre-marked as

14  Plaintiff's Exhibit Number 16?  Can you identify this document?

15  A    That's a stub of the check I received, the first

16  installment for profit.

17  Q    Can you flip through the pages and tell me if you can

18  identify what these documents are?

19  A    They're letters from the director's production company

20  that state that this is your percentage and they give a

21  distribution report of the profits and the subsequent

22  disbursals for the profit.  Then there's also the MGM paycheck

23  stub for home video.

24  Q    Do you remember when the first payment you received?

25  A    August of 2004.

1  Q     How much was it?

2  A     $6,924.00.

3  Q     Did you receive any other payments from the movie?

4  A     I did in March, I believe it was March of 2005, I received

5  a second payment for $2,949.00.

6  Q     Did you receive any other payments from the movie?

7  A     I received a payment October of 2005 for $480.00.

8  Q     So you received payments for approximately $6,000.00, then

9  $2,900.00, then about $480.00 in sequence; is that correct,

10  Renee?

11  A     Correct.

12  Q     Why do the dollar amounts keep getting so much smaller?

13  A     The profit is from sales, ticket sales when it's in the

14  cinema.  It's no longer in distribution.

15  Q     Is it on DVD?

16  A     It is.

17  Q     Do you know approximately when it went on DVD?

18  A     I'm sorry?

19  Q     Do you know approximately when it went on DVD?

20  A     I don't know offhand, no.  When it closed in the theaters

21  I know that's how they time it, but I don't know what month

22  that was.

23  Q     If your last payment was in October 2005, when do you

24  expect your next payment?

25         MR. FOGELMAN:  Objection, Your Honor.  It calls for

 1  speculation.

 2          THE COURT:  Overruled.

 3  A    Probably March of 2006.  It's bi-annual.

 4  Q    How much do you think you may get in 2006?

 5  A    I'm not expecting anything.  If I make the same as I did

 6  last time of $480.00 I would probably be surprised.

 7  Q    Why is that?

 8  A    It's no longer in distribution.

 9  Q    Okay.  You mentioned you met the director; is that

10  correct?

11  A    Yes.

12  Q    What is the director's name?

13  A    Jim Jarmusch.

14  Q    Have you ever worked with Mr. Jarmusch before Coffee and

15  Cigarettes?

16  A    No, I have not.

17  Q    Have you worked with Mr. Jarmusch after Coffee and

18  Cigarettes?

19  A    No, I have not.

20  Q    Do you have an agent?

21  A    No.

22  Q    Do you have a manager?

23  A    No.

24  Q    Did you ever once pursue an acting career?

25  A    No.

1  Q    Have you auditioned for any roles in film or television

2  other than Coffee and Cigarettes?

3  A    No, I have not.

4  Q    So Renee, for your production work and the role in Coffee

5  and Cigarettes, approximately how much money do you think you

6  made?

7  A    Including the day of the shooting and the home video

8  percentage, $11,000.00.  A little below or above $11,000.00.

9  Q    While you were working at these jobs, Renee, were you able

10 to pay any of your loans?

11 A    While I was working on which jobs?

12 Q    These production jobs.

13 A    No, I was not.

14 Q    Why not?

15 A    I was barely paying my rent throughout those years and I

16 was having a drug issue at that time.

17 Q    Can I please refer you to what's been pre-marked as

18 Plaintiff's Exhibit Number 6?  Could you take a second to flip

19 through these documents?  Do you see them?

20 A    Yes.

21 Q    Can you identify them?

22 A    They are my federal tax returns.

23 Q    What year?

24 A    From '96 through 2004.

25 Q    Are there any state tax returns in here?

1    A    Yes, yes, there is.

2    Q    Getting back to the time of your film production work,

3    Renee, do you recall how much you were paying in rent at the

4    time?

5    A    I believe it was around $700.00.  I don't remember the

6    exact of my rent.

7    Q    Were you taking drugs during this time?

8    A    Yes, I was.

9    Q    Approximately how much a month were you spending in drugs

10   at this time?

11   A    At that time, which was probably around 1992, probably

12   about $200.00 to $300.00 a month.

13   Q    Now Renee, besides waitressing at Temple Bar and Manray

14   and your various jobs in film and music videos, were there any

15   other jobs around this time?

16   A    Yeah.  After I was unable to find employment in the film

17   industry I had a friend, his name is Steven Torton [Ph.].  He

18   did wall plastering and interior wall finish.

19   Q    Could you please describe what that is?

20   A    That's a plaster finish that's put on walls instead of

21   painting walls.  It's like an interior decorating technique.

22   In 1992 he offered me to learn that trade with him and I went

23   to -- I subletted my apartment and I went to Paris to work on

24   [inaudible] group of people.

25   Q    How long were you in Paris?

1   A     For four months.

2   Q     Did you have to pay for rents when you were out there?

3   A     No.  The arrangement was I had a place to live and food

4   was purchased.  We kind of lived as a community, like a

5   communal setting and like a stipend of maybe 50 or $75.00 a

6   week or additional expenses if I was eating out.  It was kind

7   of like an internship, informal internship.

8   Q     Did you have any other internships, either formal or

9   informal with respect to wall finishing?

10  A     No.

11  Q     How did you find this job?

12  A     It was one of my closest friends.  That's what he did for

13  me.

14  Q     How many of these types of jobs have you had?

15  A     Throughout the years whenever I didn't have employment

16  or -- it kind of varied throughout the years.  I would always

17  kind of call him if I needed to work and to see if he had work.

18  So maybe ten times, ten jobs.  Some were very small jobs, some

19  were bigger jobs.

20  Q     How long do these wall finishing jobs normally last?

21  A     It really depended.  It could be a bathroom that took a

22  day or a week.  It could be -- and other jobs that he had

23  lasted quite a few months, it was an entire apartment.

24  Q     What was the longest job you ever had?

25  A     The longest one was about I believe four months.

1   Q    Were you paid for this type of work?

2   A    After the initial internship in 1992, yes, I was paid.

3   Q    How much money would you say you made from wall finishing?

4   A    Throughout the years I would think probably about

5   $25,000.00.  That's a guess though.

6   Q    You said 25 --

7   A    Piece together throughout the years.

8   Q    $25,000.00.  Okay.  When you returned from Paris, Renee,

9   what did you do?

10  A    I returned from Paris.  I looked for work as a bartender

11  and I got a job at Cafe Brock as a bartender.

12  Q    How did you find that job?

13  A    The Village Voice.

14  Q    What did you -- strike that.  Do you have any formal

15  bartender training?

16  A    No, I don't.

17  Q    What was your salary at Brock?

18  A    Minimum wage plus tips.

19  Q    Can you describe that?  Is that a bar?

20  A    It is a bar.  It's a small kind of cafe bar that was

21  housed inside of a photo studio of a fashion industry setting.

22  Q    How long did you work there?

23  A    I worked there I believe about six months or so.

24  Q    What are the hours when you were working there?

25  A    They varied a little bit but probably about six to 12.  It

1   wasn't a very -- 6 to 2 a.m.

2   Q    So Renee, around this time after you were working Temple

3   Bar, Manray, your production work, your wall finishing work,

4   Cafe Brock, were you able to pay any portion of your student

5   loans?

6   A    No.

7   Q    Why not?

8   A    I was still spending the money to pay for my rent and

9   utilities and at that time my drug problem was escalating.

10  Q    Around how much were you spending on drugs at this time?

11  A    At that time I guess maybe 300.00.

12  Q    Do you remember the year?

13  A    That was in 1993.

14  Q    Do you recall where you were living at this time?

15  A    I was living on West 20th Street.

16  Q    Do you recall what your rent was?

17  A    I believe it was about $700.00 a month.

18  Q    Was that just for yourself?

19  A    Yeah.

20  Q    Did your mother ever support you financially through this

21  period?

22  A    No, she did not.

23  Q    Getting back to your bartending work at Cafe Brock, did

24  you mention how long you were working there?

25  A    I believe I worked there for about six months.

1  Q    What did you do next?

2  A    I was offered a job at a new restaurant, Bar Six, as a

3  restaurant floor manager.

4  Q    When did you work at Bar Six?  Do you remember the year?

5  A    1994.

6  Q    Can you describe your responsibilities at Bar Six?

7  A    I managed the staff, I did the staff schedule, I handled

8  the floor, I functioned as a maitre de during the evening kind

9  of seating policies, who sits where.  I had a lot to do with

10 door policies and who gets in and kind of music, selecting the

11 right music.  Sometimes we had small promoters and DJs.

12 Q    How did you get this job?

13 A    The owner offered me the job when I met him just from

14 going out and, you know, various bars and clubs.

15 Q    Did you have any formal training in restaurant management?

16 A    I did not, no.

17 Q    How long were you at Bar Six?

18 A    Not very long.  I think about four months.

19 Q    What was your salary there?

20 A    It was $250 a shift.  I worked four shifts.  $1,000.00 a

21 week.

22 Q    Did you have benefits?

23 A    No, I did not.

24 Q    Any tips?

25 A    No.

1  Q    What were your hours at Bar Six?

2  A    About 4 to -- they were long shifts, 10 to 12 hour shifts,

3  4 p.m. to 3 a.m. or 6 p.m. to 5 a.m.

4  Q    Why did you only work at Bar Six for four months?

5  A    I was offered another management job at yet again another

6  new restaurant that was opening.  That was Bowery Bar and

7  Grill, or B Bar and Grill.

8  Q    What type of place was B Bar and Grill?

9  A    It was a much bigger restaurant, much more of a nightclub

10  scene.  Kind of like, you know, one of the hot, new downtown

11  restaurants.

12  Q    Why did you go to B Bar?

13  A    I thought it would be a good career opportunity.  It was

14  more exciting.  It seemed like the right thing to do.

15  Q    What was your position there?

16  A    The same position as floor manager.

17  Q    What was your salary?

18  A    The salary was the same but I was working actually more

19  hours.  I was working five days a week.

20  Q    Did you have any benefits?

21  A    No.

22  Q    So approximately how much per week were you making?

23  A    About $1,000.00 a week.

24  Q    Around the time you were working at the B Bar or Bowery

25  Bar, how much would you say you were spending on drugs?

1   A    It drastically -- it started escalating even more at Bar

2   Six.  When I was working at Bowery Bar I started doing IV

3   drugs.  I was using heroin at the time.  I was putting

4   significantly more money.

5   Q    How much more money?

6   A    Probably $1,000.00 a month.

7   Q    How often would you say you were on drugs at this time?

8   A    Always.

9   Q    Did you do drugs while you were at work?

10  A    Yes.

11  Q    Did your friends do drugs?

12  A    Some of them did, yes.

13  Q    Were you paying any of your student loans at the time?

14  A    No, I was not.

15  Q    Were you paying any rent at the time?

16  A    Yes.  I had moved.  I had a different apartment.  That was

17  when I lived on West 35th Street?

18  Q    What was your rent?

19  A    I believe it was $775.00.

20  Q    Was that for you, rent just for yourself?

21  A    Yes.  My boyfriend at some point had moved in with me as

22  well.

23  Q    How long were you at B Bar?

24  A    About six months.

25  Q    What were your responsibilities at the B Bar?

1  A     I functioned as a floor manager and a maitre de.  I

2  handled the staff and scheduling reservations.  My main job

3  really was knowing who was who, knowing who to sit next to who,

4  putting the right people on the front door, and kind of the

5  overall organization of the space.

6  Q     Why did you stop working at the B Bar?

7  A     They fired me due to my drug addiction.

8  Q     Where did you say you were living at the time?

9  A     West 35th Street.

10  Q     What happened after you got fired from the B Bar?

11  A     My drug addiction continued to escalate.  Eventually I was

12  evicted and forced to leave New York.

13  Q     Why were you evicted?

14  A     Not paying my rent.

15  Q     Why weren't you paying your rent?

16  A     Due to my drug addiction, I was spending all the money I

17  had on drugs.  I was at that time a very ill person.

18  Q     Do you recall when you got evicted?

19  A     I don't recall which month, no.

20  Q     What did you do after you got evicted?

21  A     Eventually left New York.  I went to stay with some

22  friends in Nashville for a short period, just a couple of

23  weeks, and then I went to San Francisco to stay with another

24  friend.

25  Q     During this time, do you smoke cigarettes as well?

1  A    Yes, I did.

2  Q    How much would you say you spent on cigarettes?

3  A    Probably $200.00 a month.

4  Q    Do you still smoke?

5  A    No.

6  Q    Did you do anything about your drug problem?

7  A    Yes.  I went to a rehab facility the beginning of 1996

8  when I was in California.

9  Q    What program?

10 A    It was called Steps.  It was like an in-patient, a

11 residence.

12 Q    Who introduced you to the Steps Program?

13 A    My friend John Loray [Ph.] found that program for me.

14 Q    How long was this program?

15 A    It was a 30 day program.  I stayed for an additional

16 month.  They had a sober living environment.

17 Q    So two months?

18 A    Two months.

19 Q    How much did the Steps Program cost?

20 A    I believe it was $14,000.00.

21 Q    Who paid that money?

22 A    John Loray paid for that.

23 Q    Did you ever pay him back for this program?

24 A    No, I did not.

25 Q    What did you do after you completed the Steps Program?

1  A    I went back to New York.  I stayed with my mother for a

2  period of time in upstate New York.  I'm not sure how many

3  months I was there.  I called my friend Steven Torton like I

4  had previously when I didn't have a job and went to New York to

5  work with him on a project, a [inaudible] project, classroom

6  project.

7  Q    How did you get that job?

8  A    I just called my friend and he happened to be starting a

9  job.

10 Q    How long was this job?

11 A    I believe maybe it was about a month.  I'm not exactly

12 sure how long that one lasted.  I mean also in that time I was

13 trying to reestablish myself and try to find a place to live

14 again.

15 Q    Do you remember how much you were paid with this job?

16 A    I don't remember exactly.  Probably $150 a day.  I'm not

17 sure.

18 Q    Do you recall what your hours were with this job?

19 A    They varied.  He worked all types of hours, long, a lot of

20 hours.

21 Q    What happened next?

22 A    What happened next is another mutual friend who worked

23 with Steven on these jobs got a job outside of Steven, he got a

24 job on his own.  So he asked me to work with him on that

25 project.  That was going to be a very fairly long three or four

1  month job and I got an apartment space, a loft space in

2  Brooklyn with the help of that friend, Masashi [Ph.] Urtsu

3  [Ph.] and started to work on the new project.  I also at that

4  time had relapsed and was using drugs again.

5  Q    What happened?  How did you get back into drugs?

6  A    I don't know how it happened.  I just did it.  It just

7  happened.

8  Q    Do you recall how much you spent on drugs the second time?

9  A    It started slowly but I don't even know, but slowly.

10  Probably I started maybe spending 3 or $400.00 initially but

11  within a short period of time I was spending at least $1,000.00

12  a month again, IV drug use again.

13  Q    What was your rent while you were in Brooklyn?

14  A    I think it was about $1,000.00.  I don't actually remember

15  the rent of that space.

16  Q    Were you able to pay that rent?

17  A    Not after awhile, no.  I was evicted from there.

18  Q    So then what happened?

19  A    I decided to go to a detox center, so I went back upstate

20  and I went to St. Peter's Hospital Detox Center in Albany, New

21  York.

22  Q    What made you decide to go to the detox center?

23  A    That was my own volition.  I had come to a point where I

24  was able to stop doing drugs.

25  Q    How long was that program?

1 A    That was just -- I think I was there for a week, seven or

2 ten days.

3 Q    How much was that program?

4 A    It was actually not a program price, it was like a

5 hospital price.  I believe it was about $3,000.00 which I did

6 not pay.

7 Q    Do you know if anybody paid it?

8 A    No.

9 Q    Have you used drugs since you left St. Peter's?

10 A    No, I haven't.

11 Q    When did you get out of St. Peter's?

12 A    In 1997, early 1997.

13 Q    After the detox center, what did you do?

14 A    Found my way to New York again and again I called my

15 friend Steven and he happened to be starting a job.  I

16 subletted a space from a friend on West 37th Street and I

17 started to work with Steven on this job.  It was about four

18 months I believe.

19 Q    When you say Steven, you mean Mr. Torton?

20 A    Mr. Torton, yes.

21 Q    Approximately how much do you think you made on this job?

22 A    I think about $20,000.00.

23 Q    At this point, this is after detox and you say you were

24 clean after detox and you started working for Mr. Torton again,

25 did you start paying off your student loans?

1  A    No.  I was still trying to reestablish myself and I had to

2  save money and get an apartment and get back on my feet.  I was

3  trying to begin to rebuild my life.

4  Q    After you worked for Torton, where did you go?

5  A    While I was working for him is when I moved to West 25th

6  Street.  I got an apartment there.  I started to look for jobs

7  in the restaurant industry, nightclub industry again.  This was

8  really more into 1998.  There was months where I wasn't working

9  and struggling and still trying to find a way to get back into

10  the industry and I contacted the owners from B Bar and Grill.

11  One of the owners was opening a new space and he offered me a

12  position when that space opened.

13  Q    Why did you look for restaurant positions?

14  A    I didn't really have any other direction to go into.

15  Going back to school didn't seem like an option at the time.  I

16  couldn't get work in the film industry and the wall plastering

17  was just occasional.  It wasn't something I could count on.

18  Q    This job you got in 1998, where did you work again?

19  A    The new restaurant was called Joe's Pub.

20  Q    Prior to that you worked --

21  A    Oh, prior to that.  Oh, at Bowery Bar, B Bar and Grill.

22  Q    How much --

23  A    I think initially it was called Bowery Bar but they had to

24  legally change their name so sometimes I say B Bar.  That's

25  why.  It's B Bar and Grill.  They hired me to fill in and pick

1   up some shifts here and there until the new restaurant opened.

2   Q    What was your salary over there?

3   A    I think I got $125 a shift.  That was day management.

4   That was just filling in.  They didn't have a full time

5   position for me.

6   Q    Was that more or less than you were receiving before?

7   A    Less.

8   Q    Why was it less than you were receiving before?

9   A    The dynamics of that restaurant had changed.  It was no

10  longer like the hottest place to go in downtown Manhattan and I

11  was working the day shift.  I was just doing basic floor

12  supervision for lunch.

13  Q    Why did you start working day shifts?

14  A    That's all they had available for me to do while I waited

15  for the new place to open.

16  Q    So what were your hours?

17  A    Probably 9 a.m., sometimes 10 a.m. to 3 or 4 p.m.

18  Q    Your responsibilities there, what were they?

19  A    Staff supervision, kitchen coordination, answering the

20  phones, taking reservations.

21  Q    How long did you work at B Bar?

22  A    Just for a few months waiting for the new place again.

23  Q    So what did you do next now?

24  A    Next I was hired as a night floor manager at Joe's Pub.

25  That was in October of 1998.

1  Q    Can you describe Joe's Pub?

2  A    That's basically a nightclub, a music venue for live

3  music.  It's housed in the public theater on Lafayette Street.

4  Early in the evening they would have shows, a wide range of

5  music shows, and after 11 p.m. it became a nightclub.

6  Q    When did you begin working at Joe's Pub?

7  A    In October of 1998.

8  Q    What was your salary there?

9  A    It started at $52,000.00 a year.

10 Q    What were your hours there?

11 A    My hours varied.  They could be from 4 p.m. to 2 a.m. or 6

12 p.m. to 5 a.m.  I worked five days a week.  I worked about 50

13 to 60 hours a week.

14 Q    Can you describe your responsibilities at Joe's Pub?

15 A    Yes.  I managed the staff.  I did the staff schedule.  I

16 did some of the production work arranging for the music shows

17 in the early evening and reservations and seating was a big

18 deal because you had to seat people in the right amount of

19 seats.  There was only so many tickets sold for a show.  Most

20 of my job really, the main reason they hired me was because I

21 knew who was who and what celebrity was who and what artist was

22 who and I dealt with door policy and working with nightclub

23 promoters, DJs, lighting, playing the right music.  I was

24 also -- I handled all of the finances at night.  I locked the

25 doors.

1    Q    Do you have any formal restaurant management experience?

2    A    No.

3    Q    At Joe's Pub did you get any benefits?

4    A    No, not initially.  Towards the very end I started to get

5    medical benefits, the last month that I worked there.

6    Q    Did you get any bonuses?

7    A    We did get Christmas bonuses.

8    Q    Did you get any overtime pay?

9    A    No, I was on salary.

10    Q    Approximately how many days a week did you work?

11    A    Five.

12    Q    How long were you there at Joe's Pub?

13    A    A little over two years.  Two years and two or three

14    months.

15    Q    Was that the longest time you ever held a job?

16    A    Yes.

17    Q    So Renee, you mentioned earlier to finance your classes at

18    SUNY Albany and junior college and the New School, you told us

19    you took out student loans.

20    A    Yes.

21    Q    Approximately how much do you owe in loans?

22    A    With interest it's about $35,000.00.

23    Q    After you got this job at Joe's Pub, were you able to pay

24    any of your loans?

25    A    I did.  I consolidated my loans after I started working at

1   Joe's Pub in 1999 and I started to make payments.

2   Q    Can you please flip to what's been pre-marked as

3   Plaintiff's Exhibit Number 7?

4   A    That's a notice of my consolidation loan, promissory note

5   application.

6   Q    What is the date on that?

7   A    The date is -- received April 2, 1999.

8   Q    Can you please flip to what's been pre-marked as

9   Plaintiff's Exhibit Number 8?  Can you identify that document?

10  A    Direct consolidation loan verification certificate.

11  Q    What is the date on that?

12  A    The date is April 2, 1999.

13  Q    Renee, were you able to make payments on your loans?

14  A    I was, yes, at that point.

15  Q    Do you recall how many payments you made?

16  A    I believe I made 20 payments.

17  Q    Do you recall the aggregate dollar amounts of your

18  payments?

19  A    Not the exact total.  I think it was a little over

20  $3,000.00.

21  Q    Can I refer you to what's been pre-marked as Plaintiff's

22  Exhibit Number 9?

23  A    Yes.

24  Q    Just flip through these several pages.  Can you identify

25  these documents?

1  A    They're copies of my canceled checks to the U.S.

2  Department of Education.

3  Q    From these documents can you generally tell me how much

4  you paid, not in total but for each check?

5  A    For each check my monthly payment was $168.00.  It was on

6  the graduated plan I believe.

7  Q    Could you please flip to what's been pre-marked as

8  Plaintiff's Exhibit Number 10?  Can you identify that document?

9  A    It's a payment history sheet, payments I made on the loan.

10 Q    From this document would you be able to tell me what does

11 this document say about how much in loans you've paid?

12 A    The total payment received was $3,365.00.

13 Q    Renee, why were you able to begin making payments on your

14 loans when you started at Joe's Pub?

15 A    I finally had a stable -- I realized I had a stable job, I

16 was sober, I was sane and functioning, functioning well.

17 Q    Why did you stop paying your student loans?

18 A    When I stopped paying is when I was laid off, so I no

19 longer had a means to pay it.

20 Q    Why were you laid off from Joe's Public?

21 A    They were not making a profit and they had to make

22 management cutbacks.

23 Q    When were you laid off from Joe's Public?

24 A    I remember the date was actually in December of 2000 or

25 January of 2001.

1   Q    Did you have any severance pay from Joe's Public?

2   A    I did have one month severance pay.  I believe it was one

3   month or two weeks.  I can't -- I'm not exactly sure.

4   Q    Did you have any income after Joe's Public?

5   A    I received unemployment benefits.

6   Q    Could you please -- do you remember how much per month you

7   received in unemployment benefits?

8   A    I received $410.00 weekly.

9   Q    Could you please flip to what's been pre-marked as

10  Plaintiff's Exhibit Number 11?

11  A    Yes.  That's the termination letter from the Department of

12  Labor for unemployment.

13  Q    Can you read the date on that letter?

14  A    Termination date is January 17th.

15  Q    Does this letter say at all how much you received in

16  unemployment?

17  A    $405.00 weekly, yes.

18  Q    Do you know when your unemployment ended?

19  A    I don't know the exact date.  It ran for 26 weeks.  I

20  think it ended in June of that year, of 2000.

21  Q    What did you do about your student loans at this time?

22  Were you able to pay your student loans?

23  A    I was not able to pay them.  I had obtained a deferment,

24  unemployment deferment.

25  Q    Can I please refer you to what's been pre-marked as

1  Plaintiff's Exhibit Number 12?  Can you please just identify
2  that document?
3  A    Yes.  That's the unemployment deferment request.
4  Q    Is there a date on that document?
5  A    The date is March 10, 2001.
6  Q    Did anything else happen in 2001, Renee?
7  A    Yes.  I became pregnant in 2001.
8  Q    Where were you living at the time?
9  A    I had moved to Washington Heights, upper Manhattan.  The
10 address was 20 Magaw Place.
11 Q    What was the rent there?
12 A    It was $1,250.00 to begin with.  It was $1,350.00 when I
13 moved.
14 Q    Did you have a roommate at the time?
15 A    Yes, I did.
16 Q    What did you do after you were fired from Joe's Public?
17 A    I had moved.  I found out I was pregnant.  I prepared for
18 the birth of my child.  I attempted to look for work in
19 restaurant management but that was pretty unsuccessful
20 considering I was pregnant.  After my unemployment ended I was
21 able to work for my friend, John Loray.  He was closing an
22 office space.  So I believe I started to work for him in July,
23 I think July or August of that year.  I worked for him on a
24 temporary basis.
25 Q    What type of work did you do for Mr. Loray?

1  A    He was closing an office space and shutting it down.  So I

2  just helped him with files, notified people that he was

3  closing, moved things into his home, packed things for a

4  storage space.

5  Q    Can you tell us what you did to look for jobs at this

6  time?

7  A    You know, I always looked for jobs mostly from the Village

8  Voice and Craig's List became a good source for restaurants and

9  nightclubs.  Obviously I couldn't work in a nightclub anymore,

10  I was pregnant.  So I was looking for day management positions

11  with my experience that I had.

12  Q    How much were you paid when you were with Loray at the

13  time?

14  A    He was paying me $20.00 an hour.

15  Q    How long were you there?

16  A    For about two months.

17  Q    Why were you there for only two months?

18  A    That office was closed, the work was done, and I was also

19  about to give birth.

20  Q    So approximately what month was this?

21  A    I worked for him I believe July and August and then I gave

22  birth in September, September 22nd.

23  Q    Who is Jaya's father?

24  A    Rafael Garcia.

25  Q    Was he with you when Jaya was born?

1  A     No, he was not.

2  Q     When did you meet Mr. Garcia?

3  A     I met him the year 2000.

4  Q     Were you seeing him at the time Jaya was born?

5  A     No, I was not.  No, it was a very casual relationship.  We

6  weren't having a -- we weren't boyfriend and girlfriend.  No, I

7  was not.  I hadn't seen him since I found out I was pregnant.

8  Q     Did he assist you financially in any way during your

9  pregnancy?

10 A     No, he did not.

11 Q     Did he assist you financially in any way with the birth of

12 Jaya?

13 A     No.

14 Q     Can you describe him?  What is he like?

15 A     He's Dominican.  He comes from a very Dominican family.

16 He lives with an extended family in Washington Heights.  He's a

17 failed rap artist.  He's a drug abuser.  He's a high school

18 dropout.  He's uneducated, unskilled.  I don't think he's ever

19 held a job in his life.

20 Q     Is he employed now do you think?

21 A     No.

22         MR. FOGELMAN:  Objection, Your Honor.  It calls for

23 speculation.

24         THE COURT:  Sustained.

25 Q     Did he have any income at all while you were dating him?

1   A    I know he used to cut hair for some men in the

2   neighborhood and I eventually realized that he was also selling

3   drugs.  But he didn't always have money and unfortunately I was

4   giving him money.  I was supporting him if anything.

5   Q    Who does he live with?

6   A    He lives with his aunts --

7        MR. FOGELMAN:  Objection, Your Honor.  Lack of

8   foundation.  He's asking about the present time.

9        THE COURT:  I'll overrule it if you can show that the

10  witness has some knowledge.

11       MR. ROLDAN:  Your Honor, earlier she testified that

12  she knew that he lived with his extended family.  I could ask a

13  few more questions if that would satisfy --

14       THE COURT:  Well, if you can determine what the basis

15  of her knowledge is.  You can cross examine on the issue.

16  Q    While you were seeing him, who did he live with?

17  A    He lived with his aunt and her husband, uncles.  I think

18  two uncles and an aunt, some nephews and nieces.  There were

19  about eight people living in the apartment I believe.  His

20  children, he has numerous other children which did not reside

21  with him.

22  Q    How many children does he have?

23  A    I believe he has six children.  To the best of my

24  knowledge he has six children.

25  Q    Is he married to their mother?

1  A    There's five other mothers.  No, he's not married to any

2  of them.

3  Q    Has Mr. Garcia ever given you financial support?

4  A    No, he's not.

5  Q    Does he give child support to any of his children do you

6  know?

7         MR. FOGELMAN:  Objection, Your Honor.

8         THE COURT:  Sustained.

9  Q    When is the last time you saw Mr. Garcia?

10 A    September 25th I believe it was, 2001.

11 Q    Where did you see him?

12 A    He showed up at my apartment a few days after I gave

13 birth.

14 Q    Has he contacted you since then?

15 A    Once in December of 2001.

16 Q    How did he contact you?

17 A    He telephoned me.

18 Q    Have you ever contacted him since the last time you saw

19 him?

20 A    No, I have not.

21 Q    You said earlier that he was a high school dropout.  Do

22 you remember what high school he went to?

23 A    I do not.

24 Q    Earlier you mentioned he lives with extended family.  Do

25 you remember exactly how many people he lived with at the time?

1  A    I believe it was eight but I don't know the exact number.

2  It seemed to vary.

3  Q    Renee, how did you support yourself after the birth of

4  your daughter?

5  A    After the September 11th, the World Trade Center, they

6  extended unemployment for a period, so there was another period

7  where my unemployment was reinstated.  So I used that money.

8  My friend John Loray gave me $15,000.00 as a gift for the birth

9  of my child.  I used that money.

10 Q    Did you use any of that gift to pay your student loans?

11 A    No.

12 Q    Why not?

13 A    I used all of that money to pay for rent, utilities, food.

14 Q    Were you still living at 20 Magaw?

15 A    I was.

16 Q    Did you have a roommate?

17 A    I did.

18 Q    What was his name?

19 A    Jeremy Lehman [Ph.].

20 Q    So this is around the time of -- I'm talking about around

21 the time of the birth of your daughter September 2001.

22 A    Right.

23 Q    Do you recall what the status of your loans was at this

24 time?

25 A    They were in deferment.

1  Q    Do you recall when the deferment period ended?

2  A    I don't remember which month.  It was initially a six

3  month deferment.  Probably March.

4  Q    What happened with your loans after that deferment?

5  A    There was a forbearance and then a second deferment.

6  Q    How long was this forbearance period?

7  A    I don't recall the exact length of the forbearance.

8  Q    Could you please flip to what's been pre-marked as

9  Plaintiff's Exhibit Number 13?  Could you please identify that

10 document?

11 A    It's a borrower history and activity report.

12 Q    Can you please flip to the fifth page of this exhibit?

13 What do you see on this page?

14 A    This is activity --

15        MR. FOGELMAN:  Your Honor, I'm sorry, but if counsel

16 could please direct us to the -- the pages are Bates numbered,

17 so we're all on the same page.

18        MR. ROLDAN:  Okay.

19        MR. FOGELMAN:  What page are you referring to?

20        MR. ROLDAN:  For the record, Bates number US29.

21        THE WITNESS:  Go ahead?

22 Q    Renee, can you read the last line at the very bottom of

23 this page?

24 A    Yes.  It's March 27, 2001, forbearance beginning January

25 28, 2001 and ending 1/28/01 applied.  I don't understand that

1  line.

2  Q    Can you please flip to the next page, US030?

3  A    Yes.

4  Q    You see the bottom of that page, the bottom line of that

5  page?

6  A    Okay.

7  Q    What does that line say?

8  A    October 3, 2001 forbearance beginning and -- okay, so it's

9  beginning October 28, 2001 and ending January 28, 2002.

10 Q    Okay.  So based on this, Renee, your forbearance ended

11 January 28, 2002.

12 A    Right.

13 Q    Do you recall what you did after that?

14 A    I requested a second unemployment deferment.

15 Q    Could you please flip to what's been pre-marked as

16 Plaintiff's Exhibit Number 14?  Can you please identify that

17 document?

18 A    That's the second unemployment deferment request.

19 Q    Okay.  Renee, we're still talking about September 2001.

20 When did you get back to work?

21 A    When did I get back to work?

22 Q    Mm hm.  [positive inflection]

23 A    I believe it was the beginning of -- maybe around 2002.

24 I'm not exactly sure what date I started to work.  I know I was

25 working I think it was after Jaya, it was about six months.  I

started to work occasionally on like a free-lance basis for

John Loray if he needed help with something with my daughter.

She wasn't in a day care program or anything.

Q    Was this your only source of employment at the time?

A    Yes, it was.

Q    Did your parents help you financially after Jaya was born?

A    Occasionally my mother -- not my parents, but my mother

would give me, you know, $100.00 if I needed to buy something

for her or if I was behind on a bill, or something like that,

but nothing substantial.  She would help in purchasing things

that Jaya needed like clothes or something like that.

Q    Why did you go back to work with Loray?

A    He needed help and it was great that I could do it because

I still had -- Jaya was an infant and I was able to do that

work with her with me.

Q    Do you remember how much you were paid?

A    Again, it was $20.00 an hour.

Q    What were your hours?  Was it regular hours?

A    No, there were no regular hours.  It just varied.  It

could be two hours one day or four hours another day.

Q    How long did you work in that manner for Mr. Loray?

A    On and off for a good part of I would say 2002, early

2002.

Q    Do you remember when you stopped working for Mr. Loray?

A    September 2002.

1  Q     Why did you stop working for Loray in September 2002?

2  A     My mother was diagnosed with cancer and I decided to

3  sublet my apartment and leave and go upstate to care for her.

4  Q     What kind of cancer?

5  A     Esophageal and stomach cancer.

6  Q     Did anything

7        else happen in September of 2002?

8  A     My roommate moved out that month as well.

9  Q     Did anything else happen in September of 2002?

10 A     I think that's when my deferment ended.  The second

11 deferment ended that month.

12 Q     So you say you went back to Cohoes.  What did you do while

13 you were in Cohoes?

14 A     I took care of my daughter and my mother.  That's all I

15 did.  She had surgery October 11, 2002.

16 Q     So your daughter came with you?

17 A     Yes.

18 Q     Did you work at all during this time?

19 A     No.

20 Q     Did you have any source of income during this time?

21 A     No, I did not.

22 Q     How long were you in Cohoes?

23 A     For four months?

24 Q     Then what did you do?

25 A     I returned in February of 2003.  I went back to my

apartment and I again worked for John when he needed help for

awhile.  I looked for -- I was constantly looking for some kind

of day management position at a restaurant that would make

sense and I could do with a child, have child friendly

functional hours.  That's what I did.

Q    Were you looking for any other types of jobs at this time?

A    I always had my -- I was always open to other types of

jobs but anything that I seemed possibly qualified for would

not have paid me enough to pay for child care, you know, $10.00

an hour, $15.00 an hour.  It wasn't functional to work a job

like that and I wouldn't have been able to pay my bills.  So it

made more sense to stay working for John at $20.00 an hour with

child friendly hours.  She had also started to go to day care

at that point.  So it freed me up a little bit to try to get

going in another direction.

Q    Can you describe --

A    But then --

Q    Sorry.

A    That was from about February to August I was looking for

other options while working for John and then John decided to

hire me full time in August of 2003 kind of to help him and

also mutually to benefit me.

Q    You mentioned earlier that you were finding jobs

approximately 10 or $15.00 an hour.  Can you describe what

types of jobs these were?

1    A    They were just random jobs in the Village Voice.  It said

2    maybe, you know, like office assistant and it didn't mention,

3    you know, having to know Excel program or -- you know, they

4    were very vague jobs.

5    Q    Do you have any computer skills?

6    A    No, I don't.

7    Q    Did you ever think about doing secretarial work?

8    A    No, I don't really have skills to be a secretary.

9    Q    What did you do to look for jobs around this time?

10   A    Mostly again Village Voice and Craig's List.  I always

11   maintained contact with the people that I know in the industry,

12   the restaurants that I previously worked at and always asked if

13   they knew if there was an opening, you know, maybe positions

14   coming up and then, you know, somebody that they were friends

15   with.

16   Q    Did you think --

17   A    Because they're always very, you know, very helpful and

18   would certainly try to help me.  There just didn't happen to be

19   any positions available at those places.

20   Q    Did you think about going to the B Bar again?

21   A    I did, yes.

22   Q    Why did you not?

23   A    They didn't have a position available.

24   Q    Did you think about doing more wall finishing work?

25   A    I did, and they didn't have any jobs at the time.

1  Mashashi was no longer doing that and Steven, most of his jobs

2  were in France and Brazil.

3  Q    How about film work?

4  A    No, I didn't contemplate that.  I was unsuccessful the

5  first time.

6  Q    So in August 2003 what happened?

7  A    John hired me as an employee as opposed to just working on

8  a free-lance basis, John Loray.

9  Q    What were your tasks from day to day?

10 A    I kind of functioned as his personal assistant in whatever

11 way he needed.  He had become ill and was trying to find a

12 diagnosis.  He was eventually diagnosed with probably chronic

13 Lyme Disease.  It's still a little questionable but -- so I

14 helped him a lot with medical research, attending doctor

15 appointments with him.  He worked on various art projects.  We

16 worked out of his home.  I helped him with that.  I did his

17 shopping, cooking, cleaning, laundry.

18 Q    What was your salary at this time?

19 A    He paid me monthly, $3,500.00 monthly.

20 Q    Was this a full-time position?

21 A    Yes.  It was very lenient with the hours.  I worked around

22 his waking hours and my daughter's day care hours.  So they

23 fluctuated.  Some things I could do at nighttime after she was

24 asleep, you know, if I needed to do research.  I probably

25 worked about 30 hours a week, sometimes 40.  I did work every

1   day.

2   Q    This money he was giving you, was this enough to pay your

3   bills?

4   A    It was just enough to pay the immediate bills but not

5   enough to pay my debt.

6   Q    So you didn't pay any of your student loans at this time?

7   A    No, I did not.

8   Q    Did you receive any other compensation from Loray?

9   A    No.

10  Q    Any benefits?

11  A    No benefits.

12  Q    Bonuses?

13  A    No.

14  Q    Overtime pay?

15  A    No.

16  Q    What was your rent at the time?

17  A    $1,350.00.

18  Q    How long had it been since your roommate moved out?

19  A    It had been almost a year.  He moved out in September of

20  2002.  So when I started working for John it was just about a

21  year.

22  Q    So from September 2002 until the time he moved out of this

23  current place, that place, did you split the rent with anybody?

24  A    No.  I had sublet the place for four months when I was

25  away.  I wasn't responsible for the rent then.  No, I looked

1    for roommates but that was unsuccessful.

2    Q    What happened when you looked for roommates?

3    A    I really didn't find anybody interested in living with an

4    infant.

5    Q    Were you living with Jaya at the time?

6    A    Yes.

7    Q    What was Jaya doing as you were looking for these jobs or

8    working with Loray?

9    A    She started at a home day care program.

10   Q    How much did that cost?

11   A    It was $220.00 weekly.

12   Q    Were you able to do both your job and take care of your

13   daughter at this time?

14   A    Yes.  The situation was functioning.

15   Q    Were you able to pay any of your student loans at this

16   time?

17   A    No.

18   Q    Why not?

19   A    I was not making enough to pay my debt. I was just paying

20   the immediate necessities; rent, food, utilities, and day care.

21   Q    When did you file for bankruptcy?

22   A    February of 2004.

23   Q    Were you working for Mr. Loray at the time?

24   A    I was.

25   Q    How long were you working for Loray?

1  A    It had been about six months, six to seven months at that

2  time.

3  Q    What happened?

4  A    When I filed?  That's when I had previously mentioned I

5  had the lien put on my checking account due to inability to pay

6  credit card debt.

7  Q    What happened with your job with Loray?

8  A    Oh, what happened with my job with Loray?  In April 2004

9  he fired me in a hostile argument.  We had a personality

10 conflict.  It just was unfunctional to be working with such a

11 close friend.

12 Q    Was your firing based at all on performance?

13 A    No.

14 Q    Okay.  Did you receive any severance pay?

15 A    He paid me for one -- he was paying me monthly, the

16 beginning of the month, so I would work that whole month.  So

17 he did pay me one more installment.  I can say yes.

18 Q    What did you do after that?

19 A    I prepared to move.  I decided to move out of New York.

20 Q    Where did you move?

21 A    That's when I moved to Cohoes, New York in May of 2004.

22 Q    Why did you go back to Cohoes?

23 A    The last few years with my daughter in New York were

24 proving unfunctional.  I just could not support us.  I had

25 gotten to the point where I couldn't pay my debt, I had to file

1    bankruptcy.  I wasn't going to find a job in time to pay those

2    bills and continue --

3    Q    Where did you move?  I'm sorry.

4    A    That's okay.

5    Q    Where did you move when you went to Cohoes?

6    A    I moved in with my mother and stepfather in their new

7    home.  We all moved in at the same time.

8    Q    What do you mean you all moved in at the same time?

9    A    They had just purchased their house.  They moved from an

10   apartment and moved into that house in Cohoes in May.

11   Q    Did you look for a job in New York City before you moved

12   to Cohoes?

13   A    No.

14   Q    Why not?

15   A    I knew I was moving.  As soon as I was fired I realized I

16   had to move.  It was impossible for me to stay.

17   Q    What do you mean it was impossible for you to stay?

18   A    Especially since I was paid a month in advance, as soon as

19   I received a bonus it was basically spent on bills and I had

20   enough money to either move or I could risk a chance and maybe

21   get a job in a week.  But since I wasn't able to really get a

22   job in the last few years that was functional, I knew it was

23   hopeless.  I felt utterly hopeless to stay there.

24   Q    Did you have any income after you got fired?

25   A    I received unemployment benefits eventually.  Not

1  immediately but --

2  Q    Can I please refer you to what's been pre-marked as

3  Plaintiff's Exhibit 15?  Could you please identify that

4  document?

5  A    That's my benefit determination for unemployment.

6  Q    Is there a date on that document?

7  A    Yes, July 19, 2004.

8  Q    When did your benefits start?

9  A    I believe that they started then or effective date was

10 July 5, 2004.

11 Q    How long did your benefits last?

12 A    26 weeks, ended in January of 2005.

13 Q    How much in benefits were you receiving per month?

14 A    $269.00 a week.

15 Q    When you got to Cohoes did you ever look for work while

16 you were there?

17 A    I did, yes.

18 Q    What type of work did you look for?

19 A    I looked for restaurant and management work, day

20 management work and I also just looked for random jobs like I

21 did in New York that weren't very skill specific.  I spent some

22 time trying to figure out the area and kind of where I could

23 possibly go.  It seemed like every job was paying $10.00 an

24 hour which after taxes would just be enough to pay for day

25 care.  So, the restaurants were mostly corporate type chain

restaurants and my nightclub experience didn't really
translate.  I wasn't getting any responses back and I think
that effort led me to realize I needed to figure out a
different direction to go in.  That's mostly what prompted me
to look into another career and that's when I decided to go to
nursing school.

Q    Can you describe some of these restaurants a little bit
further?

A    Yeah.  They were random -- I mean there were a few kind of
smaller restaurants that were similar to what I was familiar
with, kind of like more hip or trendier restaurants, but
they're far and few and between in a pretty small urban area.
Most of the restaurants and the things that were in the paper
that were advertising looking for management were kind of chain
restaurants, corporate restaurants.  Those kind of managers
have hospitality degrees.  It's a completely different -- I
mean it's a restaurant but it's nothing like I had experience
with.  It's a completely different environment.

Q    Do you have a hospitality degree?

A    No, I don't.

Q    Can you please flip to what's been pre-marked as Exhibit
Number 19, Plaintiff's Number 19?  Can you identify that?

A    Yes, that's my résumé.

Q    When did you make this résumé?

A    I made that -- well, this is a revised résumé, so I made

1  it after I moved to Cohoes.  It has my local number and

2  address.

3  Q    Did you use this résumé in Cohoes then?

4  A    Yes, I did.  It's the résumé I used.

5  Q    Did you ever think to look for film production work?

6  A    No, no.  I've never really been successful.  I don't think

7  there's a film industry in that capital region.

8  Q    How about wall finishing?  Did you ever think to look into

9  wall finishing while you were up there?

10  A    As far as I know, that doesn't exist there either.

11  Q    Do you recall how many places in Cohoes you sought

12  employment?

13  A    I probably sent out at least 20 résumés to various

14  restaurants and ads and hotels as well, and some random vague

15  job descriptions from Craig's List in Albany or Monster.

16  There's like a local job bank.

17  Q    What happened with your job search?

18  A    It was futile.  Nothing really happened at all.

19  Q    Did you get any interviews?

20  A    I had one phone call from one restaurant out of all the

21  jobs.

22  Q    What happened with that?

23  A    That was in a restaurant in [unintelligible], New York

24  which was about 45 minutes from Albany, and they required to do

25  a 60 hours work week like most trendy restaurants do.  It was

1  unfunctional.  I had nowhere to leave my daughter for that

2  amount of time.

3  Q     Okay.  So you mentioned that you made a decision to do

4  what?

5  A     To go to nursing school.

6  Q     When did you do that?  When did you decide to do that?

7  A     I think I started thinking about it probably September or

8  October and it kind of propelled itself by the time in November

9  I was clear that that's what I wanted to do.  I was actively

10 getting applications for schools.

11 Q     Were you still living at home at the time?

12 A     Yes, I was still living home.

13 Q     So then what happened after you decided to go to nursing

14 school?

15 A     My mother died in December soon after I started to look

16 into it.

17 Q     I'm sorry.  Was it related to her illness?

18 A     It was related, yes.  It wasn't the cancer but it was

19 related.

20 Q     What happened after your mother passed away?

21 A     Utter grief and despair.  The house just fell apart, you

22 know, and I basically had to -- I was like the only one that

23 could function.  Well, no one else offered.  I had to take care

24 of her affairs afterwards.  My stepfather was unfunctional so I

25 spent quite awhile closing checking accounts, you know, packing

1  up her clothes, bringing them to Salvation Army, all that kind

2  of stuff, making phone calls, grieving.

3  Q    Approximately how many hours a day did you do this?

4  A    Most of the work I actually probably did while my daughter

5  was in day care.  I started having her go full time because I

6  wasn't parenting well enough to be with her.  I was just too

7  distraught.  Maybe six hours a day actively doing things.  A

8  little bit of an emotional blur I have to say.  It was an

9  unexpected death.

10  Q    Did your mother leave you with anything?

11  A    No.  Her husband was the beneficiary, but their assets

12  were joint assets.  She didn't have anything on her own that

13  went to him.  She had one life insurance policy, $14,000.00.

14  My stepfather gave me $4,000.00 from that.

15  Q    What did you do with that $4,000.00?

16  A    I used it for child care expenses predominately.

17  Q    Could you please flip to what's been pre-marked as

18  Plaintiff's Exhibits 26, 27, and 28?

19  A    Mm hm.  [positive inflection]

20  Q    Can you please identify these exhibits?

21  A    These are the letter of costs and invoices from the day

22  care facility, Pine Hills Montessori Day Care.

23  Q    How much was the day care listed in Exhibit Number 26?

24  A    26 states $510 monthly for part time.

25  Q    How much in Exhibit Number 27?

1   A    $715 for full time enrollment.

2   Q    Why did you start going to full time?

3   A    I felt I was really dysfunctionally grieving and felt that

4   it was better for her to be full time.  I also felt like I

5   needed time to get our lives in order after my mother's death.

6   Q    What is your stepfather's name?

7   A    Bryce Baker.

8   Q    How long was he married to your mother?

9   A    I believe they were married for 17 years.

10  Q    So approximately how old were you when they married?

11  A    Early twenties, 21 or 22.

12  Q    Growing up were you ever close with Mr. Baker?

13  A    No, we weren't close, no.

14  Q    How often would you say you saw Mr. Baker?

15  A    I saw him probably two or three times a year when I went

16  to visit for holidays.

17  Q    Where were you living when your mother married Mr. Baker?

18  A    In Albany, New York.

19  Q    Does Mr. Baker have any other family?

20  A    He does.  He has two children from a previous marriage.

21  Q    How old are they?

22  A    I believe they're about 37 and 39, same ages as myself and

23  my brother.

24  Q    Where are they?

25  A    His daughter is in Schenectady, New York I think near

1  somewhere the capital region.  They're not close.  His son is

2  in Colorado.

3  Q    What does Mr. Baker do for a living?

4  A    He's a territory sales manager for farming equipment.

5  Q    Do you know the name of the company he works for?

6  A    MTD Products.

7  Q    How many hours a week does he work?

8  A    50 to 60 hours.

9  Q    Do you know what his salary is?

10 A    It's about $70,000.00.  Previous years he's made some

11 more.  He had some kind of commission change this year.  I know

12 he's making less.

13 Q    At the time your mother passed away, were you receiving

14 unemployment benefits?

15 A    Yes.

16 Q    When did these benefits end?

17 A    January of 2005.

18 Q    After January 2005 what did you do for income?

19 A    I had the initial $4,000.00 from my mother's life

20 insurance policy and since it was clear that I had kind of

21 taken over the household, Bryce offered to write a check.  I

22 get a weekly check from him for $270.00 and that's what I use

23 to purchase food for us, go grocery shopping with, I use it for

24 gas.

25 Q    What do you mean by take over household?

A    Somehow we just kind of fell into this situation where I really didn't have a way to leave right away and he couldn't really be alone.  So we just started somehow mutually taking care of each other initially.  I do his laundry, I shop, I cook dinner, I take care of his bills and pay his bills.  I do what my mother did for him, that part of it.

Q    How did you arrive at $270.00 a week?

A    It was what I was getting on unemployment.  I knew that was ending and he goes why don't I just write a check for the same amount and use that for food?  It ended up being where I used it more for food in the house but that's how that happened.

Q    Did you have any other income in 2005?

A    Oh, I did receive a check from Coffee and Cigarettes, again on the royalty payments, in March for 2,900 and something dollar check, and the third one in October of $400.00, and the other $400.00 check from MGM.

Q    Did you have any other income in 2005?

A    No.

Q    Since you moved to Cohoes have you ever looked for your own apartment?

A    I have, yes.  Yes.  My intention was always to just stay at their house for a few months until I figured out where to go and where to move and how to move and get a job, so I did look at apartments.

Q    When is the last time you looked?

A    November, December of 2004 before my mom died.

Q    What did you find, if anything?

A    Well, I never found one to take.  I didn't have the money
to actualize moving but I looked at options.  Mostly the
apartments there are about $700.00 I'd say average an
apartment.

Q    How many bedrooms?

A    I would say it would be $600.00, $650.00 for a one bedroom
and $750.00 for a two bedroom.

Q    These are apartments in Cohoes?

A    Yeah, in the vicinity, the general vicinity.

Q    Okay.  Is Jaya currently in day care?

A    She is.

Q    How much do you spend in day care?

A    It's $195.00 weekly.

Q    Do you think she'll always be in day care?

A    She will be in day care until this upcoming summer, until
June of 2005.  My summer session I have very early clinical
hours.  That's part of the program.  Day care is not open yet,
so I'd have to hire a baby-sitter for that five week session.

Q    How much are baby-sitters?

          MR. FOGELMAN:  Objection, Your Honor, lack of
foundation.

          THE COURT:  Overruled.

1    A    Baby-sitters -- I was never able to hire a nanny.  I know

2    that they can be extraordinarily expensive.  Baby-sitters when

3    you hire them generally average -- I'm paying today $9.00 an

4    hour.  That's how much a baby-sitter is.  If you hire somebody

5    more on a weekly basis, I'm hoping I could find somebody for

6    $300.00 for four days.  Whether it's feasible or not, I'm not

7    sure.

8    Q    While you're in summer session how many hours per day do

9    you think Jaya would need a baby-sitter?

10   A    I don't have my schedule yet but three days I know are

11   from 7 in the morning till 2 in the afternoon, so that's an

12   eight hour day with transportation.  So three eight hour days

13   and another day of class.  I'm not sure what the hours are

14   exactly yet.

15   Q    Now Renee, earlier you mentioned that you spend

16   approximately 30 to $40.00 a month with Jaya when the two of

17   you just go to dinner, or if the two of you already had dinner

18   together.

19   A    Yes.

20   Q    Did you ever take her to the movies?

21   A    I've taken her to the movies once.

22   Q    What else do you like to do for fun?  Do you ever go to

23   museums?

24   A    No.

25   Q    Do you ever take trips?

1  A    No.

2  Q    Do you ever go out to see plays?

3  A    No.

4  Q    Do you ever see any shows?

5  A    No.

6  Q    Any concerts?

7  A    No.

8  Q    Do you go out to bars?

9  A    No.

10 Q    Do you do drugs?

11 A    No.

12 Q    Do you smoke at all?

13 A    No.

14 Q    Do you drink?

15 A    No.  Occasionally wine with dinner.

16 Q    Do you go out with friends at all?

17 A    No.

18 Q    Are you --

19 A    I don't really have any friends in that area.

20 Q    Are you saving any money right now?

21 A    No.

22 Q    Do you have a 401K account now?

23 A    No.

24 Q    Do you have an IRA now?

25 A    No.

1   Q    Any investments?

2   A    No.

3   Q    Are you saving any money at all for Jaya's education?

4   A    No.

5   Q    Do you ever buy Jaya any toys?

6   A    Yes, I've bought her toys.

7   Q    What kind of toys?

8   A    Typical children's toys, stuffed animals, dolls, books,

9   crayons.

10  Q    How much per month do you think you spend in toys?

11  A    Maybe an average of $20.00 a month.  It's getting a little

12  bit harder to not buy her things.  She's demanding toys but no,

13  about $20.00 a month.

14  Q    You mentioned earlier that Mr. Baker pays you $270.00 a

15  week?

16  A    Yes.

17  Q    How does he pay you this money?

18  A    He writes a check from his bank account.

19  Q    Does he make enough money to give you this check?

20       MR. FOGELMAN:  Objection, Your Honor.

21       THE COURT:  Sustained.

22       MR. ROLDAN:  Well Your Honor, she testified that he

23  makes approximately $70,000.00 a year.

24       THE COURT:  Then what's the purpose of the question?

25       MR. ROLDAN:  I would like to get -- I'm trying to get

1   to that.  There is a -- if I may approach, Your Honor, I would

2   tell you, I would offer what she would tell me.

3            THE COURT:  If you both want to approach, you can

4   approach, but you can ask her if her stepfather has any

5   extraordinary expenses if you want to put that on the record.

6            MR. ROLDAN:  No, that's not what I'm --

7            THE COURT:  But your question is a different

8   question.  I mean how is she supposed to know that?

9            MR. ROLDAN:  Can I confer with --

10                    [Pause in proceedings.]

11  Q    Renee, who pays the mortgage on the house?

12  A    Bryce Baker.

13  Q    He just moved there when, in May of 2004; is that correct?

14  A    Yes.

15  Q    Did he pay for the mortgage by himself at the time?

16  A    At the time there was my mother's income as well.

17  Q    Since your mother passed away has Mr. Baker been able to

18  afford this mortgage?

19            MR. FOGELMAN:  Objection.

20            THE COURT:  Overruled.

21  A    The mortgage independently of all the bills?  He's able

22  to -- he doesn't make enough money to pay all of his -- he's

23  spending more than he's making.  I don't know if that's

24  answering okay.

25  Q    If he's spending more than he's making, Renee, how is he

1  able to pay $270.00 a week?

2  A    He's --

3          MR. FOGELMAN:  Objection, Your Honor.

4          THE COURT:  Sustained.

5  Q    Does Mr. Baker have any investments?

6  A    I don't believe investments, no.

7  Q    Does he have any stock accounts?

8  A    No.

9  Q    Any other types of accounts?

10 A    He has a 401K that he is using right now.

11 Q    What does he use that 401K for?

12 A    He's taken nearly half of that out this year.

13         MR. FOGELMAN:  Objection, Your Honor.  There's no

14 foundation.

15         THE COURT:  Overruled.

16 A    He's taken that money out to pay the expenses of -- to

17 cover for the loss of my mother's income, that I have no income

18 to pay for Jaya's day care currently.  He's using that money to

19 live on.

20 Q    Do you have an idea how much he's taken out of his 401K

21 since your mother died?

22 A    $40,000.00, yes.

23 Q    Renee, why does Mr. Baker pay for your expenses?

24         MR. FOGELMAN:  Objection.

25         THE COURT:  Overruled.

1  A    I think he wants me to take care of him.  He's afraid to

2  have me leave possibly.  He's trying to help me.  He knows I

3  have nowhere to go.  He's trying to help me get through school.

4  Q    Does Mr. Baker ever watch Jaya when you're not around?

5  A    No, he doesn't.

6  Q    Has he ever offered to watch Jaya while you're not around?

7  A    Not for any extensive period, no.  Maybe for 20 minutes if

8  I need to go to the store, but no.

9  Q    Do you know anybody who could watch Jaya whom you did not

10  have to pay?

11  A    No.  I don't have anybody in my life to help me with Jaya,

12  to care for Jaya, no.

13  Q    Where is Jaya today, right now?

14  A    I hired a baby-sitter through an agency.  She's watching

15  her from 7 to 5 p.m., and I have a friend that's driving from

16  Boston to watch her after that in case I don't get home before

17  then.

18  Q    How much are you paying this baby-sitter?

19  A    She's $9.00 an hour.  There's a $20.00 fee to the agency

20  per day.

21  Q    Your friend is coming in from Boston to watch Jaya

22  tonight?

23  A    Yeah.  I was afraid, not afraid -- yeah, I was afraid that

24  I wouldn't be home before 5.  I wasn't sure.

25  Q    How often does this friend come in to town to watch Jaya?

1   A    Not often.

2   Q    Why isn't Mr. Baker watching Jaya?

3   A    He's working most likely and he didn't offer.

4   Q    Has Mr. Baker ever offered you more money than $270.00 a

5   week?

6   A    No.

7   Q    Has he ever offered to pay your student loans?

8   A    No.

9   Q    Instead of going to school right now, if you had to work

10  what would you be doing?

11  A    I don't know what I would be doing.  The prospects of work

12  up there seem like I would make about $10.00 an hour and after

13  taxes it would barely suffice to pay for day care and I

14  wouldn't be able to support myself.  So I don't know what I

15  would do if I didn't have the option to go to school.  I would

16  probably go on Social Services actually.

17  Q    Let's talk about your nursing school, Renee.  I mentioned

18  you decided to change your career --

19  A    Yes.

20  Q    -- and go into nursing.  How did you come to that

21  decision?

22  A    I think initially caring for my mother when she was ill

23  and my friend John Loray also who was somewhat ill and I was

24  helping with that.  I had exposure to kind of medical, the

25  whole health field which I didn't have previously, and through

1  research and trying to figure out what direction to go in for a

2  new career to be able to sustain, support myself and my

3  daughter.  It seemed like a smart decision and I thought I

4  could initially have a two-year degree and start to work sooner

5  than attempting something else.

6  Q    What school do you currently attend?

7  A    Albany Memorial School of Nursing.

8  Q    Can you please flip to what's been pre-marked as

9  Plaintiff's Exhibit Number 20?

10  A    Yes.  The acceptance letter from the school.

11  Q    This is the school you attend?

12  A    It is.

13  Q    What's the date of that letter?

14  A    Where is the date on this letter?  Oh, January 21, 2005.

15  Q    When did your classes start, Renee?

16  A    I wasn't able to start.  That's past the spring session,

17  so I initially took some supporting classes in the summer

18  starting in May of 2005 through the conjunctive college which

19  is Hudson Valley Community College, the non-nursing courses you

20  take through that college.  So I took those and then I

21  matriculated in August of 2005.

22  Q    When do you expect to graduate?

23  A    May of 2007.

24  Q    Could you please tell us about your program?

25  A    It's a two year Associate Degree program for registered

1   nursing.  It's a much more technical practical program than a

2   Bachelor Degree.

3   Q    Do you go full time?

4   A    It's going to be some sessions are part time and some are

5   full time, depending.  This semester it's actually ten credits.

6   Next semester will be 16 credits.  That will vary.

7   Q    What are the hours of your classes?

8   A    They vary.  Currently my in-class hours are about 16

9   hours.

10  Q    Per week?

11  A    Studying, I probably spend another 15 hours studying and

12  reading, preparing.  Next semester will be significantly more.

13  Q    How much does nursing school cost?

14  A    That varies depending on credit hour.  Last semester was

15  about $2,000.00.  This upcoming semester is close to $3,000.00.

16  Q    Right now who's paying for it?

17  A    Bryce Baker.

18  Q    Is it possible to work while you study?

19  A    If I worked it would have to be in the evening and it

20  would only cover a baby-sitter.  I wouldn't have any profit

21  from working.

22  Q    Did you think about going to nursing school anywhere else?

23  A    Yes.  There are a number of colleges in the area for

24  nursing.  Maria College, I initially was going to go to Maria

25  College but then my mother -- I had met with them two days

1  before my mother died.  I probably could have gone that next

2  semester but it was postponed by the time I looked into it

3  again.  There was a waiting list.  Another college has a

4  waiting list until 2007 and it was a four year program at

5  Russell Sage College which I would have loved to have done but

6  it's $20,000.00.  The tuition was extraordinarily high.

7  Q    Any other hospitals?  I mean schools?

8  A    There's a sister school of Memorial Hospital which is

9  Samaritan Hospital.  I just chose Memorial.  It was a little

10 bit closer.  Alice Hospital has a program that also had a

11 waiting list.

12 Q    Did you ever think about going to nursing school in New

13 York City?

14 A    Previous to this or now?

15 Q    Now.

16 A    Now.  Yes, I fantasize about going to different schools in

17 different areas but I can't imagine how I could move back to

18 the city and pay for tuition and support ourselves.  I don't

19 think it's feasible.

20 Q    So what degree will you have when you graduate?

21 A    I'll have an Associate's Degree.

22 Q    What happens then?

23 A    You have to pass the boards to become licensed.

24 Q    Could you describe that process?

25 A    I think you have to wait three months after graduation to

take the boards.  They may have changed that policy.  Maybe

it's a shorter time period now.  It's an average of a four hour

test.  You pay I think a $400.00 fee and if you pass the test

you become licensed as a registered nurse.

Q    Can you be employed prior to passing this test?

A    You can be, yes, contingent that you pass the boards in a

certain amount of time.

Q    What type of job could you get if you don't pass the test?

A    Then you would only be hired as a licensed practical nurse

which is much less in salary.

Q    Any idea how much they make?

A    I think they make about $11.00 an hour.

        MR. FOGELMAN:  Objection, Your Honor.

        THE COURT:  Overruled.

Q    Renee, what happens if you don't pass this licensing test?

A    You can attempt to take it again.  You have to wait a

certain amount of time.  I'm not sure how long.

Q    Do you plan on getting a nursing job after you graduate?

A    Yes.

Q    Where do you plan on working?

A    I don't know yet.  I don't know where I'll be living or

what is going to make sense, or what my specialty will be by

the time I graduated.  I think that will be somewhat contingent

on what skills I find I have as I go through the process.

Q    Do you know anything about the nursing job market in your

1   area?

2   A     Some.  I don't know everything.  I know the hospital that

3   I'm attending school, the starting salary for a floor nurse is

4   $16.00 an hour.  There's another hospital, you have to have a

5   Bachelor's Degree for most of the floors, most of the units.

6   There's one floor they hire Associate's Degrees, and I believe

7   they pay $20.00 an hour.

8   Q     What's the name of that hospital?

9   A     That's Albany Medical Center.

10  Q     Have you and your stepfather discussed what will happen

11  after you graduate?

12  A     Not in a specific date or the day after graduation.  We

13  have discussed the future.  We discussed that there's a good

14  likelihood we won't be living together.  He may have to sell

15  the house if he's not able to maintain -- the lifestyle that we

16  have cannot continue for an extended period, so we are in the

17  process of trying to decide what to do.

18  Q     What do you think will happen?

19  A     I think he'll have to sell the house eventually.  I don't

20  know how I'll move out.  I don't know how I'll have an

21  apartment, but he'll probably move to an apartment of his own.

22  Q     Do you think you'll live with your stepfather after you

23  graduate?

24  A     I don't think so, no.

25  Q     Why not?

1    A    I don't want to.  I want to have my own home, my own life

2    with my daughter.  I don't think we have any intention of

3    moving to another place together.  I don't believe that he'll

4    keep that house for much, you know, for that many years.

5    Q    Why do you want to have your own place again?

6    A    I feel like I'm living with Mr. Baker due to extraordinary

7    circumstances.  It was the last thing I ever imagined that I'd

8    be living with my mother's husband.  I don't have an interest

9    in living with him.  I care about him as a person and I want

10   him to be safe and well but I don't want to take care of him

11   for the rest of my life.  I'd like to have a chance of having

12   my own life, my own home again, raising my daughter in my

13   environment, not his.  I'm not sure.

14   Q    Do you anticipate paying your own expenses?

15   A    I'm sorry?

16   Q    Do you think you'll pay your own expenses?

17   A    Yes.

18   Q    Do you think you'll be able to pay your loans after you

19   graduate?

20   A    I don't foresee myself being able to do that, no.

21   Q    Why not?

22   A    The expenses of just renting an apartment and the

23   necessity of a vehicle at least in the capital district region,

24   and I'll always have child care expenses because I'm not going

25   to find a job that coincide with school hours, food, medical

1  expenses, emergencies, care of my daughter.  I have never been

2  able to seem to find or calculate what I can make that I'd make

3  enough to surpass that and be able to pay those off.

4  Q    Are you familiar with the repayment plans offered by the

5  Federal Government?

6  A    Yes, I am.

7  Q    Have you heard of the standard plan?

8  A    Yes.

9  Q    Have you heard of the extended plan?

10 A    Yes.

11 Q    Have you heard of the graduate's plan?

12 A    Yes.

13 Q    Have you heard of the income contingent plan?

14 A    Yes.

15 Q    Have you considered these plans?

16 A    Yes.

17 Q    Do you think you will be able to afford any of these

18 plans?

19 A    I do not.

20 Q    Why not?

21 A    I don't believe that I'll make enough money to support us

22 and pay off the loans.

23 Q    Renee, have you had any health problems in 2005?

24 A    Yes.

25 Q    What kind of problems?

1  A    I was diagnosed with Morton's Neuroma.  It's a nerve

2  problem in the feet.  It's a condition where the nerve gets

3  trapped in between the metatarsal bones in the foot and becomes

4  swollen and irritated and painful.  I tried some conservative

5  methods to treat that which didn't work and I had to have

6  surgery.  That happened in April.

7  Q    Could you describe the pain?

8  A    Kind of like a pinching radiating pain.  Sometimes it

9  would be numb.  It's a nerve pain.  The symptoms of the nerve

10 dysfunction vary depending on --

11 Q    Where do you feel this pain?

12 A    The ball of the foot.

13 Q    Do you know when you developed this problem?

14 A    I don't know exactly.  It started gradually getting worse

15 over a period of about two years I think before I addressed it.

16 Q    Does this impact your daily activities at all?

17 A    I'm aware of it daily.  Yes, it prevents me from doing

18 certain types of activities or wearing certain shoes or

19 exercising in certain ways like running, or something like

20 that, I'm not able to do.

21 Q    Which foot does it affect?

22 A    It's both feet.  The surgery I had on the left foot.

23 Q    Has this condition affected your work at all?

24 A    Well, I haven't been working, so no.

25 Q    Do you think this condition would impact your work if you

1  were to work?

2          MR. FOGELMAN:  Objection.

3          THE COURT:  Overruled.

4  A    I'm not sure yet.  I'm hoping that it doesn't.  I know

5  standing for long periods of time can exacerbate the problem.

6  I have orthotics.  It could impact the types of nursing I can

7  do.  It's possible.  I'm not sure.  It's a concern of mine.

8  Q    Such as what?  Can you explain that further?

9  A    It might be that, you know, after I start working and

10 standing on my feet for 40 hours a week for months that it

11 becomes intolerable.  Maybe I would have to do another kind of

12 nursing.  Maybe a smaller office, maybe as an assistant to a

13 physician in an office where you're not standing so much or

14 walking so much.

15 Q    Do you take medication for this condition?

16 A    No.

17 Q    You mentioned surgery; is that correct, Rene?

18 A    Yes.

19 Q    When did you have surgery for this neuroma?

20 A    April of 2005.

21 Q    What happened?

22 A    It was an unsuccessful surgery.  The surgeon most likely

23 probably didn't cut one of the nerves back far enough and it

24 adhered into the scar tissue.  So it's created a similar

25 sensation that's kind of always slightly always numb and would

1  require a second surgery to have it resolved.

2  Q    Could you please describe the surgery physically what they

3  do to you?

4  A    They make an incision on the top of the foot, or they

5  could do it from the bottom.  Mine was from the top of the foot

6  and they resect the nerve.  They just simply cut the nerve out

7  of the space.  Then the nerve synapses.  The idea is then it

8  would snap back up into the top of your foot so you --

9  basically like my middle toe now is numb because the nerve on

10 both sides of that toe was cut.

11 Q    Are you going to have a second surgery?

12 A    I don't have plans to just because of time constraints and

13 I'm frightened that it would get worse rather than better.

14 Q    Who paid for the first foot surgery?

15 A    I receive New York State Government funded health

16 insurance, Family Health Plus, through Capital District

17 Physicians Health Plan, CDPHP.

18 Q    Do you have any other conditions?

19 A    I had another condition which I had surgery for this year

20 that was an eyelid condition called ptosis.  It's a congenital

21 defect.  It could be the nerve or the muscle of your eyelid and

22 your top eyelid is, upper eyelid is a little bit lower than it

23 should be.  In my case it was obscuring my pupil and affecting

24 my field of vision.

25 Q    When were you diagnosed with this?

1  A    In January of 2005 I went to just a simple -- my

2  optometrist and she told -- I never knew the name of it before.

3  I always knew I had it.  She said that it might be affecting my

4  vision so I went to an eye surgeon.  It was January of 2005.

5  Q    Have you been treated for this condition?

6  A    Yes.  I had surgery in March of 2005.

7  Q    Could you please describe that surgery physically what

8  they do to you?

9  A    Make an incision.  This is an internal incision in the

10 eyelid and they shortened one muscle to try to -- with the

11 attempt of making the eyelid be at the correct height.  That

12 surgery was unsuccessful.

13 Q    Were you under anesthesia at the time?

14 A    Yes.  You have a local anesthesia and a conscious

15 sedation.  It's not general anesthesia.

16 Q    So what happened after your first surgery?

17 A    It healed and it became obvious that it wasn't in the

18 right position, so it required a second attempt.  That occurred

19 in July of 2005.  The surgeon attempted a different technique

20 which was an external incision and a shortening of a different

21 muscle intended in the eyelid.

22 Q    Was that surgery successful?

23 A    Initially it was not.  It was over-corrected, so then my

24 cornea was over-exposed and the sclera of my eye was exposed,

25 so we had to do a revision removing an internal suture and that

1  brought it down to the right height.  At that time it did heal

2  fairly well.

3  Q    How long is the recovery time for this type of surgery?

4  A    For the eye surgery?  I had some complications with the

5  surgery so it could vary from about two weeks to a month.  It's

6  really about six -- any surgery it's about a six week healing

7  process fully for swelling and results.

8  Q    So is that the same for the foot problem, the six week

9  recovery?

10  A    Yes, yes.

11  Q    Did you ever --

12            THE COURT:  How much longer are you going to be?

13            MR. ROLDAN:  Very, very short, Your Honor.  Not long

14  at all.

15  Q    Has this condition been corrected?

16  A    The eyelid is at the right height, yes.  It didn't

17  completely correct my vision issue but it helped it.

18  Q    Would this condition ever come back?

19            MR. FOGELMAN:  Objection.

20            THE COURT:  Sustained.

21  Q    Who is your insurer right now?

22  A    City PHP Family Health Plus.

23  Q    Getting back to your foot condition, you testified that

24  both feet are affected.  Do you need surgery on both feet?

25  A    To eradicate the problem, yes.

1  Q    Do you have any other medical issues?

2  A    I also dealt with a hearing loss this year.  I have

3  moderate hearing loss in my left ear and I attempted to treat

4  that with a hearing ear, multiple attempts with hearing aids

5  which was unsuccessful.  Hearing loss is due to environmental

6  exposure from working nightclubs.

7  Q    Do you have any other medical problems?

8  A    No, I do not.

9  Q    How about your daughter?  Does she have any medical

10 problems or any medical condition?

11 A    She has mild asthma.  She has environmental allergies.

12 She's had some dental issues.  She had an enamel defect and

13 required a good amount of work on her teeth.

14 Q    Take these one by one.  What does Jaya take for her

15 asthma?

16 A    Albuteral inhaler as needed.

17 Q    How much does this cost?

18 A    I don't know how much it is if you were to pay for it.

19 It's covered through insurance.

20 Q    You mentioned another dental problem; is that correct?

21 A    Yes.  She had an enamel defect on some of her teeth and

22 they eroded.   She had to have root canal and caps put on two

23 teeth.  Then she had some work done on some other teeth.

24 Q    How much did that cost?

25 A    In total probably well over $2,000.00 spent on dentists.

1   That was in New York even before I moved up here.  Once she got

2   the insurance, part of the insurance initially covered I think

3   $700.00 for the root canal, another installment of $500.00 I

4   had to pay because they no longer covered that dentist.

5   Q    Does Jaya have any other medical conditions?

6   A    Allergies.  She has severe allergies to animals and some

7   seasonal allergies.

8   Q    Does she take anything for that?

9   A    She takes Clariton for that.

10  Q    How much does that cost?

11  A    About $20.00 a month I spend.

12  Q    Does she have any other medical problems?

13  A    No, she does not.

14          MR. ROLDAN:  I have no further questions, Your Honor.

15          THE COURT:  All right.  We'll take a lunch break and

16  then start with cross examination at 2:00.

17          MR. ROLDAN:  Thank you, Your Honor.

18          THE COURT:  All right.  Do you have any other

19  witnesses?

20          MR. ROLDAN:  No, Your Honor.

21          THE COURT:  Okay.  Thank you very much.  Please don't

22  discuss your testimony during the break.

23          THE WITNESS:  Okay.

24          THE COURT:  Thank you.

25          THE WITNESS:  Thank you.

1        MR. ROLDAN:  Thank you, Your Honor.

2                   (Recess)

3        THE COURT:  Please be seated.  Ms. French, you can

4   resume the stand.  You're still under oath.  Cross examination?

5        MR. FOGELMAN:  Thank you, Your Honor.

6                   CROSS EXAMINATION

7   BY MR. FOGELMAN:

8   Q    Good afternoon, Ms. French.

9   A    Good afternoon, Mr. Fogelman.

10  Q    Isn't it true that you would describe your overall health

11  status as good?

12  A    Yes.

13  Q    Excuse me?

14  A    I had described it as that, yes.

15  Q    In fact, you did not file this adversary proceeding

16  because of health concerns; isn't that correct?

17  A    That is correct, sir.

18  Q    You testified that you have Morton's Neuroma; correct?

19  A    Yes.

20  Q    Isn't it true that as you put it, this is not a

21  preventative factor from work; correct?

22  A    I think I did say that in the deposition, yeah.  I think I

23  meant work in a general, overall sense.

24  Q    Do you recall testifying at deposition that the Morton's

25  Neuroma is not a preventative factor from work?

1   A      Yes.

2   Q      You testified that you had a surgery to correct it; is

3   that right?

4   A      Yes.

5   Q      You testified that you expect to have a second surgery;

6   isn't that true?

7   A      Yes.

8   Q      You also testified that you expect that successful surgery

9   should take care of the problem; isn't that correct?

10  A      Yes.

11  Q      You also testified that you have ptosis; is that correct?

12  A      Yes.

13  Q      That's a congenital condition where the eyelid is lower

14  than it should be; correct?

15  A      Yes.

16  Q      That's now been resolved; correct?

17  A      Yes.

18  Q      That eye condition never affected your ability to work; is

19  that correct?

20  A      Correct.

21  Q      Isn't it true that you did not file this adversary

22  proceeding because of any medical problems of Jaya French;

23  correct?

24  A      Correct.

25              MR. FOGELMAN:  Your Honor, may I approach to attain

1  the exhibits?

2           THE COURT:  Yes.

3           MR. FOGELMAN:  The Government's exhibits.

4           THE COURT:  Why don't you take the originals?

5           MR. FOGELMAN:  Okay.

6  Q    I'd like to direct your attention to Exhibit 18.  Just

7  tell me when you have it.

8  A    Okay.  I've opened to that page.

9  Q    Do you recognize this document?

10 A    Yes.

11 Q    What is it?

12 A    The interrogatories and document requests for this

13 proceeding.

14 Q    Turn your attention to the last page of that document.  Is

15 that your verification that everything written in there is to

16 the best of your knowledge true and complete?

17 A    It is.

18 Q    Is that your signature?

19 A    Yes, it is.

20 Q    Is that handwritten in June 6, 2005?

21 A    Yes.

22 Q    If I can turn your attention to interrogatory number 13?

23 A    Okay.

24 Q    The question was to the extent that you are claiming that

25 your loans are dischargeable based on any physical, medical, or

1  mental condition of you or your dependents, identify by name,

2  current or last known address, and telephone number each and

3  every physician, surgeon, chiropractor, alternative medicine

4  practitioner or therapist, medical group, medical office,

5  pharmacist, hospital, health maintenance organization,

6  laboratory, or other medical, psychological, or mental health

7  care personnel or organization that examined you or your

8  dependents, provided medical care or treatment to you or your

9  dependents, was consulted by you or your dependents.  Do you

10  recall answering that plaintiff is not claiming that her loans

11  are dischargeable based on any present physical, medical, or

12  mental condition of her own or her dependents?

13  A    Yes.

14  Q    Isn't it true that you've never updated this document?

15  A    It is true.

16  Q    As you testified earlier, you have work experience in

17  interior wall finishing; is that correct?

18  A    Correct.

19  Q    You did a four month internship in Paris in 1992 in

20  interior wall finishing; is that true?

21  A    Yes.

22  Q    You also worked in interior wall finishing in '97 and '98

23  as a free-lance contractor; correct?

24  A    Correct.

25  Q    For that work in '97 and '98 you were paid $1,000.00 per

1   week; is that correct?

2   A    Approximately.

3   Q    I'd like to direct your attention to Exhibit 6.  Can you

4   please look through this document and confirm that these are

5   true and accurate copies of tax returns that you filed for 1996

6   through 2004?

7   A    They appear to be all the accurate ones that I provided,

8   yes.

9   Q    The work that you did for BMM Art and Computer, that was

10  interior wall finishing work; correct?

11  A    Correct.

12          THE COURT:  Is Exhibit 6 of the Government's the same

13  as Exhibit 6 of the debtor's?

14          MR. FOGELMAN:  Your Honor, I haven't compared them

15  page by page.  We just received these exhibits this morning.

16          THE COURT:  All right.  It's just a coincidence that

17  they have the same number?

18          MR. FOGELMAN:  Yes, Your Honor.  Perhaps it tracks

19  the plaintiff deposition is perhaps why both parties have the

20  same.

21          THE COURT:  All right.  That's fine.

22  Q    In 1996 you earned approximately $17,000.00 in interior

23  wall finishing for BMM Art and Computer; is that correct?

24  A    Correct.

25  Q    On your tax return for '96 you list your occupation as

1  decorative artisan; is that correct?

2  A    Yes.

3  Q    Is it correct that the work you did for Steven Torton

4  that's reflected in these tax statements was for interior wall

5  finishing?

6  A    Yes.

7  Q    In 1997 you earned approximately $14,000.00 working for

8  Mr. Torton; correct?

9  A    Correct.

10 Q    That $14,000.00 is actually wages paid after he formally

11 hired you; correct?

12 A    Formally hired me?

13 Q    As an employee as opposed to an independent contractor.

14 A    Yes, yes.

15 Q    In fact, you also made $16,000.00 that year, $16,425.00 in

16 non-employee compensation as a contractor; is that correct?

17 A    Can you refer me to which page that has that number?  I'm

18 not sure what it is.

19 Q    That's French 339 with a $16,425.00 from 1997.  The page

20 before that, French 338, is the $14,000.00, the W2 from Steven

21 Torton.

22 A    Correct.

23 Q    So cumulatively that year you earned over $30,000.00

24 working for Steven Torton in interior wall finishing; is that

25 correct?

1  A    Earned before expenses; correct.

2  Q    This Exhibit 6, does this accurately reflect all the

3  income that you received from 1996 through 2004?

4  A    Yes.

5  Q    Now, while attending school you worked at the Temple Bar

6  in New York as you testified; correct?

7  A    Correct.

8  Q    You also worked as a waitress in the Manray Restaurant in

9  the early '90s; correct?

10  A    Correct.

11  Q    Isn't it true that you made $500.00 a week in those jobs?

12  A    Approximately.  I don't recall the exact weekly amount.

13          MR. FOGELMAN:  Your Honor, may I approach?

14          THE COURT:  Yes.

15  Q    Ms. French, I'm going to show you a copy of your

16  deposition transcript.

17          MR. FOGELMAN:  Would Your Honor like me to mark this

18  as a separate exhibit?

19          THE COURT:  Are all the excerpts already in --

20          MR. FOGELMAN:  These are not the excerpts --

21          THE COURT:  -- Exhibit 16?  Not necessarily?

22          MR. FOGELMAN:  Not necessarily, Your Honor.

23          THE COURT:  You should -- well, we'll mark it for

24  identification but you certainly can use it.  It's her

25  deposition dated what?  What was the date?

1      MR. FOGELMAN:  This is dated July 8, 2005.

2      THE COURT:  All right.  As far as I'm concerned you

3  can use it as a deposition without marking it for

4  identification.  Mr. Roldan, do you want it marked for

5  identification?

6      MR. ROLDAN:  It's not necessary, Your Honor.

7      THE COURT:  All right.  Please go ahead.

8      MR. FOGELMAN:  You can hold onto this.

9  Q   I'd like to refer you to Page 131.  Excuse me, 122.

10 A   122?

11     MR. FOGELMAN:  Your Honor, I have a copy of the

12 deposition transcript if it would be helpful.

13     THE COURT:  No, go ahead.

14 Q   Just tell me when you have the page.

15 A   I have it.

16 Q   Isn't it true when you were asked what was your salary at

17 Manray you answered probably like $500.00 a week?

18 A   Yes.

19 Q   You can put the deposition aside for now.  You also

20 bartendered at Cafe Brock in the early '90s; correct?

21 A   Correct.

22 Q   Isn't it true you made $500.00 a week in that job?

23 A   Yes, about that much.

24 Q   Now, in or around 1993 or 1994 you started working in

25 restaurant management; correct?

1  A    '94 I believe it was, yes.

2  Q    You worked at Bar Six in '03 or '94?

3  A    In '94.

4  Q    You earned $1,000.00 per week at Bar Six; correct?

5  A    Yes.

6  Q    You stopped working there because you went to a different

7  restaurant, the B Bar and Grill; correct?

8  A    Correct.

9  Q    You earned $1,000.00 a week working four nights at the B

10 Bar and Grill; correct?

11 A    Five nights for B Bar and Grill.

12 Q    That was $1,000.00 a week?

13 A    Yes.

14 Q    You stopped working there because you were fired for drug

15 use; correct?

16 A    Correct.

17 Q    You went through rehab in 1995 for two months and then

18 again in 1997; correct?

19 A    I made a mistake when I said 1995.  It was 1996.

20 Q    So you went through rehab for two months in 1996 and then

21 again in 1997; correct?

22 A    Correct.

23 Q    Since then you've been drug free; correct?

24 A    Correct.

25 Q    That was before you consolidated your loans in 1999;

1  correct?

2  A    Correct.

3  Q    Since '97 you haven't regularly taken drugs or alcohol; is

4  that correct?

5  A    Correct.

6  Q    In 1998 you went back to work at the B Bar and Grill as a

7  restaurant manager; correct?

8  A    Correct.

9  Q    Your salary at that time was $600.00 a week; correct?

10 A    Possibly.  I really was just filling in at the time

11 picking up shifts and there wasn't an actual salary.  It was

12 sporadic until the new restaurant opened.

13 Q    I'd like to refer you to Page 147 of your deposition

14 testimony.

15 A    I'm there.

16 Q    Isn't it true when you were asked how much a week were you

17 earning at the B Bar and Grill your answer was probably

18 $600.00?

19 A    I did answer -- I did see that; yes.

20 Q    You were working from 10 a.m. to 4 p.m.; correct?

21 A    Yes.

22 Q    The daytime shift?

23 A    Yeah.  It varied a little but it was approximately those

24 hours; yes.

25 Q    You worked there until the opening of Joe's Public;

1  correct?

2  A     Yes.

3  Q     The work at Joe's Public involve managing a bar restaurant

4  and music venue; correct?

5  A     Correct.

6  Q     Your salary the first year was $52,000.00; correct?

7  A     Correct.

8  Q     The next year you made $54,000.00; correct?

9  A     Correct.

10  Q     Your job responsibilities included staff management,

11  scheduling, hiring, training and supervision; correct?

12  A     They were part of the responsibilities; yes.

13  Q     I'd like to refer you to Exhibit 21 of the Government's

14  exhibits which is a copy of your résumé.

15  A     Yes.

16  Q     Is this document true and accurate?

17  A     Is everything I wrote in the document -- I'm sorry, I

18  don't --

19  Q     Is everything you wrote in the document true and accurate?

20  A     It's an exaggerated résumé for purposes of getting a job

21  in a different type of venue.

22  Q     What's exaggerated on here?

23  A     I kind of down played the fact that it was a nightclub and

24  made it sound like it was more of a kind of a traditional

25  restaurant atmosphere.

1  Q    Did you actually work at the B Bar and Grill from 11/94 to

2  12/97?

3  A    No.  The time -- the whole thing is fabricated really to

4  present myself in a better light.  Not the while thing is

5  fabricated but it's exaggerated.

6  Q    Is it correct that you helped open all three

7  establishments?

8  A    Yes.

9  Q    Is it correct that you handled all aspects from employee

10  experience hiring, development and training, work flow

11  assignment, monitoring, coaching and mentoring, motivation and

12  performance improvement and corrective action?

13  A    Yes, I did do that.

14  Q    Is it true that you were involved with booking and

15  producing private events and creative customer relations?

16  A    Yes.

17  Q    Is it true that you demonstrated leadership and managed

18  staff to effectively carry out operations?

19  A    I hope so, yes.

20  Q    Is it true to the best of your knowledge?

21  A    Yes.

22  Q    Is it true that you're responsible for scheduling

23  [unintelligible] employees, payroll costs, and to cover service

24  requirements?

25  A    Yes.

1  Q    Is it correct that you handled all monies including all

2  reports, daily reconciliations, and bank deposits?

3  A    At various times I handled various reports; yes.

4  Q    So these responsibilities that you list here are in fact

5  the responsibilities that you carried out; correct?

6  A    Yes.

7  Q    Now, you worked at Joe's public until around December 2000

8  or January 2001; correct?

9  A    Correct.

10 Q    Isn't it true that you weren't fired because of

11 performance?

12 A    Correct.

13 Q    In fact, you were fired because they were making cutbacks;

14 correct?

15 A    Yes.

16 Q    After leaving Joe's Public you received unemployment

17 benefits from January 2001 to June 2001; correct?

18 A    Yes.

19 Q    You then worked for John Loray in June 2001; correct?

20 A    I believe I started in July.  I think it was July and

21 August of 2001.

22 Q    He hired you to help close down his office; correct?

23 A    Yes.

24 Q    You helped him cancel accounts and pack up; correct?

25 A    Yes.

1   Q     You gave birth in September 2001; correct?

2   A     Yes.

3   Q     At the time you gave birth Mr. Loray gave you a gift of

4   $15,000.00; correct?

5   A     Yes, around that time period.

6   Q     For six months after you gave birth you stayed home

7   because you wanted to be home with Jaya; correct?

8   A     Yes.

9   Q     During those six months you were not seeking employment;

10  correct?

11  A     Correct.

12  Q     You started working again in March 2002; correct?

13  A     I believe it was around that time; yes.

14  Q     That was for Mr. Loray; correct?

15  A     Yes.

16  Q     Mr. Loray's company is Lagardo [Ph.]?

17  A     Yes.

18  Q     So when the tax records reflect that you were paid by

19  Lagardo, that was Mr. Loray's company?

20  A     Yes.

21  Q     You worked in production as a personal assistant then;

22  correct?

23  A     Yes.

24  Q     You stopped working for Mr. Loray in September 2002;

25  correct?

1  A    Yes.

2  Q    At that time you moved to Cohoes, New York to stay with

3  your mother; correct?

4  A    Correct.

5  Q    You were in Cohoes for four to five months; correct?

6  A    Four months.

7  Q    Isn't it true you didn't work during that time?

8  A    Yes.

9  Q    At that time you were taking care of your mother and your

10 daughter; correct?

11 A    Correct.

12 Q    You returned to New York in February 2003; correct?

13 A    Yes.

14 Q    From February 2003 until August 2003 you worked

15 intermittently for John Loray; correct?

16 A    Yes.

17 Q    You were only working 20 hours a week at $20.00 an hour

18 during the several months; correct?

19 A    Approximately.

20 Q    Isn't it true that during that time you worked -- excuse

21 me, you applied to work as a restaurant manager at

22 approximately ten locations?

23 A    I don't recall the exact number.  I was always actively

24 seeking, thinking, and looking for jobs.

25 Q    Please turn to Page 158 of the deposition.  Do you recall

1  that when you were asked how many restaurants you applied to

2  during that time your answer was, "Probably maybe ten but I was

3  working free-lance for John too and I wasn't sure which

4  direction I was going."

5  A    Yes.

6  Q    Does that refresh your memory that you applied to

7  approximately ten restaurants during that time?

8  A    That was a guess but that was applications that made sense

9  that it might be feasible to get a job at.  I looked for jobs

10 outside the applications.

11 Q    So is it correct that you applied to approximately ten

12 restaurants?

13 A    I'm guessing so.

14 Q    That's what you testified at deposition; correct?

15 A    Yes.

16 Q    You don't recall interviewing with any restaurants during

17 this time; correct?  The time being February 2003 to August

18 2003?

19 A    No, I don't believe so.

20 Q    But in August 2003 you began to work full time for Lagardo

21 Productions and John Loray; correct?

22 A    Yes.

23 Q    That paid 3,500.00 a month; correct?

24 A    Correct.

25 Q    You worked at this job through April of 2004; correct?

1  A      Yes.

2  Q      At that point you were fired?

3  A      Yes.

4  Q      At that point you moved to Cohoes, New York in May 2004;

5  correct?

6  A      Yes.

7  Q      Before you moved you didn't look for any type of jobs,

8  secretarial jobs at that point; correct?

9  A      No.

10  Q      You didn't look for any restaurant positions at that time;

11  correct?

12  A      No.

13  Q      Isn't it true that you didn't look at that point because

14  you just gave up?

15  A      Yes.

16  Q      The work you did for Mr. Loray was largely secretarial in

17  nature; correct?

18  A      Secretarial?  No.

19  Q      Please turn to Page 159 of your deposition.

20  A      I see that I said that but that was incorrect.

21  Q      So at your deposition it is true that you said the work

22  you did was largely secretarial; correct?

23  A      I did say that, yeah.

24  Q      I'm referring you to Exhibit 17 of the Government's

25  deposition exhibits.  Excuse me, the Government's exhibits at

1  trial.

2  A     Yes.

3  Q     Have you seen this document before?

4  A     Page 17, yes.

5  Q     Is this corrections that you made to your deposition

6  transcript?

7  A     Yes.

8  Q     Did you sign this document at the bottom?

9  A     I did.

10  Q     In fact, it was subscribed to and sworn; correct?

11  A     I'm sorry?

12  Q     It was subscribed to and sworn on the bottom of the

13  document?

14  A     Yes.

15  Q     In this document you didn't make any correction to the

16  testimony that the work you did was largely secretarial;

17  correct?

18  A     I did not, no.

19  Q     Isn't it true that after you moved to Cohoes, New York in

20  May 2004 you conducted a job search from May 2004 through

21  November of 2004?

22  A     Yes.

23  Q     Isn't it true that the last time you applied for a job was

24  in November of 2004?

25  A     Probably yes.

1   Q    Between May of 2004 and November of 2004 isn't it true

2   that you applied to jobs at 20 restaurants?

3   A    My guess is about 20 restaurants, yes.

4   Q    You applied to these jobs by mailing in résumés; correct?

5   A    Yes.

6   Q    You didn't have any interviews; correct?

7   A    Correct.

8   Q    You were contacted by one restaurant; correct?

9   A    Yes.

10  Q    But you declined the interview; correct?

11  A    Yes.

12  Q    In addition to applying for jobs in the restaurant

13  industry you applied for approximately 20 additional jobs;

14  correct?

15  A    Yes.

16  Q    Isn't it true that you don't recall the nature of the jobs

17  that you applied for?

18  A    Not specifically.

19  Q    Isn't it true that you applied for these jobs online?

20  A    Yes.

21  Q    You testified that you stopped looking for a job in

22  November of 2004.  Your class work started in May 2005;

23  correct?

24  A    Yes.

25  Q    That was only a six week program at that point; correct?

1  In May of 2005.

2  A    Correct.

3  Q    Your full-time studies began in September of 2005;

4  correct?

5  A    Yes.

6  Q    Between November 2004 and May of 2005, isn't it true that

7  you kept Jaya in full-time day care even though you were not

8  looking for a job?

9  A    Yes.

10 Q    You're presently enrolled in nursing school at Memorial

11 Hospital; correct?

12 A    Yes.

13 Q    That's a two-year associate program for nursing; correct?

14 A    Correct.

15 Q    You matriculated in the fall of 2005; correct?

16 A    Correct.

17 Q    You expect to be enrolled full time for two consecutive

18 years; correct?

19 A    Full time?  Some semesters are part time, some are full

20 time.

21 Q    You expect to complete the program in two years; correct?

22 A    Yes.

23 Q    You testified before your stepfather is paying the entire

24 tuition; correct?

25 A    Yes.

1  Q    You do expect to have a job as a nurse when you graduate;
2  correct?

3  A    Correct.

4  Q    Isn't it true that you believe the average starting salary
5  for a nurse is $35,000.00 a year?

6  A    Approximately, yes.

7  Q    Isn't it true that with additional education beyond the
8  two-year program in your belief there are opportunities to
9  increase your income beyond $35,000.00?

10  A    Yes.

11  Q    Isn't it true that you continue to -- that you expect to
12  continue to live with your stepfather while you attend nursing
13  school?

14  A    That's not definite.

15  Q    If I can refer you to Page 36 of your deposition.

16  A    Yes.

17  Q    Isn't it true that when you were asked, "Are you going to
18  continue to live with your stepfather while you attend nursing
19  school?" your answer was "yes"?

20  A    Yes.

21  Q    You never corrected that answer, is that true?

22  A    No, I did not.  Things have changed.

23  Q    Excuse me?

24  A    Things have changed in the last few months, but I did not
25  change the deposition, no.

1    Q    Your deposition was in July; correct?

2    A    Yes.

3         MR. FOGELMAN:  Your Honor, at this time I would seek

4    to introduce Government's Exhibits 22, 23, 24, and 25.

5    Exhibits 22, 23, and 24 are statistics from the Department of

6    Labor.  These statistics show that the annual mean salary for a

7    registered nurse is $53,640.00, that in Albany the mean is

8    $50,560.00, that in New York the mean salary is $70,280.00.

9    We'd like to ask the Court to take judicial notice of these

10   documents.  They are statistics that are publicly accessible on

11   a web site which we have provided a citation for in our

12   pretrial brief.  Ms. French has testified as to what her belief

13   is in terms of how much she would make in salary and that's

14   uncorroborated testimony.  We'd like to offer this as a

15   different analysis of --

16        THE COURT:  Well, are you offering this in connection

17   with the testimony of this witness?  Do you want to show these

18   to this witness?

19        MR. FOGELMAN:  I'd be happy to show them --

20        THE COURT:  No, I'm not telling you how to put them

21   in.  Why don't you finish -- if these are documents simply that

22   you want to put in the record having no direct relationship to

23   the testimony of this witness, then I'll hear that as a

24   separate matter.  I just want to understand where we are.

25   Q    Well, let me ask briefly, Ms. French, if you could please

1   look at Exhibits 22, 23, and 24 and let me know if you've ever

2   seen these documents before.

3   A    I just saw them recently when you submitted them last

4   week.  So yes, I have seen them.

5             MR. FOGELMAN:  Your Honor, I don't have any direct

6   questions --

7             THE COURT:  All right.

8             MR. FOGELMAN:  -- for the witness in this regard.  I

9   seek to admit them for the Court --

10            THE COURT:  Solely -- but you seek to admit them

11  solely as documents that I can take judicial notice of.

12            MR. FOGELMAN:  Yes, Your Honor.

13            THE COURT:  All right.

14            MS. EDWARDS:  Your Honor, the plaintiff objects to

15  you taking judicial notice of these documents because under

16  Hunter v. New York you're not required to take judicial notice

17  of documents, judicial notice of facts, especially those that

18  like these are not facts commonly known in this jurisdiction.

19  Although the defendant's cites to the web sites are in his

20  pretrial brief, it is our position that the figures listed in

21  those web sites are irrelevant as this particular plaintiff has

22  not expressed any desire to work in New York City, or is not

23  planning, or she has not testified she planned to move to New

24  York City.  So for instance, Paragraph 34 I believe it is lists

25  the mean wage of registered nurses in New York City is

1    irrelevant to this case, as are some of the other items of fact

2    that the Government wishes you to take judicial notice of.

3              THE COURT:  All right.  There are two objections.

4    One is that I can't take judicial notice of the document

5    properly, and secondly, that they involve New York City rather

6    than Cohoes where she's now living.  Are those the two

7    principle objections?

8              MS. EDWARDS:  On these particular documents?

9              THE COURT:  On these three documents.  All right.

10             MS. EDWARDS:  That's correct, Your Honor.

11             THE COURT:  Counsel?

12             MR. FOGELMAN:  Your Honor, the witness has lived in

13   New York before.  It's certainly not out of the question that

14   she would move back to New York.  She's testified as to some

15   uncertainty as to where she would live in the future.  So we

16   think the New York numbers are at least relevant to this

17   Court's analysis.  These are documents, these are statistical

18   documents that are available to the public.  They are published

19   by the Department of Labor.

20             THE COURT:  What I'm going to do is to reserve on

21   these documents and I'd like the Government in its post trial

22   brief, if it's not in your pretrial brief, to give me authority

23   on taking judicial notice of these documents and the plaintiff

24   can give me authority to the contrary.  I do think that these

25   documents seem to include information on the Albany,

1   Schenectady, Troy area as well as New York City.  At least I

2   see Exhibit 23 as including that area.  Exhibit 24 includes New

3   York and it seems to be New York, New York.  I can obviously

4   tell the difference between the capital area and New York City.

5        MS. EDWARDS:  That is correct, Your Honor.  Those

6   documents also deal with mean salaries though, and so we will

7   fully brief in our post trial the problem with using a mean

8   salary which is predicated on years of experience, et cetera.

9        THE COURT:  All right.

10        MS. EDWARDS:  Not a starting salary.

11        THE COURT:  All right.  Thank you.  So I'm going to

12   reserve on admitting these particular documents, but I'll take

13   them.  Obviously they're in the documents that I have.

14        MR. FOGELMAN:  Thank you, Your Honor.

15   BY MR. FOGELMAN:

16   Q    Jaya's father is Rafael Garcia; correct?

17   A    Yes.

18   Q    He lives in Washington Heights at West 185th Street;

19   correct?

20   A    Yes.

21   Q    You stopped talking to him in February of 2001; correct?

22   A    Yes.

23   Q    Since that time you've only spoken with him twice;

24   correct?

25   A    Yes.

1  Q    That was in September 2001 and again in December of 2001;

2  correct?

3  A    Yes.

4  Q    So you haven't talked to him since December of 2001;

5  correct?

6  A    Correct.

7  Q    He does not give you any money to help support Jaya;

8  correct?

9  A    Correct.

10  Q    In fact, you've never asked him for money to help support

11  Jaya; correct?

12  A    Correct.

13  Q    You've never filed a lawsuit against him to obtain child

14  support; correct?

15  A    Correct.

16  Q    You've been living in Cohoes since May 2004 with your

17  stepfather; correct?

18  A    Correct.

19  Q    Isn't it true that your stepfather has offered for you to

20  continue living with him as long as you would like?

21  A    He did offer that, yes.

22  Q    You testified before that your stepfather writes you a

23  check for $270.00 a week; correct?

24  A    Yes.

25  Q    You use those funds to pay for groceries and other

1  necessary expenses; correct?

2  A     Yes.

3  Q     Isn't it true that your father pays the Con Ed bills on

4  the house?

5  A     Yes.

6  Q     Excuse me, your stepfather.  Isn't it true that your

7  stepfather pays for the maintenance of the house?

8  A     Yes.

9  Q     Isn't it true that your stepfather pays for the

10  electricity on the house?

11  A     Yes.

12  Q     Isn't it true he pays for the telephone?

13  A     Yes.

14  Q     Both local and long distance; correct?

15  A     Yes.

16  Q     He also pays for the heat and hot water; correct?

17  A     Yes.

18  Q     Your stepfather also pays for the cable television and

19  high speed modem; correct?

20  A     Yes.

21  Q     Isn't it true that your stepfather has given you a credit

22  card for your personal use?

23  A     For necessity, yes.

24  Q     Isn't it true that you've had dental expenses of $1,200.00

25  in the past year?

1   A    I don't understand the question.

2   Q    Isn't it true that you have had dental expenses --

3   A    Oh, dental.  I thought you said ample.

4   Q    Oh.

5   A    Dental, yes, I have.

6   Q    Isn't it true that you used his charge card to pay for

7   those expenses?

8   A    Yes.

9   Q    So in fact, your stepfather has paid for those costs;

10  correct?

11  A    Most of them.  It was broken up I think in one of the

12  expenses I may have paid when I had money from the life

13  insurance policy of my mother as well.  But yes, all that money

14  was from him anyway, so yes, he has.

15  Q    Isn't it true that you had no other out-of-pocket medical

16  or dental bills?

17  A    Yes.

18  Q    Your stepfather has been paying for the day care; correct,

19  for Jaya?

20  A    As of lately, yes.

21  Q    Your cell phone bill is $80.00 a month; correct?

22  A    Yes.

23  Q    That bill is currently paid by your stepfather; correct?

24  A    Yes.

25  Q    Isn't it true that you never called Cingular to inquire

1  about whether you could switch to a less expensive plan?

2  A    I have since and I'm under contract for another seven

3  months.   [inaudible] testified that I didn't call them.

4  Q    So is it true at the time of your deposition that you

5  hadn't called Cingular to inquire about whether you could

6  switch to a less expensive plan?

7  A    Yes.

8  Q    You currently drive a Volkswagen Jetta; correct?

9  A    Correct.

10 Q    There's a $300.00 a month lease on that that's paid for by

11 your stepfather; correct?

12 A    Correct.

13 Q    Your stepfather is also paying the car insurance; correct?

14 A    Correct.

15 Q    Your stepfather pays for the gas; correct?

16 A    Yes.

17 Q    Other than gas, you have no transportation expenses;

18 correct?

19 A    Correct.

20 Q    Isn't it true that you expect your current financial

21 arrangement to remain in place while you continue your

22 schooling?

23 A    It's unclear whether I will continue living together for

24 the rest of my school.  We have discussed the possibility of

25 not doing so.

1  Q    I'd like to refer you to Page 59 of your deposition.  Just

2  tell me when you have it.

3  A    Okay.  I have it.

4  Q    Isn't it true that -- I'll bring you to Line 17, when you

5  were asked, "Do you expect the current financial arrangement to

6  remain in place while you continue your schooling?" your answer

7  was yes?

8  A    At that time it was yes.

9  Q    Isn't it true that your stepfather earns $70,000.00 to

10 $100,000.00 a year?

11 A    That's his past history.  The past history has been

12 $70,000.00 to $100,000.00 a year.

13 Q    Isn't it true that you don't expect that you'll have any

14 debts, aside from the student loan debt, isn't it true that you

15 don't expect that you'll have any debts following this

16 bankruptcy proceeding?

17 A    I expect so.  I expect so.

18 Q    Do you expect that Jaya will start kindergarten in fall of

19 2006?

20 A    Yes.

21 Q    Do you expect that she'll attend public school?

22 A    Yes.

23 Q    Do you expect that that will cut down on your day care

24 expenses?

25 A    I'm not sure yet.

1  Q    As you testified before, you attended school

2  intermittently from '85 to '90; correct?

3  A    Yes.

4  Q    Isn't it true that student loans, you took out student

5  loans to help pay for the cost of the schools; correct?

6  A    Right.

7  Q    Isn't it true that you consolidated your loans in 1999?

8  A    Yes.

9  Q    Isn't it true that you had not made payments on your

10 student loans from the time you took them out through 1999 when

11 you consolidated them?

12 A    Yes, it's true.

13 Q    If I could refer you to Exhibit 7, please.  Is this the

14 application and promissory note that you filled out for the

15 consolidated loans?

16 A    Yes, it is.

17 Q    On Page US0003, is that your signature on the bottom of

18 the page?

19 A    Yes, it is.

20 Q    You checked the box on this form for graduated; correct?

21 That's on the same page, US3.

22 A    Yes.

23 Q    Isn't it true that you don't recall making a choice about

24 what type of payment plan you wanted?

25 A    I didn't recall what went into that decision at the time

1  you asked me, no.

2  Q    Isn't it true that you received billing statements from

3  the Department of Education on a regular basis?

4  A    Yes.

5  Q    Isn't it true that you made payments on your student loans

6  from the time you consolidated them until around the time that

7  you stopped working at Joe's Public in December 2001 or

8  January -- excuse me, December of 2000 or January of 2001?

9  A    Yes.

10 Q    Is it true that you had a deferment from February of 2001

11 through September 19, 2001?

12 A    September 2002?  Yes.

13 Q    It's true that your first deferment was from February 8,

14 2001 through September 19, 2001?

15 A    The first deferment?  I'm sorry, could you repeat that?

16 Q    Is it correct that your first deferment was from February

17 8, 2001 through September 19, 2001?

18 A    I believe so, yes.

19 Q    Is it true that because of 9/11 there was a forbearance

20 from October 28, 2001 through January 28, 2002?

21 A    Yes.

22 Q    Is it true that you sought a second deferment and you

23 obtained a second deferment from February 27, 2002 through

24 September 11, 2002?

25 A    Yes.

1  Q    Isn't it true that at the time that you applied for your
2  second deferment you understand that it could last for no more
3  than six months, the deferment?
4  A    Yes.
5  Q    Isn't it true that from the time -- excuse me, towards the
6  end of 2002 until the time you filed for bankruptcy in 2004 you
7  did not make any efforts to obtain a deferment on your loans?
8  A    That is true.
9  Q    Isn't it true that from towards the end of 2002 until the
10 time you filed for bankruptcy in 2004 that you did not make any
11 efforts to obtain a forbearance on your loans?
12 A    That's true.
13 Q    Isn't it true that from towards the end of 2002 until the
14 time you filed for bankruptcy in 2004 you did not look into
15 whether you could change your payment option on your student
16 loans?
17 A    True.
18 Q    Isn't it true that you did not seek a deferment because,
19 as you put it, you just avoided it?
20 A    That's part of the reason, yes.
21 Q    Isn't it true that you were throwing away the statements
22 you received from the Department of Education at that time
23 instead of saving them?
24 A    Yes.
25 Q    Referring you to Exhibit 10, is that a fair depiction of

1    the payments that you made on your student loans?

2    A    Yes.

3    Q    Let me put the document aside.  Isn't it true that at the

4    time of your deposition you didn't recall discussing standard

5    repayment plan with the Department of Education?

6    A    That is true.  I did not remember.

7    Q    Do you remember now discussing with the Department of

8    Education a standard repayment plan?

9    A    I still do not remember the discussion, no.

10   Q    Do you recall ever discussing with the Department of

11   Education the extended repayment plan?

12   A    No.

13   Q    Do you recall ever discussing with the Department of

14   Education a graduated repayment plan?

15   A    I just wanted to ask -- I'm sorry, do you mean after the

16   deferment or when I consolidated?

17   Q    At any point do you recall speaking with the Department of

18   Education about the graduated repayment plan?

19   A    I now recall speaking about plans when I consolidated, but

20   I don't recall the details or how I came to the decision.

21   Q    Do you have any specific recollection about discussing the

22   income contingent repayment plan at any point with the

23   Department of Education?

24   A    Specific recollection?

25   Q    Yes.

1    A     No.

2    Q     Isn't it true that you had a credit card from Barney's of

3    New York from October 2000 through late 2002?

4    A     Yes.

5    Q     You purchased clothes from Barney's; correct?

6    A     Correct.

7    Q     You consider Barney's to be a luxury store; correct?

8    A     Yes.

9    Q     At the time you filed for bankruptcy you owed Barney's

10   $2,391.00; correct?

11   A     Correct.

12   Q     Isn't it true that in September 2004 you spent $487.00 for

13   a video camera to videotape your daughter?

14   A     Correct.

15   Q     I'd like to turn your attention to Exhibits 12 and 13.  I

16   note these documents have not been put into evidence.  They are

17   objected to.  But before offering to move them into evidence

18   I'd like to ask the witness if she could first please identify

19   first Exhibit 12.

20   A     It's a Citibank statement, checking account statement.

21   Q     Can you please look through them and let me know if these

22   are fair and accurate copies of the Citibank statements that

23   they represent?

24   A     They appear to be, yes.

25   Q     For Exhibit 13, are these fair and accurate copies of

1  statements from Trustco Bank?

2  A     They appear to be, yes.

3            MR. FOGELMAN:  Your Honor, at this time I'd seek to

4  move these two exhibits into evidence.  The Government is using

5  these exhibits for the purpose of demonstrating expenses that

6  Ms. French had in recent years.  The plaintiff has opened the

7  door on direct claiming that she lives a very somewhat frugal

8  lifestyle and we'd submit that these expenses are to the

9  contrary.

10           MS. EDWARDS:  Our objection stands, Your Honor, under

11 relevance.  I understand the Government's argument but

12 plaintiff argues that at least for the Citibank bank records,

13 these are records that are dealing with a time period prior to

14 even when the plaintiff filed for bankruptcy which is in

15 February of 2004.  What she did up until that point we would

16 argue is totally irrelevant.  The whole point of the Bankruptcy

17 Code is for debtors to get a fresh start.  So what her spending

18 patterns were back then aren't of any relevance to this

19 particular proceeding because what the plaintiff has to prove

20 here today is undue hardship which has to do with her current

21 standard of living and the state of affairs as they are today

22 and how they'll be going into the future.

23           THE COURT:  Well, the Bruner test is a little broader

24 than you've describe it.  Ms. French, these two exhibits are

25 copies of your personal checking accounts?

1              THE WITNESS:  Yes, they are.

2              THE COURT:  All of the expenses that are shown on

3    these exhibits are your personal expenses as opposed to

4    expenses of your stepfather or other parties?  Yours and your

5    daughter's?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  Objection overruled.  We'll

8    admit them for what they're worth.

9       (Bank Records, Government's Exhibits 12 and 13, Received)

10             THE COURT:  You certainly can cross examine if you

11   wish with regard to the documents, and you can certainly make

12   whatever argument is appropriate with regard to their relevance

13   or their significance.

14   Q    Ms. French, I'd like to turn your attention to Exhibit 13.

15   A    Okay.

16   Q    On the second page the charge for 487 to Circuit City,

17   that was for the video camera --

18   A    Yes, it was.

19   Q    -- to videotape your daughter; correct?

20   A    Yes, it was.

21   Q    Referring you to also Exhibit 13, Page 221.  Isn't it true

22   that this document shows that you bought a pair of boots for

23   $221.00 November of 2004?

24   A    221?

25   Q    Yes.

1   A     All right.  Okay.  Yes.

2   Q     I'm referring you to French Exhibit 13, French 217, the

3   document.  Isn't it true that you spent $192.99 for hair

4   coloring in or around January of 2005?

5   A     Yes.

6   Q     That was after you filed for bankruptcy; correct?

7   A     Yes.

8   Q     Referring you to Exhibit 12, the page French 2.

9   A     2?

10  Q     French 2.

11  A     Okay.

12  Q     Page 2 of 8 of a statement from September 4th --

13  A     Okay.

14  Q     -- to October 2, 2003.  Isn't it true that you spent

15  $81.47 for one pair of shoes from David Z?

16  A     Yes.

17  Q     Referring to French 121 which is closer to the beginning

18  of that.  That's the third page in of Exhibit 12.  Isn't it

19  true that this shows that you had a membership for a year in

20  the New York Sports Club?

21  A     Yes.

22          MR. FOGELMAN:  I have nothing further.

23          MR. ROLDAN:  I'll be short, Your Honor.

24          THE COURT:  It's all right.  Take your time.

25                    CROSS EXAMINATION

1   BY MR. ROLDAN:

2   Q    Renee, if I may refer you to deposition transcript Page

3   159.  Do you still have that book in front of you?

4   A    I'll get it in front of me.  Page 159?

5   Q    Yes.

6   A    Okay.  I'm here.

7   Q    The second line in Page 159 where it says, "Was that work

8   secretarial?"

9   A    Yes.

10  Q    You answered yes; is that correct?

11  A    I did answer that.

12  Q    Can you tell us what you meant at the time?

13  A    I think I wasn't paying attention at the time and I don't

14  know what I meant.  I think I just answered yes.  I went on to

15  elaborate a little bit farther about the personal errands and

16  shopping which is not secretarial, but I think I just quickly

17  said yes.  I wasn't paying enough attention.

18  Q    Okay.  Would you say right now if somebody asked you right

19  now if you did secretarial work for John Loray --

20  A    I would say no.

21  Q    Renee, during the time period November 2004, from November

22  2204 to May 2005 was Jaya in day care?

23  A    Yes, she was.

24  Q    Renee, what happened in December of 2004?

25  A    My mother died.

1  Q    What did you do after she died?

2  A    I dealt with her affairs and the aftermath of her death,

3  and I grieved.  I also addressed my medical issues and had the

4  surgeries.

5  Q    During this time period November 2004 to May 2005, was

6  Jaya in part time or full time day care?

7  A    Part time initially and then she switched to full time.

8  Q    When did she switch to full time day care?

9  A    I believe it was January 2005.

10  Q    Why did you switch Jaya to full time day care?

11  A    Because I was not parenting well.  I thought it was better

12  for her, it was healthier for her to be in day care and it

13  allowed me to take care of the things related to my mother's

14  death.

15  Q    Can you explain further why you say you weren't parenting

16  well?

17  A    I was just distraught and grieving dysfunctionally.  I

18  didn't feel like it was healthy for her to be with me longer

19  than she had to really.

20  Q    Okay.  Renee, it's true, isn't it, you never filed a

21  lawsuit against Rafael Garcia for child support?

22  A    That is true.

23  Q    Why have you not sued Mr. Garcia?

24  A    I know he has no income.  If he does have any money it's

25  from selling drugs, as I had mentioned.  I feel he's unsafe.  I

1  don't want him in my daughter's life.  I feel like if I did

2  attempt to do it, it would only be a burden of a taxpayer.  I

3  know he never paid child support for his other children.  I

4  heard through a mutual acquaintance that he was ordered to pay

5  child support to another child --

6          MR. FOGELMAN:  Objection.  Your Honor, if I may, to

7  the extent that the witness is relating hearsay testimony, I'd

8  ask that it be stricken.

9          THE COURT:  Sustained.

10          MR. ROLDAN:  May I respond to that, Your Honor?

11          THE COURT:  Yes.

12          MR. ROLDAN:  Your Honor, the witness is explaining

13  why she hasn't sued Mr. Garcia for rent [sic].  We're not

14  offering as testimony that he is or is not paying child

15  support.  This is her own impression as to why she didn't sue

16  him.

17          THE COURT:  All right.  For the limited purpose of

18  her state of mind.

19  A    Okay.  I did hear that he was ordered to pay approximately

20  $30.00 a week for one child and he was court ordered to go to

21  vocational school because he had no skills, which I heard that

22  he didn't do.  I feel like if he was brought to Court again he

23  would just be put in jail for evasion of child support.  There

24  are many children that he would be ordered to pay and he has no

25  income.

1  Q    You mentioned that you were afraid it was unsafe or he was

2  unsafe.  Can you please elaborate on that?

3  A    The fact that he sells drugs and is a drug user is not

4  somebody that should be near a child.

5  Q    Okay.  Renee, you testified that your stepfather paid for

6  the following bills; Con Edison, maintenance, electricity,

7  telephone, water; is that correct?

8  A    Correct.

9  Q    Do you know what your stepfather pays in Con Edison bills?

10 A    I think it's about an average of $350.00 a month.  It

11 varies per season.

12 Q    Do you know what he pays in maintenance?

13 A    Not offhand.  Maybe $1,000.00 a year for the home.

14 Q    Do you know what he pays in electricity?

15 A    That's part of the Con Ed.  That's electricity and heat.

16 Q    Right.  Do you know what he pays in telephone?

17 A    Telephone?  We have a cable.  It's part of the cable

18 phone.  It's $140.00 for cable, RoadRunner and telephone.

19 Q    Do you know what he pays in water?

20 A    I don't offhand.  There's a separate water bill for the

21 city but I don't recall the amount.

22 Q    Did you testify earlier that you and your stepfather

23 intend to move out of that house?

24 A    We are in the midst of discussing what we should be doing

25 in the future, yes, and the possibility of selling the house.

1  Q    Did you testify earlier that you intend to not live with

2  him after you sell this house?

3  A    Yes.

4  Q    Renee, if you do not live with him, who will pay for Con

5  Edison bills?

6  A    In my new residence?

7  Q    For where you live, right.

8  A    I would have to find a way to pay those bills.  I'd have

9  to find a way to move out independently.

10 Q    Who will pay for your telephone bills?

11 A    I will.

12 Q    Who will pay for your cable bills?

13 A    I will.

14 Q    Who will pay for your water?

15 A    I will.

16 Q    Do you know what you would pay in terms of utilities when

17 you live alone?

18 A    I would guess an average of $200.00 a month for an

19 apartment.

20 Q    Do you know what you'd pay for cable were you to live

21 alone?

22 A    I would probably have the combined telephone with cable

23 which is like $140.00 for all [inaudible].

24 Q    Renee, you testified that Jaya will eventually go to

25 kindergarten; is that correct?

1  A     Correct.

2  Q     And she'll eventually go to public school; is that

3  correct?

4  A     Correct.

5  Q     Do you anticipate working at this period of time when

6  she's in either kindergarten or public school?

7  A     I'll still be in school when she's in kindergarten.  I do

8  anticipate working throughout the rest of her school years,

9  yes.

10 Q     Do you anticipate being able to take her to her

11 kindergarten classes?

12 A     I'll either have to have before school care or after care,

13 and that's unknown what my hours will be but they won't be

14 school hours.

15 Q     What is before school care?

16 A     I don't know.  I would imagine it's finding a baby-sitter

17 who can come and take care of the child for the morning and

18 breakfast and bringing her to school.

19 Q     What is after school care?

20 A     After school care, sometimes there are programs in certain

21 school districts.  I'm not sure about all the school districts

22 in the capital region.  I'm not sure of the hours yet.

23 Q     Do you know anybody who you'd be able to count on, rely on

24 to watch Jaya so that you don't have to hire before school care

25 or after school care?

1   A     No.  I'll always have to pay for child care.

2   Q     Do you have any idea how much before school care may cost

3   per hour?

4   A     I don't know yet, no.

5   Q     Do you have any idea how much after school care would cost

6   per hour?

7   A     I do not know that yet.

8            MR. ROLDAN:  No further questions, Your Honor.

9            THE COURT:  All right.

10           MR. FOGELMAN:  We have nothing further, Your Honor.

11  We submitted the declaration of Lola Hahn.

12           THE COURT:  Well, just one second.  Nothing further

13  for the witness.  Thank you very much, Ms. French.

14           THE WITNESS:  Thank you very much as well.

15           THE COURT:  You may step down.  You can leave the

16  documents there.

17           THE WITNESS:  Okay.  Thank you very much.

18           THE COURT:  All right.  We're still in plaintiff's

19  case.  Does plaintiff have any further evidence?

20           MR. ROLDAN:  No further evidence, Your Honor.

21           THE COURT:  All right.  Now, for the defendant.  We

22  have admitted the declaration of Ms. --

23           MR. FOGELMAN:  Ms. Lola Hahn.

24           THE COURT:  Ms. Hahn?

25           MR. FOGELMAN:  Yes.  We would like, even before

1  reaching the defense case in chief to move for a judgment,

2  partial findings pursuant to Rule 52.

3             THE COURT:  I'll reserve on that.

4             MR. FOGELMAN:  Thank you, Your Honor.

5             THE COURT:  Now for your case in chief.

6             MR. FOGELMAN:  For our case in chief, Your Honor, we

7  do rely upon, with the consent of the plaintiff, upon the

8  declaration of Ms. Hahn.

9             THE COURT:  And the exhibits attached thereto?

10            MR. FOGELMAN:  And the exhibits attached thereto,

11 Your Honor.

12            THE COURT:  All right.  Those have been admitted.

13 Anything further for the Government's case?

14            MR. FOGELMAN:  No, Your Honor.

15            THE COURT:  All right.  Anything further then for the

16 plaintiff?

17            MR. ROLDAN:  No, Your Honor, just the closing

18 arguments.

19            THE COURT:  All right.  Well, I can take closing

20 argument.  I would suggest they be brief because I'm giving

21 both parties an opportunity to put in further pleading or

22 further memoranda if they wish or findings and conclusions.  I

23 have the Government's.  The Government need not put in anything

24 further.  If you want to put in transcript references if you're

25 going to purchase the transcript, that obviously would be fine,

1  or anything further that the Government wishes to put in.

2          Mr. Roldan, I know you wish to put in findings and

3  conclusions or memorandum.  How much time would you like?

4          MR. ROLDAN:  Your Honor, we will be ordering a

5  transcript, so I'd request 30 days after the date we receive

6  the transcript.  I don't know -- we'll order an expedited

7  transcript.

8          THE COURT:  Well, I don't -- obviously you can

9  discuss that with your client, but I'm not requiring that.  I

10 don't know how long it takes to get a transcript under normal

11 circumstances.  We now have a new system.  But I certainly

12 don't urge you to go to the expense of ordering on an expedited

13 basis unless there's some reason to do so.  I'll leave that up

14 to you.

15         MR. ROLDAN:  Well then, Your Honor, let's --

16         THE COURT:  But still 30 days from the date you get

17 the transcript and I'll give the Government the same time to

18 put in anything further if it wishes to.

19         MR. FOGELMAN:  Thank you, Your Honor.

20         MR. ROLDAN:  Will we have some time thereafter to

21 reply to the Government's response, Your Honor?

22         THE COURT:  I don't think it's necessary.  I'll give

23 you another two weeks I suppose to reply to each other, but I

24 really don't think it's necessary.  So I think if you both put

25 in your cases, I don't think -- you have the Government's brief

1  already, so you can reply to the Government to the extent you

2  wish to.  But I can read the briefs.  I think I know what the

3  issues are.  The Second Circuit's test is well known.  Even if

4  it isn't always simple to apply, the law is what it is and

5  simply needs to be applied to the facts.

6          MR. FOGELMAN:  That's simply 30 days from --

7          THE COURT:  30 days from the date you receive the

8  transcript.  I'll hear any argument you wish to make now but I

9  would suggest you make it very brief.

10         MR. ROLDAN:  I'll be very brief, Your Honor.  This

11  will not be a dissertation on Bruner.

12         Your Honor, as I stated earlier, this is a story

13  about a 39 year old woman with an infant daughter, four year

14  old daughter that she takes care of.  The daughter's father is

15  not in her life.  This case is just about getting this Renee

16  French, our client, a fresh start.

17         We submit that we've proven our case that the debtor

18  has -- currently she has no assets right now and we've

19  established what her expenses are right now as well.  Renee has

20  no income.  She used to receive about $269.00 a week in

21  unemployment.  This is when she -- it was after she was fired

22  from her latest job in I believe 2004.  Now she received

23  $270.00 a week from her stepfather just to match what she used

24  to make in unemployment.

25         For various reasons, the plaintiff cannot rely on her

1  stepfather.  He has certainly been generous with providing the

2  plaintiff with money to cover expenses but he's got no

3  obligation to do so.  The stepfather doesn't have any excess

4  money.  He helps Renee out by taking money out of his own 401K

5  account.  He only offers this to Renee because Renee has been

6  taking care of household tasks since the passing of her mother

7  and his wife.  The stepfather has two of his own children and

8  is currently paying the mortgage on his house which he will

9  probably sell.  Renee plans on moving out.  She and her

10  stepfather have talked about this.

11        Renee cannot count on her daughter's father for child

12  support.  Rafael Garcia has multiple children with different

13  mothers.  He lives with his extended family.  He did not have a

14  job while they dated.  She doubts whether he ever had a job.

15  He deals drugs.  She understands he has no education, not even

16  high school.  Thus Renee has no money to pay for child care

17  expenses or for such basic needs as her own apartment and the

18  later living expenses, let alone the obligations, her loan

19  obligations right now.  The evidence shows that were she to get

20  a job right now, her wages would almost all be used up in day

21  care or baby-sitting expenses.

22        Now Your Honor, additional circumstances exist to

23  indicate that this state of affairs is likely to persist.

24  Renee's salary after nursing school -- we don't know what her

25  salary will be although Renee has testified that nurses at her

hospital make approximately $16.00 an hour.  We won't find out

until the fall of 2007 which is quite some time away.  Beyond

that, Renee has --

THE COURT:  Well doesn't the Bruner test require that

additional circumstances exist now indicating that she will not

be able to maintain a minimal standard of living if forced to

repay the loans.  So the Bruner test requires us to do a

certain amount of speculation as to the future.  She's going to

nursing school for a reason, that is to improve her standard of

living and to improve her current situation.  What additional

circumstances now exist to indicate that she will not be able

to repay the student loans in the future?

MR. ROLDAN:  Well, Your Honor --

THE COURT:  In the indefinite future.

MR. ROLDAN:  Your Honor, other than her nursing

school education which she's receiving right now, she doesn't

have any marketable skills.  She has no college degree.  This

is an Associate's RN degree she's studying for.  Film is not an

option because she is not an actress.  She was in that one film

basically because she knew the director.  Production assistant

work is not an option.  She testified as to why she doesn't

look for that type of work anymore.  There aren't any

opportunities in Cohoes.  Plastering work is not an option.

She had approximately -- I think she testified she had

approximately ten of these in her life and that she's had no

1  formal training, and still no opportunities in Cohoes.  Her

2  other skill is restaurant management.  Restaurant in Cohoes are

3  completely different than the restaurants in New York.  She's

4  testified as to that.  She's testified the managers at these

5  restaurants require some sort of training and these restaurants

6  tend to be chain restaurants.  Additionally, she applied to

7  these restaurants and she got no interviews.

8        Your Honor, she does have a daughter she must care

9  for.  Her daughter will have a day care expense.  She'll have

10  preschool expenses, after school expenses.  Right now Jaya's

11  day care is $195.00 a week and Renee doesn't know anybody who

12  could care for Jaya other than a baby-sitter who she has to

13  pay.

14        Renee did testify in her deposition that she didn't

15  file this adversary proceeding on the basis of any medical

16  condition but it doesn't mean that these conditions don't

17  exist.  It doesn't mean that she's completely healthy.  She has

18  testified to two foot surgeries and complications with her foot

19  surgery and eyelid surgery.

20        Finally, Your Honor, it's not disputed that Renee has

21  made certain payments to repay her loans.  Not disputed that

22  she consolidated her loan sometime in 1999 and paid

23  approximately $3,300.00 toward her loans.  It's not disputed

24  that she has sought two deferments and she has also received an

25  administrative forbearance.  It's not disputed that she was

1  formerly a drug addict.  Additionally, Renee has testified that

2  the reason why she filed for bankruptcy was because there was a

3  lean on her account placed there by a credit card company.

4         You must remember, Your Honor, that Renee testified

5  that in September 2002 simultaneously her roommate moved out,

6  her second deferral ended and her mother had just been

7  diagnosed with cancer.

8         In the meantime Renee has cut back her expenses to a

9  minimum.  She's off the drugs, she doesn't smoke anymore.

10  Substantially all her money goes to caring for her daughter.

11         We conclude, Your Honor.  The plaintiff respectfully

12  submits that Renee has satisfied the standard set forth in the

13  Second Circuit and that her student loan should be discharged.

14         THE COURT:  All right.  Thank you.

15         MR. FOGELMAN:  Your Honor, just very briefly.  We do

16  intend to rely on our papers but just to note to the Court that

17  Ms. French certainly does have good future prospects.  She is

18  in nursing school.  By her own account she expects to make

19  $35,000.00 a year when she gets out of school.  It's only

20  likely to increase over time.  The standard under the Second

21  Circuit is simply not met here.  If Ms. French qualifies for

22  loan forgiveness, there's nothing to say that any single mother

23  who's a registered nurse would be able to qualify.  Sorry.  If

24  Ms. French is correct that her loan should be discharged then

25  there's nothing to distinguish her from any other single mother

1  who is working as a registered nurse.  Certainly not everyone's

2  student loans are discharged in those circumstances.

3          We respectfully rest on our submission, Your Honor.

4          THE COURT:  All right.  Thank you very much.  I

5  appreciate both parties having provided an excellent record.

6  I'll get out a decision as soon as I can after I receive your

7  findings and conclusions.  Thank you very much.

8          MR. ROLDAN:  Thank you very much, Your Honor.

9          MS. EDWARDS:  Thank you.

10          THE COURT:  Thank you.

11                      *  *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I certify that the foregoing is a court transcript from an

2 electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5    _____

6                    Mary Greco

7 Dated:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25