**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re:

RENEE MARIE FRENCH,                              Case No. 04-40365 (ALG)
                                                 Chapter 7
                     Debtor.


---------------------------------------------------------------x
RENEE FRENCH,

                     Plaintiff,                  Adv. No. 04-03060


          -against-

NCO FINANCIAL SYSTEMS, INC. and
THE UNITED STATES OF AMERICA,
DEPARTMENT OF EDUCATION,

                     Defendants.

---------------------------------------------------------------x

**MEMORANDUM OF OPINION**

A P P E A R A N C E S:

DLA PIPER RUDNICK GRAY CARY US LLP
Counsel for the Debtor
  By:  Thomas R. Califano, Esq.
       Vincent J. Roldan, Esq.
1251 Avenue of the Americas
New York, New York 10020-1104

DAVID N. KELLEY
United States Attorney
Southern District of New York
Counsel for the Government
  By:  Lawrence H. Fogelman, Esq.
       Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

This is an adversary proceeding filed by Renee Marie French (the "Debtor") seeking to discharge student loans held by the defendant, the United States Department of Education (the "Government"). On the basis of a one-day trial and extensive briefing by both parties, the Court makes the following findings of fact and conclusions of law. As set forth below, the Debtor has not demonstrated "undue hardship" under § 523(a)(8) of the Bankruptcy Code and her student loans cannot be discharged.[1]

**Background**

At the time of trial, the Debtor was 39 years old and unmarried and had one child, a four year-old daughter named Jaya. The Debtor and her daughter lived with the Debtor's stepfather in the latter's house in Cohoes, New York.

**The Debtor's College Education from 1985 to 1990**

After graduating high school, the Debtor attended the Junior College of Albany, taking classes in English, composition, anthropology, and film history. Before earning any degree, the Debtor transferred to the State University of New York at Albany ("SUNY Albany") where she studied philosophy. The Debtor attended SUNY Albany from the fall of 1986 through the spring of 1988, during which time she took out a student loan from the federal government in the principal amount of $11,071.67. The Debtor eventually stopped going to school and began to work as a waitress in downtown Albany until she moved to New York City in the spring of 1990.

When she arrived in New York City, the Debtor enrolled in The New School, where she studied liberal arts. The Debtor financed her education at The New School with student loans

---

[1] Also before the Court is the Debtor's motion to strike from the Government's post-trial reply brief certain references to disputed facts not contained in the record. The Court has not relied on any of these references for purposes of this decision and need not reach the issues raised in the motion to strike.

2

and financial aid. She took out one student loan from the federal government in the principal amount of $2,772.10 and attended one semester of classes at The New School in the spring of 1990. The Debtor dropped out of The New School after one semester.

**The Debtor's Post-College Employment History from 1990 to 2005**

From the time she left The New School until April 1999, the Debtor made no payments on her student loans. During this time, she worked a variety of jobs, including waitressing, bartending and managing a restaurant and nightclub. Her weekly income from these positions rose from $500 per week in 1990 to $1,000 per week during at least parts of 1994 and 1995. The Debtor was eventually fired from her restaurant and nightclub management position due to a drug problem, which she battled for a period of years before overcoming it in 1997. In October 1998, she secured another restaurant management position paying $1,000 per week.

In April 1999, the Debtor consolidated her student loans and selected the Government's graduated repayment plan, which called for graduated payments of $180-$330 per month through the year 2019. At the time of consolidation, the Debtor owed $19,553.19 on the loan she had taken out in 1987 while at SUNY Albany and $5,049.00 on the loan she had taken out in 1990 while at The New School. The Debtor made twenty consecutive payments in 1999 and 2000, totaling $3,365. The Debtor stopped making payments when she was laid off from her job (due to management cutbacks) in December 2000 or January 2001. She received only severance pay and unemployment benefits, and in or about March 2001, requested and received a deferral of her student loans as a consequence of her unemployment. The Debtor then found a temporary position moving office files for a friend, earning $20 per hour.

In September 2001, the Debtor gave birth to a daughter, Jaya. The Debtor has not been in contact with Jaya's father since December 2001 and claims that he has never given the child or

3

the Debtor any financial support. The Debtor has not pursued Jaya's father for child support because she believes him to have no traceable income and does not want to encourage him to seek involvement in Jaya's life.

After Jaya was born, the Debtor and Jaya subsisted on a $15,000 gift from a friend, occasional assistance from the Debtor's mother and a temporary reinstatement of unemployment benefits authorized by legislation passed in response to the terrorist attacks of September 11, 2001. From October 2001 to January 28, 2002, the Debtor's student loans were in forbearance due to the Debtor's place of residence in the vicinity of the World Trade Center site. At the end of that administrative forbearance, the Debtor requested and received a second unemployment deferral. Around this time, the Government points out, the Debtor purchased a one-year membership to New York Sports Club and incurred a debt to Barney's, a luxury clothing store, that amounted to $2,391 at the time that the Debtor filed for bankruptcy.

In March 2002, the Debtor returned to work part-time for her friend. In or about September 2002, she moved with Jaya to Cohoes, New York to care for her mother who was ill. Four months later, she moved back to New York City, where she worked for a friend, earning $20 per hour. In August 2003, her friend hired her to work full-time as a personal assistant at a salary of $3,500 per month. In April 2004, her employer terminated her without cause. The Debtor moved back to the house of her mother and stepfather in Cohoes and helped care for her mother.

The Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on February 11, 2004. She had $79,747.13 in debt, mostly to credit card companies.

Although the Debtor does not consider herself an actress, in the early 1990's she was hired for a small part in an independent film directed by a friend. In May 2004, the film was

4

finally released. The Debtor earned $500 for one day of shooting plus 1% of the net profits of the film. For her role in the film, the Debtor received $6,924.00 in August 2004, $2,949.00 in March 2005, and $480 in October 2005. Her earnings from the film are continually decreasing because the film is no longer in distribution, although the Debtor has received a modest amount from home video sales, including a $400 payment in October 2005.

From the spring of 2004 through the spring of 2005, the Debtor looked unsuccessfully for restaurant or bar work in the Albany metropolitan area by mailing out approximately twenty resumes. She received unemployment benefits in the amount of approximately $270 per week from July 2004 to January 2005. During this time, the Debtor made several large purchases, including a $487 video camera, a pair of boots for $221, and $192.99 for hair coloring.

The Debtor's mother died in December 2004. The Debtor received nothing from her mother's modest estate, although her stepfather gave the Debtor $4,000 from the proceeds of a life insurance policy on her mother's life. The Debtor used this money to pay living expenses after her unemployment benefits ran out. Since that time, the Debtor's stepfather has been directly and indirectly paying for nearly all of the Debtor's expenses.

**The Debtor's Return to School**

In late 2004, the Debtor decided to attend nursing school. In January 2005, she was accepted into a two-year associate's degree program for registered nursing at Albany Memorial School of Nursing. The Debtor took certain prerequisite courses at Hudson Valley Community College during the summer of 2005 and enrolled at Albany Memorial School of Nursing in the fall of 2005. The Debtor's stepfather pays the Debtor's tuition for nursing school, which ranges from $2,000 to $3,000 per semester.

**The Debtor's Proposed Budget**

The Debtor currently lives with her stepfather, who does not charge her rent and covers most of her living expenses. He also writes her a weekly check for $270, which the Debtor primarily uses to purchase groceries for herself, her stepfather and her daughter. The Debtor testified that her stepfather provides her with the $270 weekly checks as a replacement for the unemployment benefits she had been receiving in the same amount from July 2004 through January 2005.

Provided that her stepfather can maintain his home, the Debtor plans to continue living with him until she finishes nursing school in 2007. The Debtor calculates her expenses to be approximately $1,654.99 per month while living with her stepfather and approximately $2,644.99 per month once she moves into her own apartment, as follows. Because the Debtor lives with her stepfather, her current expenses do not include rent or shared costs for utilities and cable/telephone/internet charges.

| Monthly Expenses | Current | Future |
|---|---|---|
| Cell phone | $   80.00 | $   80.00 |
| Day care | 780.00 | 780.00 |
| Food | 400.00 | 400.00 |
| Medical | 50.00 | 50.00 |
| Transportation | 160.00 | 160.00 |
| Car Insurance | 83.33 | 83.33 |
| Clothing | 41.66 | 41.66 |
| Dining | 40.00 | 40.00 |
| Recreation/Toys | 20.00 | 20.00 |
| Utilities | - | 200.00 |
| Rent | - | 650.00 |
| Cable/Telephone/Internet | - | 140.00 |
| Total | $1,654.99 | $2,644.99 |

When the Debtor's second unemployment deferral ended in or about September 2002, payments again became due on her federal student loans, but she has not made any payments on

6

her loans since that time. At the time of trial, the Debtor's student loan indebtedness was approximately $35,000, inclusive of interest, which accrues at a rate of 8.25 percent per year.

## Discussion

Section 523(a)(8) of the Bankruptcy Code governs the dischargeability of student loans and states in pertinent part that a debtor cannot discharge any debt "for an educational…loan made, insured or guaranteed by a governmental unit…unless excepting such debt from discharge…will impose an undue hardship on the debtor and the debtor's dependents." The Code is silent as to what constitutes "undue hardship."

In *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987), the Second Circuit in a per curiam opinion delineated a three-part test defining "undue hardship" that is controlling here and has been adopted by a majority of the Circuits:

> (1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 396. Each of the *Brunner* factors must be shown by a preponderance of the evidence. See *In re Elmore*, 230 B.R. 22, 26 (Bankr. D. Conn 1999). The threshold for showing undue hardship is a high one and "will not be based simply on the debtor's difficulty in making payments." *Williams v. New York State Higher Education Services Corp. (In re Williams)*, 296 B.R. 298, 302 (S.D.N.Y. 2003). A debtor must satisfy each of the prongs of the *Brunner* test in order to be eligible for a discharge of a student loan.

As discussed below, although it is not clear whether the Debtor satisfies the first *Brunner* prong, the Debtor has failed to satisfy the second and third prongs, and is therefore not entitled to discharge of her student loans.

7

I.   **Whether the Debtor Can Currently Maintain a Minimum Standard of Living While Repaying Her Student Loans**

The first *Brunner* prong examines a debtor's short-term ability to make student loan payments, taking into account the debtor's current income and expenses. As stated above, the Debtor's only taxable income comes from modest royalty payments, which approximated $880 in 2005 but are continually diminishing because the film is no longer in distribution. The Debtor also receives $270 per week ($1,170 per month) from her stepfather, which she uses to cover those expenses that her stepfather does not pay directly. (Transcript of Trial dated November 28, 2005 ("Tr.") at 141, line 22, to 142, line 2.) The Debtor calculated her current expenses to be $1,650 per month.

It is undisputed that the Debtor cannot presently afford to make the monthly payments on her student loans under the graduated repayment plan she selected when she consolidated her loans in 1999. However, the Government argues that the Debtor nevertheless fails the first *Brunner* prong because she can make reduced payments by rehabilitating her loans under the William D. Ford Loan Program (the "Ford Program"), which grants deferrals, forbearances, and loan reorganizations under certain circumstances. See 34 C.F.R. §§ 685.204, 685.205, 685.209 (2006). According to a Government student loan analyst, the Debtor must "rehabilitate" her loans to return to non-defaulted status and could do so over a one-year period by making monthly "reasonable and affordable" payments based on her current income. (Decl. of Lola Ham, ¶¶ 17, 33.) A rehabilitation program allows a debtor who has little or no income to rehabilitate her loans by paying only $5 per month for the duration of the one-year rehabilitation period, and if the debtor successfully rehabilitates her loans, she would then be able to choose from among a variety of repayment, forbearance or deferral plans. (Decl. of Lola Ham, ¶ 17.) According to the Government, if the Debtor is still in nursing school after rehabilitation, she will

8

be eligible for an in-school deferral, during which time no payments would be required. If the Debtor has graduated by the time she completes rehabilitation, she can take advantage of the Government's "income contingent" plan, which assumes a family size of two and allows a borrower to pay a monthly amount adjusted to his or her income level. (Decl. of Lola Ham, ¶¶ 11, 16, 33.)

It is unclear whether the Government would classify the $270 weekly checks that the Debtor receives from her stepfather as "income" in calculating what it would cost for the Debtor to rehabilitate her loans. If the Government did not treat the checks as income and the Debtor were required to pay $5 per month, it would be reasonable to assume the Debtor could pay this small amount. Alternately, if the Government did classify the checks as income, she might be required to pay substantially more. In any event, the Court need not make a determination as to whether the Debtor can afford to rehabilitate her loans, which would necessitate a finding that the Debtor has failed to satisfy the first prong of the *Brunner* analysis. As discussed below, the Debtor has failed to satisfy the second and third *Brunner* prongs and cannot be granted a discharge of her student loan indebtedness.

**II.    The Debtor Has Not Demonstrated Additional Circumstances Indicating That Her Financial Difficulties Are Likely to Continue for a Significant Portion of the Repayment Period.**

Unlike the first *Brunner* prong, the second prong focuses on a debtor's long-term ability to make loan repayments. To satisfy this prong, a debtor must show additional circumstances indicating that the Debtor's current state of affairs is likely to persist for a significant portion of the repayment period. See *Brunner*, 831 F.2d at 396. The District Court in *Brunner* explained that "additional circumstances" may include "illness, a lack of useable job skills, the existence of a large number of dependents, or a combination of these." 46 B.R. at 755 (citations omitted).

9

The Debtor displays none of the "additional circumstances" detailed in *Brunner* that could lead to satisfaction of the second test and a discharge of her student loans. *Id.* The Debtor's career prospects appear good. Her income as a nurse should be sufficient to allow her to pay back her student loans while maintaining a reasonable standard of living for herself and her daughter, taking into account the options with which she can move from bankruptcy and default toward a repayment of her outstanding loans.

The Debtor is enrolled in nursing school full-time and is expected to graduate in May 2007. She will begin working as a registered nurse within a few months of graduation, assuming she passes a New York State licensing exam.[2] Although the Debtor provides no documentary support, she estimates that her starting salary as a registered nurse will be between $16 and $20 per hour (Tr. at 106, lines 2-7), which, based on a 40-hour work week, approximates between $33,240 and $41,600 per year. The Government counters these figures with statistical data indicating that the mean annual wage of registered nurses in the Albany metro area is $50,560.[3] The Debtor disputes the relevance of this statistical data, claiming that it includes nurses with advanced degrees or in senior positions, both of whom receive disproportionately high salaries and artificially raise the average. While this argument has some merit, it is a double-edged sword. As the Debtor rises through the nursing ranks, it is likely that she will command a higher salary. While in the short term, the Debtor may earn less than the average nurse in the Albany

---

[2] Even if she does not pass the exam, she will be able to obtain a slightly lower paying position as a "practical nurse."

[3] The Government relies on the Occupational Employment Statistics, published by the United States Department of Labor, Bureau of Labor Statistics as the source for its figure. See Gov. Ex. 23, citing Bureau of Labor Statistics, November 200X Metropolitan Area Occupational Employment and Wage Estimates available at http://www.bls.gov/oes_5600.htm#b43-0000 (last visited May 25, 2005).

area, in the long term, which the second *Brunner* prong measures, it appears likely that she will gain seniority and experience, with a commensurate increase in salary.[4]

With regard to expenses, the Debtor plans to be living on her own upon graduation from nursing school and anticipates monthly expenses totaling $2,644.99. The Government contends that the Debtor's proposed budget is speculative and inflated, specifically attacking the $780 per month the Debtor has allotted for child care, the $80 per month the Debtor has allotted for a cell phone, and the $140 per month the Debtor plans to pay for a telephone/cable/internet package. Only certain of these expenses appear unreasonable.[5] From an overall perspective, the Debtor should have sufficient income to make payments on her loans in that, as discussed above, the Debtor will be eligible for loan reorganization under a variety of government plans once she rehabilitates her loans. (Decl. of Lola Ham, ¶ 33.) The Government's "income contingent" plan would allow the Debtor to pay a calculated percentage of her loan amount based on her annual gross income. This program would permit the Debtor to maintain an adequate standard of living and repay her loans over time.

At trial, the Debtor summarily dismissed the various loan repayment options, speculating that she would be unable to pay back her loans under any plan. (Tr. at 108, lines 4-22.) The Debtor's statements are conclusory and do not satisfy her burden of proof. See *Mitchell v. U.S. Dep't of Ed.*, 210 B.R. 105, 108 (N.D. Ohio 1996) (a debtor's speculation as to his or her future

---

[4] It is relevant that the Debtor has other marketable skills as well. She has worked extensively in the restaurant business and, for a period, received a salary in the area of $52,000 per year working as a restaurant manager. (Tr. at 126-28, lines 3-6; Gov. Ex. 16, French Dep., at 148-50.) Such work experience may lead to an alternate source of income should the Debtor not complete her current studies.

[5] With regard to child care expenses, the Debtor expects that her daughter will soon begin attending public school but will require child care during the hours in which the Debtor works. While the Government argues that the $780 child care expense in the Debtor's budget is exaggerated, this Court credits the Debtor's testimony regarding the price of child care in the Albany area and the probability that the Debtor's nursing shifts will necessitate before-school and/or after-school care. (Tr. at 159, line 12, to 160, line 7.) However, certain of the Debtor's expenses for internet and telephone service appears too high. See *In re Pincus*, 280 B.R. 303, 317-318 (Bankr. S.D.N.Y. 2002).

11

ability to repay loans does not satisfy their burden of proof under the second *Brunner* prong). In fact, any of the aforementioned repayment plans would increase the Debtor's ability to successfully repay her loans and avoid default. The availability of an array of tailored repayment options supports a finding that the Debtor has failed to satisfy the second *Brunner* prong.

The Debtor has also failed to establish that she should be relieved of her loan obligations under the second prong of *Brunner* because of illness. See *Brunner*, 46 B.R. at 755. The Debtor testified that she suffers from various health problems, specifically with regard to a foot condition that restricts her ability to stand for extended periods of time. (Tr. at 110, lines 3-14.) However, the Debtor also admitted that her ailments would not pose a real obstacle to her future career as a nurse and that her foot condition could be corrected by surgery. (Tr. at 116, line 18, to 117, line 10.) Her testimony established her as a competent, able individual and her ailments do not evidence a serious impairment of her future ability to work and would not be a basis on which to grant her a discharge under the second prong of the *Brunner* test.

**III.    The Debtor Has Not Demonstrated a Good Faith Effort to Repay Her Loans.**

Under the third *Brunner* prong, a court must determine whether a debtor has made "good faith efforts" to repay his or her student loans. *Brunner*, 831 F.2d at 396. In making this determination, courts examine not only a debtor's loan payment history, but also a debtor's efforts to "maximize his income, minimize his expenses, and participate in alternative repayment options." *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265, 274 (Bankr. E.D.N.Y. 1998); see also *In re Pincus*, 280 B.R. at 317.

The Debtor's attempts at higher education ceased in 1990 after she dropped out of The New School. However, she did not make any loan payments or seek deferral or forbearance on her loans until 1999, when she consolidated her loans and subsequently made twenty consecutive

12

monthly payments, totaling $3,365. The Debtor argues that her twenty monthly payments demonstrate good faith. While a history of loan repayment can serve as evidence of good faith, *In re Pincus*, 280 B.R. at 316-17, such a showing is only one factor to be considered in the overall determination whether a debtor made good faith efforts to repay student loans. Here, 20 months of payments over a period of approximately 14 years from 1990 to the Debtor's bankruptcy filing in 2004 do not establish good faith. Moreover, although the Debtor sought out and received two loan deferrals during 2000 and 2002, she has failed to explore further deferral or forbearance options and has also failed to avail herself of any of the Government's loan repayment plans described above. A debtor's failure to avail herself of alternative repayment plans is not per se evidence of a lack of good faith, *Ford v. Student Loan Guarantee Foundation of Arkansas (In re Ford)*, 269 B.R. 673, 677 (8th Cir. B.A.P. 2001), but it can be a significant factor pointing towards such a conclusion, as in the present case. See *In re Pincus*, 280 B.R. at 316; see also *In re Thoms*, 257 B.R. 144, 149 (Bankr. S.D.N.Y. 2001).

The Debtor claims that she rejected debt reorganization as a realistic option out of a belief that repayment under any plan would be impossible. (Tr. at 108, lines 4-22.) However, it does not appear from the record that the Debtor made any attempt to explore reduced repayment options based on her financial circumstances. (Decl. of Lola Ham, ¶ 31.) Such steps would serve as evidence of a good faith effort to determine whether or not debt reorganization was a viable alternative to default.

The Debtor has also failed to establish that she has maximized income and minimized expenses. The Debtor has held a variety of jobs since college, the most lucrative of which was as a restaurant manager. While the Debtor claims she conducted an unsuccessful job search in the Albany area, it was not very extensive even in the restaurant industry. (Tr. at 134, lines 1-5.)

13

See *Archibald v. United Student Aid Funds (In re Archibald)*, 280 B.R. 222, 227 (Bankr. S.D. Ind. 2002); *In re Dolph*, 215 B.R. 832 (6th Cir. 1998). With regard to jobs outside the restaurant industry, the Debtor claims that there were no jobs available to her that would pay more than what it would cost to send her daughter to day care. However, the Debtor has provided no evidentiary support for this claim, and her stepfather has been covering day care expenses. Given the Debtor's varied work experience and skills, her failure to meaningfully broaden her job search beyond the restaurant industry is inconsistent with a finding of good faith. See *In re Kraft*, 161 B.R. 82 (Bankr. W.N.D.Y. 1993).

### Conclusion

For the reasons set forth above, the Debtor has not shown that she will suffer undue hardship as contemplated by the Bankruptcy Code if denied a discharge of her student loans. The Debtor has failed to satisfy the *Brunner* standard and, accordingly, is not entitled to a discharge of her student loans, in whole or in part. The Government shall settle an order on five days' notice.[6]

Dated: New York, New York
      August 31, 2006

                                         /s/ Allan L. Gropper
                                        UNITED STATES BANKRUPTCY JUDGE

---

[6] The Court thanks Debtor's counsel, who represented her on a *pro bono* basis.